## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| URSULA MCGLONE, JASON MCGLONE, JULIA DUNHAM, and K.D. and C.D., minor children by and through their parent and natural guardian Julia Dunham | CIVIL ACTION |
| | Case No. |
| Ohio residents, on behalf of themselves individually and all others similarly situated, | **CLASS ACTION COMPLAINT** |
| | **Jury Demanded** |
| Plaintiffs, | |
| v. | |
| CENTRUS ENERGY CORP. a Delaware Corporation, individually and as successor-in interest to USEC Incorporated, | |
| UNITED STATES ENRICHMENT CORPORATION a Delaware Corporation, | |
| URANIUM DISPOSITION SERVICES, LLC a Tennessee Limited Liability Company, | |
| BWXT CONVERSION SERVICES, LLC a Delaware Limited Liability Company, | |
| MID-AMERICA CONVERSION SERVICES a Delaware Limited Liability Company, | |
| BECHTEL JACOBS COMPANY, LLC a Delaware Limited Liability Company, | |
| LATA/PARALLAX PORTSMOUTH, LLC a New Mexico Limited Liability Company, | |
| FLUOR-BWXT PORTSMOUTH, LLC an Ohio Limited Liability Company, | |
| Defendants. | |

## I.     INTRODUCTION

Plaintiffs Ursula McGlone, Jason McGlone, Julia Dunham, and K.D. and C.D., minor children by and through their parent and natural guardian, Julia Dunham, on behalf of themselves individually and all others similarly situated (collectively "Plaintiffs"), through undersigned counsel, based on their personal knowledge, information and belief, as and for their Class Action Complaint for damages, equitable and injunctive relief against the Defendants respectfully allege as follows:

## II.     NATURE OF THE ACTION

1.     In Pike County, Ohio sits the 3,777-acre Portsmouth Site which has accommodated uranium enrichments operations by Defendants.

2.     What the populace did not know was that the operations at the Portsmouth Site expelled air laden with radioactive material and other metals.

3.     Winds have carried the radioactive materials and other metals throughout the area in such concentrations that radioactive materials and metals can be found deposited in soils and buildings in and around Piketon, Ohio.

4.     On May, 13, 2019 Zahn's Corner Middle School in Piketon was suddenly closed due to health concerns because enriched uranium was detected inside the building. Neptunium-237 was also detected by an air monitor next to the school. The school is approximately two miles from the Portsmouth Site and serves more than 300 students. This incident was the first notification to the community about radioactive materials migrating into populated areas from the Portsmouth Site.

5.     Plaintiffs seek remediation of the radioactive and metal contamination found on their property.

6.      In addition to damages, Plaintiffs petition this Court for injunctive relief to protect Plaintiffs and Class Members from further dangers.

7.      Plaintiffs and Class Members are individuals who have suffered economic losses, property losses, and non-economic damages as the result of Defendants' toxic and radioactive releases. Plaintiffs and Class Members have all suffered in common an array of damages from Defendants' emissions of radioactive material, specifically and as explained in more detail herein.

8.      Plaintiffs' claims do not fall within the scope of the Price-Anderson Act. The Defendants have never received a license to dispose of radioactive materials on Plaintiffs' properties via air dispersion. The method of disposal that has caused harm to Plaintiffs is not and has never been a licensed activity. Furthermore, after conducting due diligence, Plaintiffs have been unable to identify any indemnification agreement between any of the Defendants and the United States government under 42 U.S.C. § 2210 with respect to the complained of activities. Upon information and belief, Defendants have no such agreement.

9.      Plaintiffs expressly contend that the ongoing and continuous releases that resulted in the contamination and that form the basis of this suit are not "nuclear incidents" as that term is defined in the Price-Anderson Act. Plaintiffs' claims are freestanding state law claims concerning traditional state regulation and do not implicate the Price-Anderson Act and its textually manifest concerns related to liability limitation and indemnification.[1]

10.     Alternatively, even if the Price-Anderson Act is determined to apply, state law provides the substantive rules of decision. Irrespective of the Price-Anderson Act's applicability, personal injury standards do not apply for property damage claims. This is an action for property damage claims and not for personal injury.

_____

[1] See *Cook v. Rockwell Intern. Corp.*, 790 F.3d 1088 (10th Cir. 2015)

### III.     PARTIES

#### A.     <u>Plaintiffs</u>

11.     Putative Class Representatives and Plaintiffs Ursula McGlone and Jason McGlone are married, above the age of majority and live approximately two miles from the Portsmouth Site on property they own. Scientific testing shows their property to be impacted with radioactive and toxic materials. They seek damages for loss of use and enjoyment of property, diminution of property value, annoyance, inconvenience, emotional distress, punitive and property damage, including remediation, along with such injunctive and declaratory relief as necessary to protect human health and the environment.

12.     Putative Class Representative and Plaintiff Julia Dunham is above the age of majority and lives approximately four miles from the Portsmouth Site on property she owns. Julia Dunham's property is located within the zone of impact. She seeks damages for loss of use and enjoyment of property, diminution of property value, annoyance, inconvenience, emotional distress, punitive and property damage, including remediation, along with such injunctive and declaratory relief as necessary to protect human health and the environment.

13.     Putative Class Representatives K.D. and C.D. are below the age of majority. Thus, their claims are brought by and through their parent and natural guardian, Julia Dunham. K.D. and C.D. live approximately four miles from the Portsmouth Site. They live within the zone of impact. They seek damages for loss of use and enjoyment of property, diminution of property value, annoyance, inconvenience, emotional distress, punitive and property damage, including remediation, along with such injunctive and declaratory relief as necessary to protect human health and the environment.

#### B.     <u>Defendants</u>

<u>Gaseous Diffusion Plant and Centrifuge Plant Defendants</u>

14.     Defendant Centrus Energy Corp. ("Centrus"), formerly USEC Incorporated ("USEC Inc"), is a Delaware corporation with its principal place of business in Maryland. This action is brought against Centrus Energy Corp., individually, and as successor-in-interest to USEC Inc.

15.     Defendant United States Enrichment Corporation ("USEC") is a Delaware corporation with its principal place of business in Maryland and is a wholly owned subsidiary of Centrus Energy Corp.

<u>Depleted Uranium Hexafluoride Plant Defendants</u>

16.     Defendant Uranium Disposition Services, LLC ("UDS") is a Tennessee limited liability company with its principle place of business in Florida.

17.     Defendant BWXT Conversion Services, LLC ("BWXT") is a Delaware limited liability company with its principle place of business in Kentucky.

18.     Mid-America Conversion Services, LLC ("MCS") is a Delaware limited liability company with its principle place of business in Kentucky.

<u>Environmental Remediation and Waste Management Defendants</u>

19.     Bechtel Jacobs Company, LLC ("Bechtel Jacobs") is a Delaware limited liability company with its principle place of business in Tennessee.

20.     Lata/Parallax Portsmouth, LLC is a New Mexico limited liability company with its principle place of business in New Mexico.

21.     Fluor-BWXT Portsmouth, LLC is an Ohio limited liability company with its principle place of business in Ohio.

**IV.     JURISDICTION**

22. Original jurisdiction of this Court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1332(d)(2). This Court is vested with jurisdiction by virtue of 28 U.S.C. §1332(d). Minimal diversity exists between named Plaintiffs of this putative class action, all of whom are citizens of the State of Ohio, and Defendant Centrus, a citizen of Delaware, its state of incorporation, and Maryland, its headquarters and principal place of business location. The proposed class exceeds 100 persons, and, the amount in controversy exceeds $5,000,000.00.

23. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

## V.    FACTUAL ALLEGATIONS

### A.    <u>Operations at Portsmouth Site</u>

<u>Gaseous Diffusion Plant</u>

24. Located at the Portsmouth Site is the Portsmouth Gaseous Diffusion Plant, or the "A-Plant" as the locals refer to it. In July 1993, the Unites States Enrichment Corporation ("USEC") assumed the uranium enrichment operations at the Portsmouth Gaseous Diffusion Plant and operated the plant until 2001.

25. The primary mode of enrichment was the gaseous diffusion of uranium hexafluoride to separate the lighter fissile isotope, U-235, from the heavier non-fissile isotope, U-238.

26. From 2001 to 2011, USEC was responsible for maintaining the gaseous diffusion plant in a safe configuration. Initially, the process equipment was kept in Cold Standby, capable of restart if the need arose. Eventually, the plant transitioned to Cold Shutdown where systems were permanently disengaged, and equipment prepared for eventual decommissioning.

<u>Depleted Uranium Hexafluoride Conversion Plant</u>

27.     In 2002, Uranium Disposition Services, LLC was contracted to design, build, and operate a Depleted Hexafluoride Conversion Plant ("DUF6 Conversion Plant").

28.     Depleted uranium hexafluoride (DUF6) is a coproduct of the uranium enrichment process that occurred at the Portsmouth Site. The DUF6 Conversion Plant was designed and constructed to convert inventory of DUF6 produced by the Paducah Gaseous Diffusion[2] and the Portsmouth Gaseous Diffusion Plants, to a more stable uranium oxide form for reuse, storage, and/or transportation and disposition. A coproduct of the conversion process is hydrofluoric acid (HF), which is reused industrially. The Portsmouth DUF6 inventory is expected to be processed in approximately 18 years.

29.     In 2010, BWXT Conversion Services, LLC was contracted to operate the DUF6 Conversion Plant at the Portsmouth Site. BWXT was also responsible for continuing cylinder surveillance and maintenance (S&M) services for the inventory of DUF6, low-enrichment uranium hexafluoride (UF6), normal UF6, and other cylinders. The contract was initially scheduled to expire in September 2016 but was extended to accommodate procurement for a new DUF6 operations contract.

30.     In 2016, Mid-America Conversion Services, LLC was contracted to operate the DUF6 Conversion Plant. MCS is responsible for providing cylinder surveillance and maintenance for the DUF6 conversion facility and associated equipment, operating the conversion facility to convert the DUF6 from the inventory at Paducah and Portsmouth to uranium oxide; reusing, storing, transporting and/or and disposing of the DUF6 conversion process end-products; selling the aqueous hydrofluoric acid (AqHF) product; and, providing S&M services for the cylinder storage yards.

---

[2] The Paducah Gaseous Diffusion Plant is located in McCracken County, Kentucky, near Paducah, Kentucky.

Centrifuge Operations

31.     In 2002, USEC Inc. signed a lease for use of centrifuge-related equipment and facilities at the Portsmouth Site.

32.     In 2004, USEC Inc. began operating what is known as the American Centrifuge Lead Cascade Facility ("Lead Cascade"). The Lead Cascade was a test loop which demonstrated the effectiveness of centrifuge design and equipment by processing uranium in a closed loop. In 2016, USEC Inc.'s successor, Centrus, ceased uranium enrichment operations at the Lead Cascade. This was followed by removal of uranium gas from the centrifuges and process piping, dismantling of equipment, and other actions need to ultimately decommission the facility. The Lead Cascade is currently in decommissioning phase.

33.     The Lead Cascade was a test loop for USEC Inc.'s, now Centrus', American Centrifuge Plant ("ACP"). Construction began on the ACP in 2007 and was demobilized in 2009. On January 7, 2019, it was announced that the facility would be opened again and the ACP is currently under construction.

34.     Centrus' centrifuge operations are carried out pursuant to source materials licenses which allow for the possession of radioactive material but do not allow for the disposal of radioactive material via air dispersion on Plaintiffs' properties.

Environmental Remediation and Waste Management

35.     Environmental cleanup at the Portsmouth Site began in 1989, and it continues today. At all materials times to this lawsuit, environmental remediation was and is being conducted.

36.     Between 1997 and 2005 Bechtel Jacobs Company, LLC ("Bechtel Jacobs") was responsible for environmental remediation at the Portsmouth Site.

37.     Between 2005 and 2010 LATA/Parallax Portsmouth, LLC ("LATA/Parallax") was responsible for environmental remediation at the Portsmouth Site. LATA/Parallax was responsible for groundwater and soil remedial actions, removing legacy waste, decontamination and decommissioning (D&D) facilities, highly enriched uranium disposition, operating the site waste storage facilities, and surveillance and maintenance activities, as well as other activities.

38.     From 2010 to present Fluor-BWXT Portsmouth, LLC ("Fluor-BWXT") has been responsible for environmental remediation at the Portsmouth Site. Fluor-BWXT's work is expected to continue until 2024.

39.     In 2015, a plan was agreed to for disposing more than 2 million cubic yards of waste that would be generated from the Portsmouth Site's decontamination and decommissioning process. This plan includes construction of an on-site waste disposal facility.

40.     Construction activities on the waste disposal facility, including site clearing and roadway construction, began around 2017.

**B.     Defendants' Operations Spread Radioactive Particles Off-Site and Contaminated Plaintiffs' Properties**

41.     Plaintiffs' properties are within the zone impacted by radioactive materials, including alpha emitting radionuclides. Samples taken on and around Plaintiffs' properties and at other locations near the Portsmouth Site confirm an elevated presence of radioactive particles.

42.     Environmental evidence gathered thus far indicates that property and persons near the Portsmouth Site have been and continue to be exposed to toxic and radioactive substances and are negatively impacted by toxic and radioactive releases from the Portsmouth Site.

43.     Plaintiffs' environmental sampling and scientific testing of properties near the Portsmouth Site reveal the presence of radioactive and toxic materials consistent with those expected to be found near a site such as the Portsmouth Site where uranium enrichment

operations are conducted. Tests reveal the presence of these radioactive and toxic materials in residences near the Portsmouth Site.

44.     Scientific analysis of samples has revealed the presence of "fingerprints" linking the hazardous, toxic, carcinogenic, radioactive materials either stored, processed and/or manufactured at the Portsmouth Site to the contamination.

45.     Jason and Ursula McGlone's Property is approximately two miles from the Portsmouth Site. This proximity puts the McGlone's Property in the direct path of radioactive air emissions, radioactive particles distributed by the wind blowing such contamination off the site in dirt and dust, all of which emanate from the Portsmouth Site.

46.     Julia Dunham's Property, where she, K.D., and C.D. reside, is approximately four miles from the Portsmouth Site. This proximity puts the Ms. Dunham's Property in the direct path of radioactive air emissions, radioactive particles distributed by the wind blowing such contamination off the site in dirt and dust, all of which emanate from the Portsmouth Site.

47.     Plaintiffs' properties are in the zone of contamination.

48.     On May 13, 2019 Zahn's Corner Middle School in Piketon was suddenly closed due to health concerns because enriched uranium was detected inside the building. Neptunium-237 was also detected by an air monitor next to the school. The school is approximately two miles from the Portsmouth Site. The school serves more than 300 students.

49.     K.D. is a student of Zahn's Corner Middle School. She was evacuated from the school after the detection of enriched uranium.

50.     A recent study conducted by Northern Arizona University determined that:

(1)    Enriched Uranium is found in surface waters, sediments, and interior dusts in the Piketon area which are consistent with the operations at the Portsmouth Site.

(2)    Non fallout $^{237}$Np (Neptunium) and Pu (Plutonium) isotopes are found in bed sediments, suspended sediments, and interior dusts in the Piketon area.

(3)    Non fallout $^{237}$Np (Neptunium) is found in sediments of an unnamed creek that is draining a landfill construction area that is currently being worked.

(4)    Enriched Uranium is found in interiors spaces of Zahn's Corner Middle School, and in attic dust in the Piketon area.

(5)    Emissions from the Portsmouth Site account for the enriched contents of Uranium, Neptunium and Plutonium encountered in environmental samples from the Piketon area.[3]

51.    Defendants could not have prevented all risks from harm to humans from their operations, but they could have prevented or mitigated the offsite impact with better precautionary measures, compliance with applicable regulations, and the use of reasonable care. The foreseeable risks of harm posed could have been reduced or avoided by reasonable instructions or warnings when it became clear that toxins had been released into the environment. Those omissions render Defendants' operations not reasonably safe. Exposure to this radioactive and toxic mixture in the environment through human pathways can cause grave bodily injury and has created a need for a mitigation/abatement program to protect the public from further risk of being harmed by Defendants' tortious contamination of their properties.

---

[3] Michael E. Ketterer, *Investigation of Anthropogenic Uranium, Neptunium, and Plutonium in Environmental Samples Near Piketon, Ohio,* April 27, 2019.

Irrespective of Defendants unconscionable behavior, these claims are subject to absolute/strict liability.

52. On information and belief, Plaintiffs allege that discharges of highly toxic and carcinogenic alpha emitting radionuclides from the Portsmouth Site into the surrounding area have created an imminent and substantial endangerment to public health.

53. Radioactive material contamination in and around Plaintiffs' Properties is a nuisance which constitutes trespass and renders them unfit for normal use and enjoyment and destroys their fair market value.

54. As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class are currently being subjected to radioactive waste contamination and will suffer irreparable harm if an injunction is not granted requiring Defendant to conduct a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

C. **Radioactive Wastes**

55. Ounce for ounce, radioactive isotopes are considered the most toxic materials known to man.

56. Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay. As these materials decay they release radiation energy and transform into other materials which may then also decay by releasing radiation energy and transforming into other materials.

57. Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other material. When radiation energy interacts with other material, it causes a process called ionization which can damage chemical structures. When the "other material" that ionizing

radiation passes through is human cells, it can cause damage within those cells resulting in mutations in genetic material, which can lead to cancer and other harms.

58.     People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body. Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin. The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

59.     One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that, even if the energy absorbed is low, the biological effects can still be gravely serious. Another characteristic is that there are latent biological effects of radiation.

60.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries. Somatic injuries are damages to the individual exposed. These include damages to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system, as well as cancers. Illnesses such as cancers may take a number of years to appear. Research shows that uranium has a high chemical affinity for DNA and causes genetic damage to individuals resulting in birth defect outcomes and cancer at levels much greater than previously modelled.

61.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells. As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase. These genetic mutations can be passed

down to a person's offspring even generations later, manifesting in injuries such as birth abnormalities and cancer.

62.    One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment. As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material. The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate. For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eighth the original sample, and so forth.

63.    The decay chain for U-238:



64. The photo below shows tracks made by alpha rays emitted from a particle of plutonium embedded in the lung tissue. Alpha emitters are among the most deadly of radioactive materials. The tracks in the photograph were made by bursts of alpha-radiation over a 48-hour period:



65. The toxic and carcinogenic effects of exposure to radioactive materials have been a matter of general scientific knowledge since the early 20th Century.

**D.    <u>Concealment of Facts Related to Risk/Fraudulent Concealment</u>**

66. Defendants, through their silence as well as their aggressive public relation efforts, have reassured the public and Plaintiffs that their operations have not contaminated nearby properties. In particular, Defendants made misrepresentations that were meant to assure Plaintiffs that the Portsmouth Site presents absolutely no danger to public health.

**VI.    CLASS ACTION ALLEGATIONS**

67. Plaintiffs seek to represent the following class of individuals:

*(1) All property owners within a 7-mile radius of the Portsmouth Site or other geographic designation as supported by future scientific evidence*

> *(2) All residents and former residents with more than one year of residence within a 7-mile radius of the Portsmouth Site or other geographic designation as supported by future scientific evidence*
>
> *(3) All current and former students at Zahn's Corner Middle School from 1993 to present as well as their parents.*

68.　Excluded from the Class are Defendants and their officers, directors, and employees, as well as the Court and its personnel working directly on the case with the exception of court reporters.

69.　Plaintiffs and all others similarly situated are entitled to have this case maintained as a class action pursuant to Federal Rules of Civil Procedure for the following reasons:

(1) The prerequisites for a class action under Federal Rule of Civil Procedure 23(a) are met. The class is so numerous that joinder of all persons is impracticable. As many as two thousand, or more, people are adversely affected by Defendants' release of radioactive materials. The number of Class Members can be readily determined from the United States Census Bureau and school records.

(2) There are common issues of law and fact, including: (a) whether Defendants are liable for damages to the class for negligently allowing the release of radioactive materials into the surrounding inhabited area and/or their failure to warn of those materials' toxicity; (b) the scope of damages caused by Defendants' conduct; (c) whether Defendants are strictly liable for conducting an ultra-hazardous activity injurious to members of the class; (d) whether Defendants are liable for nuisance and trespass; (e) whether Defendants may be compelled under statute or court order to take steps to protect human health and the environment, including but not

limited to medical monitoring, topsoil replacement, a compliance audit and improved environmental safety measures; and (f) whether Defendants are liable to the Class for punitive damages. These and other common issues of law and fact relate to and affect the rights of Plaintiffs and Class Members.

70.     Plaintiffs' claims are typical of the class. Plaintiffs all own property and reside and/or were present within the affected area.

71.     Plaintiffs have suffered annoyance, aggravation, as well as economic loss and injury to their real and personal property and/or have been subjected to health risks, that are typical of the experience of Class Members. Plaintiffs' interests are identical to and aligned with those of other Class Members. Plaintiffs and Class Members have suffered an array of damages all stemming from the common trunk of facts and issues related to Defendants' emissions. Those damages are as follows:

(1) Non-Physical Tort Claims are pursued by Class Members for emotional distress, annoyance, loss of enjoyment, nuisance, and inconvenience;

(2) Property Related Claims are pursued by Class Members for trespass, property damage, diminution of value and loss of use of property;

(3) Equitable and Injunctive Relief in the form of Medical Monitoring is pursued by Class Members.

72.     Plaintiffs have retained counsel experienced in the prosecution of class action litigation who will adequately represent the interests of the class;

(1) Plaintiffs and their counsel are aware of no conflicts of interest between Plaintiffs and absent Class Members or otherwise that cannot be managed through the implementation of available procedures;

(2) Plaintiffs, through their counsel have adequate financial resources to assure that the interests of the class will be protected; and

(3) Plaintiffs are knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this litigation.

73.     A class action may be maintained under Federal Rule of Civil Procedure 23(b)(2) because the parties opposing the class have acted and/or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole. Plaintiffs and the Class seek an injunction requiring:

(1) Amendments to Defendants' community warning plans;

(2) A third-party compliance audit of Defendants' waste management operations and environmental health and safety program;

(3) A full-site characterization of the entire affected areas to identify all impacted properties which require cleanup and to limit the opportunity for re-suspension.

(4) Decontamination of homes and top-soil replacement to remediate continuing threats to human health and the environment; and

(5) Implementation of a medical surveillance and medical monitoring program to protect Plaintiffs' and Class Members from on-going threats to their health.

If this injunctive relief is not granted, great harm and irreparable injury to Plaintiffs and members of the Class will continue, and Plaintiffs and members of the Class have no adequate remedy at law for the injuries which are threatened to occur. Absent action from this Court, operations at the Portsmouth Site will continue to damage Plaintiffs and members of the Class and threaten future injury. Defendants' actions and inactions are generally applicable to the Class as a whole, and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Class as a whole.

74. A class action may also be maintained under Federal Rule of Civil Procedure 23(b)(3) because common issues of law and fact predominate over those issues that might pertain to individual cases, and a class action is superior to other available procedures for the fair and efficient adjudication of this controversy. The interests of all members of the class in establishing the liability of Defendants, and relative fault, for the release of radioactive materials are cohesive. The certification of a Class seeking damages is an appropriate means by which injured Plaintiffs and Class Members may assert claims to recover economic losses and property damage, as well as assert claims for annoyance, aggravation and inconvenience.

75. A class action may be maintained under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, thereby making appropriate the entry of equitable or injunctive relief to prevent recurrence of the conduct in the future.

76. Furthermore, any denial of liability and defenses raised by the Defendants would be applicable to all claims presented by all members of the class or can otherwise be managed through available procedures.

77. Defendants' conduct presents predominant common factual questions. Fundamentally, all of the Plaintiffs' claims arise out of Defendants' course of conduct causing the release of radioactive materials from the Portsmouth Site. Although Defendants' releases affected a sizeable geographic area and many individuals and businesses, they can be traced back to actions taken, or not taken, by Defendants. Whether Plaintiffs and the Class Members are presenting one or more of the relevant categories of Non-Physical Tort Claims, Property Claims and Medical Monitoring, they will present common liability proof that is the same for each member of the Class. Across claim categories, Plaintiffs' common proof of Defendants' liability

will involve the same cast of characters, events, discovery, documents, fact witnesses, and experts.

78.     The need for proof of Plaintiffs' and Class Members' damages will not cause individual issues to predominate over common questions. The amounts of economic and non-economic losses, consistent with each of the categories of claims, can be efficiently demonstrated either at trial or as part of routine claims administration through accepted and court-approved methodologies with the assistance of court-appointed personnel, including Special Masters. Certain types or elements of damage are subject to proof using aggregate damage methodologies or simply rote calculation and summation.

79.     A class action is superior to maintenance of these claims on a claim-by-claim basis when all actions arise out of the same circumstances and course of conduct. A class action allows the Court to process all rightful claims in one proceeding. Class litigation is manageable considering the opportunity to afford reasonable notice of significant phases of the litigation to Class Members and permit distribution of any recovery. The prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members in this action, is impracticable and would create a massive and unnecessary burden on the resources of the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of each member of the class or subclasses, should that be determined to be appropriate.

80.     The conduct of this action as a class action conserves the resources of the parties and the court system, protects the rights of each member of the class, and meets all due process requirements.

81.     Certification of the Class with respect to particular common factual and legal issues concerning liability and comparative fault, as well as the necessary and appropriate quantum of punitive damages, or ratio of punitive damages to actual harm, is appropriate under Federal Rule of Civil Procedure 23(c)(4).

82.     The particular common issues of liability, comparative fault, and the quantum of punitive damages or ratio of punitive damages to actual harm are common to all Class Members no matter what type of harm or injury was suffered by each Class Member.

## VII.     CAUSES OF ACTION

83.     Each cause of action alleged herein is brought against each Defendant.

### COUNT I – NEGLIGENCE/GROSS NEGLIGENCE

84.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

85.     Defendants' conduct, acts, and omissions violated duties owed to Plaintiffs and the Class. Defendants' negligence proximately caused damage to Plaintiffs and the Class.

86.     Defendants failed to act as a reasonably prudent nuclear operator under like circumstances would.

87.     Defendants failure to warn also constitutes negligence.

### COUNT II – TRESPASS

88.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

89.     Defendants' conduct as set forth herein constitutes trespass, which resulted in damages to Plaintiffs and the Class.

### COUNT III – NUISANCE

90.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

91.     Defendants' conduct as set forth herein constitutes the tort of nuisance which is ongoing and has resulted in damages to Plaintiffs and the Class.

## COUNT IV – ULTRA-HAZARDOUS ACTIVITY/ABSOLUTE LIABILITY/STRICT LIABILITY

92.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

93.     Defendants' conduct as set forth herein constitutes the tort of ultra-hazardous liability, which resulted in damages to Plaintiffs and the Class.

## COUNT V – INJUNCTIVE AND EQUITABLE RELIEF OF MEDICAL MONITORING

94.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

95.     Plaintiffs and the Class have been and continue to be exposed to radioactive contaminants, which are known to be carcinogenic substances, at a concentration higher than expected for the general populace.

96.     Plaintiffs and the Class face a lifetime of latent, dread medical and emotional conditions proven to be linked to exposure to radioactive particles.

97.     Defendants' tortious actions resulting in radioactive pollution have invaded the legal protections afforded Plaintiffs and the Class by the laws of Ohio.

98.     Plaintiffs and the Class will benefit from medical monitoring for the aforementioned medical and emotional conditions because testing and continued monitoring will bring to light the onset of these medical and emotional conditions so that treatment and intervention may begin at the earliest point possible.

99.     Plaintiffs and the Class will benefit from a medical monitoring program featuring an epidemiological component that collects and analyzes medical monitoring results[4] so that other heretofore unrecognized latent, dread diseases that may be associated with exposure to radioactive particles may be identified so that treating professionals may better care for the Class Members and so that medical professionals engaged in the research and development of new treatment will have access to a broader universe of data.

100.     Further, Plaintiffs and the Class will require on-going care for the conditions which are known to result from exposure to radioactive particles.

101.     The harms visited upon Plaintiffs and the Class are irreparable.

102.     Money damages will not suffice because it is impossible to predict with any certainty the costs of such monitoring and treatment for each individual class member nor is it possible to predict new treatment and intervention protocol that may be developed as data from medical monitoring of the Class is provided to the medical research community.

103.     Furthermore, money damages will not suffice because an award of money damages for future monitoring and treatment would not result in comprehensive programs, whereby important information is shared among the medical community so that new treatments, protocols, intervention and test may be developed.

104.     Plaintiffs, on behalf of all those similarly situated, seek a Court-administered fund replenished from time-to-time by the Defendants to achieve such injunctive and equitable relief as necessary for the continuing benefit of the class, including a court-administered medical monitoring program.

---

[4]  Such epidemiological data will be collected, maintained and analyzed in such a manner as to protect the identity of individual class members.

105.     Given the immense wealth of the Defendants, such injunctive and equitable relief presents no undue burden or irreparable damage to the Defendants.

## COUNT VI – DECLARATORY JUDGMENT

106.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

107.     Plaintiffs seek declaratory relief pursuant to 28 U.S.C. §§ 2201.

108.     The above allegations present ascertained or ascertainable facts of a present controversy between Plaintiffs and the Class Members and Defendants

109.     Plaintiffs, on behalf of those similarly situated, seek declaratory judgment clarifying the rights and obligations of the parties to each other.

## DEMAND FOR JURY TRIAL

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this Complaint that are so triable as a matter of right.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for a Jury Trial and for the following relief:

(1)  An Order certifying this action to proceed as a Class Action, authorizing Plaintiffs to represent the interests of the Class (or subclasses, as appropriate) and appointing undersigned counsel to represent the Class;

(2)  An award of damages or mechanism for recovery for Class Members who incurred any out-of-pocket expenses as a result of Defendants' acts or omissions along with an award of damages to pay for any necessary mitigation or remediation of class members' property;

(3)  An award of damages or mechanism for recovery to compensate for loss of use and enjoyment of property, annoyance, nuisance, aggravation, and inconvenience as a result of Defendants' acts or omissions;

(4)  An award of punitive damages for all Class Members who were exposed to radioactive materials as a result of Defendants' acts or omissions;

(5)  An Order implementing a remediation including full site characterization and cleanup of the Plaintiffs' properties;

(6)  An Order implementing a medical surveillance and medical monitoring program;

(7)  Prejudgment and post-judgment interest;

(8)  An Order establishing such administrative procedures as are reasonable to effectuate the relief granted to Plaintiffs and the Class Members;

(9)  Declaratory relief clarifying the rights and obligations of the parties to each other.

(10) That the Court order Defendants to pay for the costs of this proceeding, including reasonable attorneys' fees and costs, including, but not limited to, costs of class notice and administration; and

(11) Such other relief as the Court or Jury may deem appropriate.

Respectfully submitted,

/s/ Stuart E. Scott
Stuart E. Scott (0064834)
Kevin C. Hulick (0093921)
**Spangenberg Shibley & Liber LLP**
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
Telephone: (216) 696-3232
Facsimile: (216) 696-3924
sscott@spanglaw.com
khulick@spanglaw.com

Mark Underwood
**Underwood Law Office**
923 Third Avenue
Huntington, WV  25701
Telephone: (304) 209-4387
markunderwood@underwoodlawoffice.com

Jason Leasure
**Vital & Vital, L.C.**
536 Fifth Avenue
Huntington, WV  25701
Telephone: (304) 525-0320
jleasure@vitallc.com

Celeste Brustowicz
*Attorney seeking pro hac vice admission*
Stephen H. Wussow
*Attorney seeking pro hac vice admission*
Victor Cobb
*Attorney seeking pro hac vice admission*
**Cooper Law Firm, LLC**
1525 Religious Street
New Orleans, LA  70130
Telephone: (504) 399-0009
cbrustowicz@sch-llc.com
swussow@sch-llc.com
vcobb@sch-llc.com

Stuart H. Smith (of counsel to Cooper Law Firm, LLC)
*Attorney seeking pro hac vice admission*
**Stuart H. Smith, LLC**
508 St. Philip Street
New Orleans, LA  70118
Telephone: (504) 566-1558
ssmith@sch-llc.com

Kevin W. Thompson
*Attorney seeking pro hac vice admission*
David R. Barney, Jr.
*Attorney seeking pro hac vice admission*
**Thompson Barney**
2030 Kanawha Boulevard, East
Charleston, WV  25311
Telephone: (304) 343-4401
Facsimile: (304) 343-4405
kwthompsonwv@gmail.com

drbarneywv@gmail.com

**ATTORNEYS FOR PLAINTIFFS**