## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **URSULA MCGLONE, JASON MCGLONE, L.M. G.M., B.M., E.M.,** and **M.M.,** minor children by and through their parent and natural guardian, Ursula McGlone, **JULIA DUNHAM, K.D**. and **C.D**., minor children by and through their parent and natural guardian, Julia Dunham, **ADAM RIDER, BRITTANI RIDER, M.R., C.R., L.R.** and **L.R**., minor children by and through their parent and natural guardian, Brittani Rider,<br><br>Ohio residents,<br>on behalf of themselves individually and all others similarly situated,<br>Plaintiffs,<br><br>**v.**<br><br>**CENTRUS ENERGY CORP**., a Delaware Corporation, individually and as successor-in interest to USEC Incorporated,<br><br>**UNITED STATES ENRICHMENT CORPORATION,** a Delaware Corporation,<br><br>**URANIUM DISPOSITION SERVICES, LLC,** a Tennessee Limited Liability Company,<br><br>**BWXT CONVERSION SERVICES, LLC,** a Delaware Limited Liability Company,<br><br>**MID-AMERICA CONVERSION SERVICES,** a Delaware Limited Liability Company,<br><br>**BECHTEL JACOBS COMPANY, LLC,** a Delaware Limited Liability Company,<br><br>**LATA/PARALLAX PORTSMOUTH, LLC,** a New Mexico Limited Liability Company,<br><br>**FLUOR-BWXT PORTSMOUTH, LLC ,** | Civil Action No.: **2:19-cv-02196-ALM-EPD**<br><br>**Chief Judge Algenon L. Marbley and Chief Magistrate Judge Elizabeth Preston Deavers**<br><br>**PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**Jury Demanded** |

1

an Ohio Limited Liability Company,                     §
                                                       §
Defendants.                                            §
                                                       §

## PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

### I.  INTRODUCTION

Plaintiffs Ursula McGlone, Jason McGlone, L.M., G.M., B.M., E.M., and M.M., minor children by and through their parent and natural guardian, Ursula McGlone, Julia Dunham, K.D. and C.D., minor children by and through their parent and natural guardian, Julia Dunham, Adam Rider, Brittani Rider, and M.R., C.R., L.R. and L.R., minor children by and through their parent and natural guardian, Brittani Rider, on behalf of themselves individually and all others similarly situated (collectively "Plaintiffs"), through undersigned counsel, hereby file this Second Amended Class Action Complaint, pursuant to Fed. R. Civ. P. 15(a)(1)(B).  Based on their personal knowledge, information and belief, as and for their Class Action Complaint for damages, equitable and injunctive relief against the Defendants, Plaintiffs respectfully allege as follows:

### II.  NATURE OF THE ACTION

1.      In Pike County, Ohio sits the 3,777-acre Portsmouth Site (sometimes referred to "PORTS"), which has accommodated uranium enrichments operations by Defendants.

2.      What the populace did not know was that the operations at the Portsmouth Site expelled air laden with radioactive material and other metals.

3.      Winds have carried the radioactive materials and other metals throughout the area in such concentrations that radioactive materials and metals can be found deposited in soils and buildings in and around Piketon, Ohio.

2

4.     On May 13, 2019, Zahn's Corner Middle School in Piketon was suddenly closed due to health concerns because enriched uranium was detected inside the building. Neptunium-237 was also detected by an air monitor next to the school. The school is approximately two miles from the Portsmouth Site and serves more than 300 students. This incident was the first notification to the community about radioactive materials migrating into populated areas from the Portsmouth Site.

5.     Plaintiffs seek remediation of the radioactive, metal, organic and inorganic contamination found on their property and restoration of their property to its original, uncontaminated condition.

6.     In addition to damages, Plaintiffs petition this Court for injunctive relief to protect Plaintiffs and Class Members from further dangers.

7.     Plaintiffs and Class Members are individuals who have suffered economic losses, property losses, and non-economic damages as the result of Defendants' toxic and radioactive releases. Plaintiffs and Class Members have all suffered in common an array of damages from Defendants' emissions of radioactive material, specifically and as explained in more detail herein.

8.     Releases of radioactive material from the Portsmouth Site exceed levels of radiation and concentrations of radioactive materials permissible in unrestricted (general public) areas.[1]

9.     Releases of hazardous and toxic materials and storage of hazardous substances and/or wastes pose a threat to the health of citizens in the surrounding area and pollute and devalue property owned by citizens in the surrounding area.

---

[1] In the event it is determined, for any reason, that the releases of radioactive material do not exceed such permissible levels, or that the actions of one or more of the Defendants are not governed by the Price Anderson Act, Plaintiffs have pleaded, in the alternative, state law causes of action. These state law claims have also been asserted concurrently with regard to the release, storage, and/or disposal of hazardous substances and/or wastes.

### III.    PARTIES

**A.    <u>Plaintiffs</u>**

10.    Putative Class Representatives and Plaintiffs Ursula McGlone and Jason McGlone are married, above the age of majority and live approximately two miles from the Portsmouth Site on property they own. Recent scientific testing shows their property to be impacted with radioactive and toxic materials.  The McGlones were unaware until such testing that their property had been contaminated with radioactive and toxic materials.  They seek damages for loss of use and enjoyment of property, diminution of property value, annoyance, inconvenience, emotional distress, punitive and property damage, including remediation, along with such injunctive and declaratory relief as necessary to protect human health and the environment.

11.    Putative Class Representatives L.M., G.M., B.M., E.M., and M.M. are below the age of majority. Thus, their claims are brought by and through their parent and natural guardians, Ursula McGlone. L.M., G.M., B.M., E.M., and M.M. live approximately two miles from the Portsmouth Site. They live within the zone of impact. They seek damages for loss of use and enjoyment of property, diminution of property value, annoyance, inconvenience, emotional distress, punitive and property damage, including remediation, along with such injunctive and declaratory relief as necessary to protect human health and the environment.

12.    Putative Class Representative and Plaintiff Julia Dunham is above the age of majority and lives approximately four miles from the Portsmouth Site on property she owns. The Dunham property is located within the zone of impact. Plaintiff Julia Dunham was unaware until the closing of her children's school that property within the zone of impact had been contaminated with radioactive and toxic materials.  She seeks damages for loss of use and enjoyment of property, diminution of property value, annoyance, inconvenience, emotional distress, punitive and property

damage, including remediation, along with such injunctive and declaratory relief as necessary to protect human health and the environment.

13.     Putative Class Representatives K.D. and C.D. are below the age of majority. Thus, their claims are brought by and through their parent and natural guardian, Julia Dunham. K.D. and C.D. live approximately four miles from the Portsmouth Site. They live within the zone of impact. They seek damages for loss of use and enjoyment of property, diminution of property value, annoyance, inconvenience, emotional distress, punitive and property damage, including remediation, along with such injunctive and declaratory relief as necessary to protect human health and the environment.

14.     Putative Class Representatives and Plaintiffs Adam Rider and Brittani Rider are above the age of majority and live approximately four and one-half miles from the Portsmouth Site on property they own.  Scientific testing shows their property to be impacted with radioactive and toxic materials. The Riders were unaware until such testing that their property had been contaminated with radioactive and toxic materials.  They seek damages for loss of use and enjoyment of property, diminution of property value, annoyance, inconvenience, emotional distress, punitive and property damage, including remediation, along with such injunctive and declaratory relief as necessary to protect human health and the environment.

15.     Putative Class Representatives M.R., C.R., L.R. and L.R. are below the age of majority. Thus, their claims are brought by and through their parent and natural guardian, Brittani Rider. M.R., C.R., L.R. and L.R.. live approximately four and one-half miles from the Portsmouth Site. Scientific testing shows their property to be impacted with radioactive and toxic materials. They seek damages for loss of use and enjoyment of property, diminution of property value, annoyance, inconvenience, emotional distress, punitive and property damage, including

remediation, along with such injunctive and declaratory relief as necessary to protect human health and the environment.

**B.**     **Defendants**

### Gaseous Diffusion Plant and Centrifuge Plant Defendants
### (hereinafter "Centrifuge Defendants")

16.     Defendant Centrus Energy Corp. ("Centrus"), formerly USEC Incorporated ("USEC Inc."), is a Delaware corporation with its principal place of business in Maryland. This action is brought against Centrus Energy Corp., individually, and as successor-in-interest to USEC Inc.

17.     Defendant United States Enrichment Corporation ("USEC") is a Delaware corporation with its principal place of business in Maryland and is a wholly owned subsidiary of Centrus Energy Corp.

### Depleted Uranium Hexafluoride Plant Defendants
### (hereinafter "Depleted Uranium Defendants")

18.     Defendant Uranium Disposition Services, LLC ("UDS") is a Tennessee limited liability company with its principal place of business in Florida.

19.     Defendant BWXT Conversion Services, LLC ("BWXT") is a Delaware limited liability company with its principal place of business in Kentucky.

20.     Mid-America Conversion Services, LLC ("MCS") is a Delaware limited liability company with its principal place of business in Kentucky.

### Environmental Remediation and Waste Management Defendants
### (hereinafter "Remediation Defendants")

21.     Bechtel Jacobs Company, LLC ("Bechtel Jacobs") is a Delaware limited liability company with its principal place of business in Tennessee.

6

22.    Lata/Parallax Portsmouth, LLC ("Lata/Parallax") is a New Mexico limited liability company with its principal place of business in New Mexico.

23.    Fluor-BWXT Portsmouth, LLC ("Fluor-BWXT") is an Ohio limited liability company with its principal place of business in Ohio.

## IV.    JURISDICTION

24.    Original jurisdiction of this Court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1332(d)(2). This Court is vested with jurisdiction by virtue of 28 U.S.C. §1332(d). Minimal diversity exists between named Plaintiffs of this putative class action, all of whom are citizens of the State of Ohio, and Defendant Centrus, a citizen of Delaware, its state of incorporation, and Maryland, its headquarters and principal place of business location. The proposed class exceeds 100 persons and the amount in controversy exceeds $5,000,000.00.  Further, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under a law of the United States, namely, the Price-Anderson Act (hereinafter "PAA"), 42, U.S.C. § 2210 et seq. This Court may also exercise subject matter jurisdiction over this action directly pursuant to Section 2210(n)(2) of the PAA, which provides that the United States District Court in the district where the nuclear incident takes place shall have original jurisdiction with respect to any public liability action arising out of, or resulting from, a nuclear incident.

25.    Venue is proper in this judicial district pursuant to 42 U.S.C. § 2210(n)(2) because the nuclear incidents giving rise to Plaintiffs' claims took place in this district.  As state law claims, venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

## V.  FACTUAL ALLEGATIONS

### A.        Operations at Portsmouth Site

### Gaseous Diffusion Plant

26.       Located at the Portsmouth Site is the Portsmouth Gaseous Diffusion Plant, or the "A-Plant" as the locals refer to it. In July 1993, the United States Enrichment Corporation ("USEC") assumed the uranium enrichment operations at the Portsmouth Gaseous Diffusion Plant and operated the plant until 2001.

27.       The primary mode of enrichment was the gaseous diffusion of uranium hexafluoride to separate the lighter fissile isotope, U-235, from the heavier non-fissile isotope, U-238.

28.       From 2001 to 2011, USEC was responsible for maintaining the gaseous diffusion plant in a safe configuration. Initially, the process equipment was kept in Cold Standby, capable of restart if the need arose. Eventually, the plant transitioned to Cold Shutdown where systems were permanently disengaged, and equipment prepared for eventual decommissioning.

### Depleted Uranium Hexafluoride Conversion Plant

29.       In 2002, Uranium Disposition Services, LLC ("UDS") was contracted to design, build, and operate a Depleted Hexafluoride Conversion Plant ("DUF6 Conversion Plant").

30.       Depleted uranium hexafluoride (DUF6) is a coproduct of the uranium enrichment process that occurred at the Portsmouth Site. The DUF6 Conversion Plant was designed and constructed to convert inventory of DUF6 produced by both the Paducah Gaseous Diffusion[2] and the Portsmouth Gaseous Diffusion Plants, to a more stable uranium oxide form for reuse, storage,

---

[2] The Paducah Gaseous Diffusion Plant is located in McCracken County, Kentucky, near Paducah, Kentucky.

and/or transportation and disposition. A coproduct of the conversion process is hydrofluoric acid (HF), which is reused industrially. The Portsmouth DUF6 inventory is expected to be processed in approximately 18 years.

31.     In 2010, BWXT Conversion Services, LLC was contracted to operate the DUF6 Conversion Plant at the Portsmouth Site. BWXT was also responsible for continuing cylinder surveillance and maintenance (S&M) services for the inventory of DUF6, low-enrichment uranium hexafluoride (UF6), normal UF6, and other cylinders. The contract was initially scheduled to expire in September 2016 but was extended to accommodate procurement for a new DUF6 operations contract.

32.     In 2016, Mid-America Conversion Services, LLC was contracted to operate the DUF6 Conversion Plant. MCS is responsible for providing cylinder surveillance and maintenance for the DUF6 conversion facility and associated equipment, operating the conversion facility to convert the DUF6 from the inventory at the Paducah and Portsmouth plants to uranium oxide; reusing, storing, transporting and/or disposing of the DUF6 conversion process end-products; selling the aqueous hydrofluoric acid (AqHF) product; and providing S&M services for the cylinder storage yards.

### Centrifuge Operations

33.     In 2002, USEC Inc. signed a lease for use of centrifuge-related equipment and facilities at the Portsmouth Site.

34.     In 2004, USEC Inc. began operating what is known as the American Centrifuge Lead Cascade Facility ("Lead Cascade"). The Lead Cascade was a test loop which demonstrated the effectiveness of centrifuge design and equipment by processing uranium in a closed loop. In 2016, USEC Inc.'s successor, Centrus, ceased uranium enrichment operations at the Lead Cascade.

This was followed by removal of uranium gas from the centrifuges and process piping, dismantling of equipment, and other actions need to ultimately decommission the facility. The Lead Cascade is currently in decommissioning phase.

35.     The Lead Cascade was a test loop for USEC Inc.'s, now Centrus', American Centrifuge Plant ("ACP"). Construction on the ACP began in 2007 at the Portsmouth Site and was demobilized in 2009. On January 7, 2019, it was announced that the facility would be reopened and the ACP is currently under construction.

36.     Centrus' centrifuge operations are carried out pursuant to source materials licenses which allow for the possession of radioactive material but do not allow for the disposal of radioactive material via air dispersion on Plaintiffs' properties.

### Environmental Remediation and Waste Management

37.     Environmental cleanup at the Portsmouth Site began in 1989, has been continuous, and continues today.

38.     Between 1997 and 2005 Bechtel Jacobs Company, LLC ("Bechtel Jacobs") was responsible for environmental remediation at the Portsmouth Site.

39.     Between 2005 and 2010 LATA/Parallax Portsmouth, LLC ("LATA/Parallax") was responsible for environmental remediation at the Portsmouth Site. LATA/Parallax was responsible for groundwater and soil remedial actions, removing legacy waste, decontamination and decommissioning (D&D) facilities, highly enriched uranium disposition, operating the site waste storage facilities, and surveillance and maintenance activities, as well as other activities.

40.     From 2010 to present Fluor-BWXT Portsmouth, LLC ("Fluor-BWXT") has been responsible for environmental remediation at the Portsmouth Site. Fluor-BWXT's work is expected to continue until 2024.

41.     In 2015, a plan was agreed to for disposing of more than 2 million cubic yards of waste that would be generated from the Portsmouth Site's decontamination and decommissioning process. This plan includes construction of an on-site waste disposal facility.

42.     Construction activities on the waste disposal facility, including site clearing and roadway construction, began around 2017.

## Releases and Statistically Significant Increase in Cancer

43.     Reports by DOE, NIOSH and EPA, demonstrates that there have been multiple instances of release of contaminants from the Portsmouth Site, including both radioactive and/or hazardous contaminants, to the water, air, and soil  in violation of federal statutes and/or regulations.

44.     Recent scientific testing performed at locations adjacent to the plant on publicly accessible areas supports a conclusion that external radiation levels exceed the allowable level of exposure to members of the public under federal law, including The Price-Anderson Act, and including, but not limited to, more than 100 millirems above background levels in a calendar year.

45.     Based on national and local cancer data from 2011 to 2016, cancer rate levels for all types of cancers in the small zip code of Jasper, Ohio, which lies to the west of the PORTS plant and along the Scioto River, are more than 7 times the national rate.

46.     Analysis of cancer rates for all cancers combined in the Census Tracts adjacent to the plant show statistical significance. Specifically, a 60% excess rate for all cancer types between 2011 and 2016, based on national and local cancer data. Zip code cancer data identify lung cancer as a major issue in the area near the Portsmouth site.

47.     The counties which contain and are adjacent to the plant, namely Pike, Scioto, Vinton, Adams and Lawrence counties, are among those having the highest cancer rates in the State of Ohio.

48.     The high levels of cancer in these counties, in the areas near the site, and along the rivers and streams draining the land near the plant and to which the discharges have historically been released, are consistent with the exposures of individuals living in these areas to the radioactive materials emanating from the plant.

**B.     Defendants' Operations Spread Radioactive Particles Off-Site into Unrestricted Areas and Contaminated Plaintiffs' Properties**

49.     Upon information and belief, Defendants' activities have caused and/or contributed to radioactive contamination offsite and into unrestricted areas in levels that exceed levels allowable under federal law, and specifically, The Price-Anderson Act.

50.     Plaintiffs' properties are within the zone impacted by radioactive materials, including alpha emitting radionuclides. Samples taken on and around Plaintiffs' properties and at other locations near the Portsmouth Site confirm an elevated presence of radioactive particles, which presents a substantial and imminent risk of harm.

51.     Environmental evidence gathered thus far indicates that property and persons near the Portsmouth Site have been and continue to be exposed to toxic and radioactive substances and are negatively impacted by toxic and radioactive releases from the Portsmouth Site.

52.     Plaintiffs' environmental sampling and scientific testing of properties near the Portsmouth Site reveal the presence of radioactive and toxic materials consistent with those expected to be found near a site, such as the Portsmouth Site, where uranium enrichment operations

are conducted. Tests reveal the presence of these radioactive and toxic materials in residences near the Portsmouth Site.

53. Scientific analysis of samples has revealed the presence of "fingerprints" linking the hazardous, toxic, carcinogenic, radioactive materials either stored, processed and/or manufactured at the Portsmouth Site to the contamination alleged herein.

54. Jason and Ursula McGlone's property, where they and L.M., G.M., B.M., E.M., and M.M live, and is approximately two miles from the Portsmouth Site. This proximity puts the McGlone's Property in the direct path of radioactive air emissions, radioactive particles distributed by the wind blowing such contamination off the site in dirt and dust, most if not all of which emanate from the Portsmouth Site.

55. Julia Dunham's Property, where she, K.D., and C.D. reside, is approximately four miles from the Portsmouth Site. This proximity puts Ms. Dunham's property in the direct path of radioactive air emissions, radioactive particles distributed by the wind blowing such contamination off the site in dirt and dust, all of which emanate from the Portsmouth Site.

56. Adam and Brittani Rider's Property, where they and M.R., C.R., L.R. and L.R. live, and is approximately four and one-half miles from the Portsmouth Site. This proximity puts the McGlone's property in the direct path of radioactive air emissions, radioactive particles distributed by the wind blowing such contamination off the site in dirt and dust, most if not all of which emanate from the Portsmouth Site

57. Plaintiffs' properties have either tested positive for contamination or are in the zone of contamination.

58. On May 13, 2019 Zahn's Corner Middle School in Piketon was suddenly closed due to health concerns because enriched uranium was detected inside the building. Neptunium-

237 was also detected by an air monitor next to the school. The school is approximately two miles from the Portsmouth Site. The school serves more than 300 students.

59. Following closure of the Zahn's Corner Middle School, fencing was placed around the school property warning of radioactive material. Anyone who goes beyond the fencing is required to wear protective gear. Zahn's Corner Middle School remains quarantined and closed.

60. K.D. is a student of Zahn's Corner Middle School. She was evacuated from the school after the detection of enriched uranium.

61. A recent study conducted by Northern Arizona University determined that:

(1) Enriched Uranium is found in surface waters, sediments, and interior dusts in the Piketon area which is consistent with the operations at the Portsmouth Site.

(2) Non-fallout $^{237}$Np (Neptunium) and Pu (Plutonium) isotopes are found in bed sediments, suspended sediments, and interior dusts in the Piketon area.

(3) Non-fallout $^{237}$Np (Neptunium) is found in sediments of an unnamed creek that is draining a landfill construction area that is currently being worked.

(4) Enriched Uranium is found in interior spaces of Zahn's Corner Middle School, and in attic dust in the Piketon area.

(5) Emissions from the Portsmouth Site account for the enriched contents of Uranium, Neptunium, and Plutonium encountered in environmental samples from the Piketon area.[3]

62. Defendants could have prevented or mitigated the offsite impact with better precautionary measures, compliance with applicable regulations, and the use of reasonable care.

---

[3] Michael E. Ketterer, *Investigation of Anthropogenic Uranium, Neptunium, and Plutonium in Environmental Samples Near Piketon, Ohio,* April 27, 2019.

The foreseeable risks of harm posed could have been reduced or avoided by reasonable instructions or warnings when it became clear that toxins had been released into the environment. Those omissions render Defendants' operations not reasonably safe. Exposure to this radioactive and toxic mixture in the environment through human pathways can cause grave bodily injury and has created a need for a mitigation/abatement program to protect the public from further risk of being harmed by Defendants' tortious contamination of their properties. Irrespective of Defendants unconscionable behavior, these claims are subject to absolute/strict liability.

63.     On information and belief, Plaintiffs allege that discharges of highly toxic and carcinogenic alpha emitting radionuclides from the Portsmouth Site into the surrounding area have created an imminent and substantial endangerment to public health and the environment.

64.     Radioactive material contamination in and around Plaintiffs' properties is a nuisance which constitutes trespass and renders the properties unfit for normal use and enjoyment, and destroys their fair market value.

65.     As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class are currently being subjected to radioactive waste contamination and will suffer irreparable harm if an injunction is not granted requiring Defendants to conduct a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

**C.     Radioactive Wastes**

66.     Ounce for ounce, radioactive isotopes are considered the most toxic materials known to man.

67.     Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay. As these materials

decay, they release radiation energy and transform into other materials which may then also decay by releasing radiation energy and transforming into other materials.

68.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other material. When radiation energy interacts with other material, it causes a process called ionization which can damage chemical structures. When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutations in genetic material, which can lead to cancer and other harms.

69.     People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body. Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin. The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

70.     One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that, even if the energy absorbed is low, the biological effects can still be gravely serious. Another characteristic is that there are latent biological effects of radiation.

71.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries. Somatic injuries are damages to the individual exposed. These include damages to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system, as well as cancers. Illnesses such as cancers may take a number of years to appear. Research shows that uranium has a high

chemical affinity for DNA and causes genetic damage to individuals resulting in birth defect outcomes and cancer at levels much greater than previously modelled.

72.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells. As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase. These genetic mutations can be passed down to a person's offspring even generations later, manifesting in injuries such as birth abnormalities and cancer.

73.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment. As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material. The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate. For example, after one half-life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eighth the original sample, and so forth.

74.     The decay chain for U-238:

# Decay Chain of Uranium-238



75.     The photo below shows tracks made by alpha rays emitted from a particle of plutonium embedded in the lung tissue. Alpha emitters are among the most deadly of radioactive materials. The tracks in the photograph were made by bursts of alpha-radiation over a 48-hour period:



18

76.     The toxic and carcinogenic effects of exposure to radioactive materials have been a matter of general scientific knowledge since the early 20th Century.

77.     According to recent scientific testing, radioactive materials which have been identified as originating from the plant, particularly enriched Uranium, exist at statistically significant excess levels in the sediments and floodwater sediments of the nearby creeks and rivers. These creeks and rivers are ones into which radioactive liquid discharges from the plant are and have been released and also into which airborne discharges which are washed out by precipitation find their way into by means of runoff.

78.     Recent evidence published in the scientific literature since 2000 highlights a particular anomalous hazard from Uranium which has a combination of chemical and radioactive genotoxicity owing to its high chemical affinity for DNA, the acknowledged target for the genetic and genomic effects which lead to cancer and other illnesses and also birth defects. These effects are especially relevant to inhaled Uranium.

**D.  <u>Hazardous Substances and/or Wastes</u>**

79.     One or more of the Defendants is responsible for PORTS continuing to release hazardous substances and/or wastes from the facility to offsite areas.  The waste stream that has been and continues to be released from PORTS is mixed, and includes, but is not limited to, radionuclides such as Uranium, depleted Uranium, enriched Uranium, Neptunium, Plutonium, Cesium, Thorium, and Radium; toxic metals, heavy metals, Polychlorinated biphenyls (PCBs) (including dioxin forms of PCBs); Trichloroethylene (TCE); and other organic and inorganic materials.  By releasing this mixed waste stream in violation of their permit, standards, regulations, conditions, requirements, and prohibitions under the Resource Conservation and Recovery Act ("RCRA"), one or more of the Defendants, as Responsible Parties, are liable under 42 U.S.C. §

19

6972(a)(1)(A). The Defendants are also in violation of the prohibition of land disposal of hazardous wastes under 42 U.S.C. § 6924(d), (g), and (k) and 40 C.F.R. § 268.2(c), and state-law equivalent. Because one or more of the Defendants have contributed or are contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may and does present an imminent and substantial endangerment to health and the environment, which is prohibited by RCRA, the Defendants are Responsible Parties and are liable under 42 U.S.C. § 6972(a)(1)(B). One or more of the Defendants, as Responsible Parties, have violated and continue to violate "an effluent standard or limitation" under Section 505(a)(1)(A) of the Clean Water Act ("CWA") 33 U.S.C. § 1365(a)(1)(A), and state-law equivalent, by failing to comply with the terms of the National Pollution Discharge Elimination System ("NPDES") and associated permit.

80. Further, one or more of the Defendants, as Responsible Parties, are also in ongoing and continuing violation of section 301 of the CWA, 33 U.S.C. § 1311, and state-law equivalent as a result of the unpermitted and unlawful discharge of radionuclides such as Uranium, depleted Uranium, enriched Uranium, Neptunium and Plutonium. One or more of the Defendants, as Responsible Parties, are in violation of the Clean Air Act ("CAA") because PORTS has emitted and continues to emit radionuclides to the ambient air from the facility in excess of federal limits, including, but not limited to an amount that would cause any member of the public to receive in any year an effective does equivalent of 100 millirem (mrem) per year. 42 U.S.C. § 7401. One or more of the Defendants, as Responsible Parties, are also in violation of the CAA because PORTS has emitted and continues to emit hazardous air pollutants in violation of applicable limitations and standards. 42 U.S.C. § 7412. This includes violations of Hazardous Air Pollutant emissions (42 U.S.C. §§ 7412(f)(4), 7412(i)(3)(A), and state-law equivalents) regarding emissions of

radionuclides (40 C.F.R. Part 61, Subpart I). This also includes unpermitted air emissions more generally (42 U.S.C. § 7412). Despite the foregoing allegations, the Plaintiffs will not be asserting causes of action for violation of RCRA, CAA, and CWA herein; rather, they will file a separate suit and seek consolidation thereof with the instant action.

### E. Concealment of Facts Related to Risk/Fraudulent Concealment

79. Defendants, through their silence as well as their aggressive public relation efforts, have reassured the public and Plaintiffs that their operations have not contaminated nearby properties. In particular, Defendants made misrepresentations that were meant to assure Plaintiffs that the Portsmouth Site presents absolutely no danger to public health.

80. Upon information and belief, Defendants have failed to accurately keep and maintain environmental and regulatory data and records to ensure their reliability.

## VI. CLASS ACTION ALLEGATIONS

81. Plaintiffs seek to represent the following class of individuals:

*(1) All property owners within a 7-mile radius of the Portsmouth Site or other geographic designation as supported by future scientific evidence;*

*(2) All residents and former residents with more than one year of residence within a 7-mile radius of the Portsmouth Site or other geographic designation as supported by future scientific evidence;*

*(3) All current and former students at Zahn's Corner Middle School from 1993 to present as well as their parents; and*

*(4) All property owners with property located within 500 yards of the waterways draining the plant*

*(5) All property owners with property within 500 yards of the Scioto River downstream of a point 500 yards upstream of Piketon until its confluence with the Ohio River at Portsmouth.*

82.    Excluded from the Class are Defendants and their officers, directors, and employees, as well as the Court and its personnel working directly on the case with the exception of court reporters.

83.    Plaintiffs and all others similarly situated are entitled to have this case maintained as a class action pursuant to Federal Rules of Civil Procedure for the following reasons:

(1) The prerequisites for a class action under Federal Rule of Civil Procedure 23(a) are met. The class is so numerous that joinder of all persons is impracticable. As many as two thousand, or more, people are adversely affected by Defendants' release of radioactive materials. The number of Class Members can be readily determined from the United States Census Bureau and school records.

(2) There are common issues of law and fact, including: (a) whether Defendants are liable for damages to the class for negligently allowing the release of radioactive materials into the surrounding inhabited area and/or their failure to warn of those materials' toxicity; (b) the scope of damages caused by Defendants' conduct; (c) whether Defendants are strictly liable for conducting an ultra-hazardous activity injurious to members of the class; (d) whether Defendants are liable for nuisance and trespass; (e) whether Defendants may be compelled under statute or court order to take steps to protect human health and the environment, including but not limited to medical monitoring, topsoil replacement, a compliance audit and improved environmental safety measures; and (f) whether Defendants are liable to the Class

22

for punitive damages. These and other common issues of law and fact relate to and affect the rights of Plaintiffs and Class Members.

84.    Plaintiffs' claims are typical of the class. Plaintiffs all own property and reside and/or were present within the affected area.

85.    Plaintiffs have suffered annoyance, aggravation, as well as economic loss and injury to their real and personal property and/or have been subjected to health risks, that are typical of the experience of Class Members. Plaintiffs' interests are identical to and aligned with those of other Class Members. Plaintiffs and Class Members have suffered an array of damages all stemming from the common trunk of facts and issues related to Defendants' emissions. Those damages are as follows:

(1) Non-Physical Tort Claims are pursued by Class Members for emotional distress, annoyance, loss of enjoyment, nuisance, and inconvenience;

(2) Property Related Claims are pursued by Class Members for trespass, property damage, diminution of value and loss of use of property;

(3) Equitable and Injunctive Relief in the form of Medical Monitoring is pursued by Class Members.

86.    Plaintiffs have retained counsel experienced in the prosecution of class action litigation who will adequately represent the interests of the class;

(1) Plaintiffs and their counsel are aware of no conflicts of interest between Plaintiffs and absent Class Members or otherwise that cannot be managed through the implementation of available procedures;

(2) Plaintiffs, through their counsel have adequate financial resources to assure that the interests of the class will be protected; and

(3) Plaintiffs are knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this litigation.

87.     A class action may be maintained under Federal Rule of Civil Procedure 23(b)(2) because the parties opposing the class have acted and/or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole. Plaintiffs and the Class seek an injunction requiring:

(1) Amendments to Defendants' community warning plans;

(2) A third-party compliance audit of Defendants' waste management operations and environmental health and safety program;

(3) A full-site characterization of the entire affected areas to identify all impacted properties which require cleanup and to limit the opportunity for re-suspension;

(4) Decontamination of homes and top-soil replacement to remediate continuing threats to human health and the environment; and

(5) Implementation of a medical surveillance and medical monitoring program to protect Plaintiffs' and Class Members from on-going threats to their health.

If this injunctive relief is not granted, great harm and irreparable injury to Plaintiffs and members of the Class will continue, and Plaintiffs and members of the Class have no adequate remedy at law for the injuries which are threatened to occur. Absent action from this Court, operations at the Portsmouth Site will continue to damage Plaintiffs and members of the Class and threaten future injury. Defendants' actions and inactions are generally applicable to the Class as a whole, and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Class as a whole.

88.     A class action may also be maintained under Federal Rule of Civil Procedure 23(b)(3) because common issues of law and fact predominate over those issues that might pertain

24

to individual cases, and a class action is superior to other available procedures for the fair and efficient adjudication of this controversy. The interests of all members of the class in establishing the liability of Defendants, and relative fault, for the release of radioactive materials are cohesive. The certification of a Class seeking damages is an appropriate means by which injured Plaintiffs and Class Members may assert claims to recover economic losses and property damage, as well as assert claims for annoyance, aggravation and inconvenience.

89.     A class action may be maintained under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, thereby making appropriate the entry of equitable or injunctive relief to prevent recurrence of the conduct in the future.

90.     Furthermore, any denial of liability and defenses raised by the Defendants would be applicable to all claims presented by all members of the class or can otherwise be managed through available procedures.

91.     Defendants' conduct presents predominant common factual questions. Fundamentally, all of the Plaintiffs' claims arise out of Defendants' course of conduct causing the release of radioactive materials from the Portsmouth Site. Although Defendants' releases affected a sizeable geographic area and many individuals and businesses, they can be traced back to actions taken, or not taken, by Defendants. Whether Plaintiffs and the Class Members are presenting one or more of the relevant categories of Non-Physical Tort Claims, Property Claims and Medical Monitoring, they will present common liability proof that is the same for each member of the Class. Across claim categories, Plaintiffs' common proof of Defendants' liability will involve the same cast of characters, events, discovery, documents, fact witnesses, and experts.

92.     The need for proof of Plaintiffs' and Class Members' damages will not cause individual issues to predominate over common questions. The amounts of economic and non-economic losses, consistent with each of the categories of claims, can be efficiently demonstrated either at trial or as part of routine claims administration through accepted and court-approved methodologies with the assistance of court-appointed personnel, including Special Masters. Certain types or elements of damage are subject to proof using aggregate damage methodologies or simply rote calculation and summation.

93.     A class action is superior to maintenance of these claims on a claim-by-claim basis when all actions arise out of the same circumstances and course of conduct. A class action allows the Court to process all rightful claims in one proceeding. Class litigation is manageable considering the opportunity to afford reasonable notice of significant phases of the litigation to Class Members and permit distribution of any recovery. The prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members in this action, is impracticable and would create a massive and unnecessary burden on the resources of the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of each member of the class or subclasses, should that be determined to be appropriate.

94.     The conduct of this action as a class action conserves the resources of the parties and the court system, protects the rights of each member of the class, and meets all due process requirements.

95.     Certification of the Class with respect to particular common factual and legal issues concerning liability and comparative fault, as well as the necessary and appropriate quantum of

punitive damages, or ratio of punitive damages to actual harm, is appropriate under Federal Rule of Civil Procedure 23(c)(4).

96.     The particular common issues of liability, comparative fault, and the quantum of punitive damages or ratio of punitive damages to actual harm are common to all Class Members no matter what type of harm or injury was suffered by each Class Member.

### VII.    CAUSES OF ACTION

97.     Each cause of action alleged herein is brought against each Defendant.

98.     The Plaintiffs are proceeding tentatively under this, their *Second Amended Complaint*, on Count One (Violation of Price-Anderson Act), Count II (Violation of CERCLA), Count Three (A) (Declaratory Judgment as to Class Rights and Status) and Count Four (Causes of Action for State Law Claims as to Hazardous Substances/Wastes Only). However, if either (1) discovery reveals that one or more defendants or their activities are not subject to Price Anderson, or (2) Count One – Violation of Price Anderson Act is dismissed or otherwise negatively disposed of in any part, the Plaintiffs alternatively assert causes of action in section VIII – (Pleas for Alternative Relief).

99.     The Plaintiffs are proceeding, in good faith, based upon the Defendants' assertions in their *Motion to Dismiss for Failure to State a Claim*, filed against the original *Complaint for Class Action*, that all Defendants' and their respective activities are covered entities and activities under the Price Anderson Act.  Plaintiffs have been provided with no discovery, have been thwarted in their attempts to obtain documents via their requests made pursuant to the Freedom of Information Act and Ohio Public Records Act, and, accordingly, must take the Defendants' assertions at face value.

100.     To the extent that discovery reveals information that Plaintiffs could use to support an argument that one or more Defendants or one or more of the Defendants' activities are not subject to Price Anderson, Plaintiffs herein reserve the right to assert their reserved Pleas for Alternate Relief set forth in Section VIII of this *Second Amended Complaint.*

101.     However, with respect to any responsive motion filed by the Defendants to this *Second Amended Complaint* prior to conclusion of discovery, Plaintiffs are currently only asserting a cause of action for violation of the Price Anderson Act, together with the asserted and reserved causes of action for violation of other Federal Statutes under Count Two.

## COUNT ONE– VIOLATION OF THE PRICE ANDERSON ACT

102.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

103.     In 1957, Congress amended the Atomic Energy Act to implement its policy to foster private sector participation in the nuclear energy industry. These 1957 amendments became known as the Price-Anderson Act ("PAA"). The uranium and other radioactive substances processed, handled, stored, and/or disposed by Defendants at the Portsmouth Site include nuclear by-product materials, special nuclear materials, and/or source materials. 42 U.S.C. § 2014(e), (z), (aa). Any release of these by-product, special nuclear, or source materials causing bodily injury, sickness, disease, death, loss or damage to property, or loss of use of property constitutes a "nuclear incident" under the terms of the Price-Anderson Act. 42 U.S.C. § 2014(q).

104.     Plaintiffs further assert that Defendants' acts and omissions and negligent releases of hazardous, toxic, and radioactive waste materials have exposed Plaintiffs to highly dangerous materials. Plaintiffs suffered loss or damage to property, or loss of use of property, as a direct and proximate result of their exposures. Plaintiffs' cause of action therefore asserts legal liability based

28

upon a "nuclear incident," or series of such incidents (to the extent same occurred and is consequently a "public liability action" within the terms of the PAA).

105.    Each Defendants' conduct constituted a "nuclear incident" within the meaning of the PAA because it was an occurrence within the United States causing loss or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material.

106.    Pursuant to the PAA, the substantive rules for decision in this action arising under 28 U.S.C. § 2210 shall be derived from the law of the State in which the nuclear incident involved occurred, namely, Ohio, unless such law is inconsistent with the provisions of such section.

107.    Ohio substantive rules for decision provide that a person is strictly liable for harm, injury, or damage arising from an abnormally dangerous/ultra-hazardous/unreasonably hazardous activity. Processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials which pose a significant risk of harm to persons living and working in the vicinity of the operation constitute such abnormally dangerous/ultra-hazardous/unreasonably hazardous activity under Ohio law.

108.    Defendants' conduct in the processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials posed significant risk of harm to persons living and working in the vicinity of the operation. The consequences of nuclear accidents or incidents to health, property, and the environment are extremely dire, and can be measured in millions, if not billions of dollars. It is not possible to eliminate all of the risk by taking reasonable precautions. Finally, the processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials has never been a matter of common usage; indeed, private operators historically

were not permitted to engage in such activities at all. The conduct of Defendants' activities at the Portsmouth Site constituted abnormally dangerous activities.

109.    Defendants owed to Plaintiffs a duty of due care which could only be satisfied by the legal, safe, and proper processing, handling, storage, and/or disposal of the radioactive, toxic, and hazardous substances in Defendants' possession. Defendants had a duty to prevent the discharge or release of such substances that might harm Plaintiffs. Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to radioactive, toxic, and hazardous substances, and to warn or notify Plaintiffs of the fact that discharges or releases of these substances had occurred and were likely to occur in the future.

110.    Further, Defendants had a duty to comply with applicable state, federal, and local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials.

111.    To the extent that the Defendants were acting under an NRC license, the Defendants and their activities are subject to liability under the Price Anderson Act.  To the extent that the Defendants were not acting under an NRC license, the Defendants and/or their activities may or may not be subject to liability under the Price Anderson Act, depending upon the yet undiscovered factual circumstances.

112.    Defendants breached these duties by their negligent, grossly negligent, and reckless processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials at the Portsmouth Site. Such conduct was in utter non-compliance with applicable federal, state, and local laws, regulations, and guidelines. Defendants' negligent, grossly negligent, reckless, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances into the communities surrounding the Portsmouth Site. These actual and continued releases

subjected Plaintiffs to an unreasonable risk of harm, and to loss or damage to property, or loss of use of property. Defendants also failed to warn Plaintiffs of the actual and threatened releases of such hazardous, toxic, and radioactive substances and of the reasonably foreseeable effects of such releases, an omission that was negligent, grossly negligent, and reckless. Finally, Defendants failed to act to prevent their releases from harming Plaintiffs.

113.    To the extent Defendants were or are subject to applicable federal regulations, Defendants breached their duty by violating federal regulations with respect to levels of radiation and concentrations of radioactive materials in unrestricted (general public) areas.

114.    Alternatively, Defendants are not regulated under federal regulations lawfully issued pursuant to the Administrative Procedure Act, 5 U.S.C. § 500, *et seq*., and are, accordingly, strictly liable under Ohio law.

115.    Defendants knew about the hazards associated with nuclear operations. The legislative history of the PAA, which was passed with the active participation of private companies involved in the nuclear power industry, is rife with references to the extreme consequences that could be expected in the event of a nuclear incident. Indeed, the gravity of such consequences was a major contributing factor to the passage of the PAA. These Defendants knew or should have known that the generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic, and hazardous substances in connection with their operations at the Portsmouth Site would result in actual injuries and increased risks to the persons, property, and economic interests of the public without taking proper safety precautions.

116.    Defendants' acts and omissions and their negligence were a direct and proximate cause of Plaintiffs' injuries causing both actual present harm and/or creating an increased risk of harm to person. Plaintiffs are entitled to recover damages for such injuries.

117. Because Defendants' conduct was intentional, malicious, grossly negligent, and reckless, Plaintiffs seek punitive damages.

### COUNT TWO- VIOLATION OF THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT (CERCLA)

118. All allegations set forth above are incorporated by reference as if fully set forth herein.

119. The Defendants are liable for the release of hazardous substances under Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a).

120. Defendants are Responsible Parties as defined by CERCLA. The Responsible Parties are each a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

121. Each Responsible Party is a current "owner and operator of a vessel or facility" under 42 U.S.C. § 9607(a). CERCLA Section 101(9) defines "facility" to include "(A) any building, structure, installation, equipment, … storage container, ...or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located ..." 42 U.S.C. § 9601(9).

122. As Responsible Parties, Defendants are liable for release of hazardous substances under Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), for response costs incurred, damages to natural resources (including assessment costs), and the cost of necessary health assessment and/or health effects studies. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides, in part: (1) the owner and operator of a vessel or a facility…(4)…from which there is a release, or a threatened release which

causes the incurrence of response costs, of a hazardous substance, shall be liable for –… (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title. Plaintiffs also seek injunctive relief under 42 U.S.C. § 9607

123. The release of radionuclides and other hazardous substances and/or pollutants by the Responsible Parties constitute "emitting," "escaping," and/or "disposing into the environment," and are thus "releases" as defined under 42 U.S.C. §9601(22). The radionuclide products and other non-radionuclide pollutants are "hazardous substances" as defined by 42 U.S.C. § 9601(14), as they are considered "hazardous mixed wastes". The hazardous substances include, but are not limited to, those listed herein.

124. The releases of hazardous substances occurred at a facility owned and operated by the Responsible Parties, who are therefore "liable" for response costs under § 107(a) of CERCLA, 42 U.S.C. § 9607(a)(1). Plaintiffs seek to recover response costs from the Responsible Parties and any other available relief under CERCLA Section 107(a).

125. Plaintiffs have undertaken response actions in response to the releases or threatened releases of hazardous substances and have incurred necessary costs of response.

126. To date, Plaintiffs have incurred response costs, within the meaning of § 101(25) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(25) and 9607(a), in connection with response actions, in the course of responding to the release of hazardous substances from PORTS. Plaintiffs' response thus far has been in the form of substantial investigation and sampling costs necessary to determine the nature and extent of the releases and contamination of the area around Pike County.

The response costs incurred by Plaintiffs are consistent with the National Contingency Plan, 40 C.F.R. Part 300. These costs now exceed $240,500 spent to date on collecting environmental samples and analytical laboratory fees for the analysis of said samples.

127. Plaintiffs have a basis for a Section 9607 "cost-recovery" suit. If successful, the Responsible Parties could be held liable for, in addition to attorney fees, expert witness fees, and other litigation costs:

- "[N]ecessary costs of response incurred … consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B).

- "[D]amages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release." 42 U.S.C. § 9607(a)(4)(C).

- "[T]he costs of any health assessment or health effects study carried out under section 9604(i)." 42 U.S.C. § 9607(a)(4)(D).

128. Cost recovery for a release of a hazardous substance is limited by "costs of response plus $50,000,000 for any damages under this subchapter." 42 U.S.C. § 9607(c)(1)(B). However, if there is "willful misconduct or willful negligence", or the "primary cause" of the release is a violation of safety, construction, or operating standards or regulations, cost recovery shall be the "full and total costs of response and damages." 42 U.S.C. § 9607(c)(2).

129. On December 09, 2019, prior to the filing of this amended complaint, Plaintiffs provided notice as required by CERCLA of the allegations contained herein and to date Defendants have not taken: (a) cognizable action to fully comply with applicable environmental laws and regulations; and (b) appropriate steps to abate this imminent and substantial endangerment to health and the environment.

34

130.     On December 09, 2019, prior to the filing of this amended complaint, the County also provided notice pursuant to the requirements of 40 C.F.R. 374.2 to the United States Attorney General, the Attorney General of Tennessee, the Administrator of the EPA, the Regional Administrator for EPA Region 5 and the Director of the Agency for Toxic Substances and Disease Registry.

## COUNT THREE(A) - DECLARATORY JUDGMENT AS TO CLASS RIGHTS AND STATUS

131.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

132.     Plaintiffs seek declaratory relief pursuant to 28 U.S.C. §§ 2201.

133.     The above allegations present ascertained or ascertainable facts of a present controversy between Plaintiffs and the Class Members and Defendants.

134.     Plaintiffs, on behalf of those similarly situated, seek declaratory judgment clarifying the rights and obligations of the parties to each other.

## CAUSES OF ACTION FOR STATE LAW CLAIMS AS TO HAZARDOUS SUBSTANCES/WASTES ONLY

135.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

136.     To the extent that the contamination of the Plaintiffs' properties and/or other damages of the Plaintiffs is caused by non-radioactive releases, substances, and/or wastes, the Plaintiffs assert the following state law claims.

137.     By asserting the following state law claims, the Plaintiffs are not asserting these claims at this time as to any contamination or releases of radioactive materials which would be, or could be, governed by the Price Anderson Act.[4]

### COUNT FOUR(A) - NEGLIGENCE/GROSS NEGLIGENCE

138.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

139.     One or more of the Defendants' conduct, acts, and omissions, with respect to hazardous substances and/or wastes, violated duties owed to Plaintiffs and the Class. Defendants' negligence proximately caused damage to Plaintiffs and the Class.

140.     One or more of the Defendants failed to act as a reasonably prudent operator under like circumstances would.

141.     One or more of the Defendants' failure to warn also constitutes negligence.

### COUNT FOUR(B) – TRESPASS

142.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

143.     One or more of the Defendants' conduct, as to hazardous substances and/or wastes, as set forth herein constitutes trespass, which resulted in damages to Plaintiffs and the Class.

### COUNT FOUR(C) – NUISANCE

144.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

---

[4] Plaintiffs are reserving, in section VIII herein, their right to assert, in the alternative, state law claims as to radioactive contamination or releases only upon the occurrence of contingent circumstances, such as dismissal of their Price Anderson claim and/or determination that the Price Anderson Act does not apply.

145.     One or more of Defendants' conduct as set forth herein, as to hazardous substances and/or wastes, constitutes the tort of nuisance which is ongoing and has resulted in damages to Plaintiffs and the Class.

### COUNT FOUR(D) – ULTRA-HAZARDOUS ACTIVITY/ABSOLUTE LIABILITY/STRICT LIABILITY

146.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

147.     One or more Defendants' conduct as set forth herein constitutes the tort of abnormally dangerous/ultra-hazardous/abnormally hazardous activity, which resulted in damages to Plaintiffs and the Class for which Defendants, or one or more of them, are strictly/absolutely liable.

### COUNT FOUR(E) – INJUNCTIVE AND EQUITABLE RELIEF OF MEDICAL MONITORING

148.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

149.     Plaintiffs and the Class have been and continue to be exposed to hazardous and toxic materials, substances and wastes at a concentration higher than expected for the general populace.

150.     Plaintiffs and the Class face a lifetime of latent, dread medical and emotional conditions proven to be linked to exposure to hazardous and toxic materials, substances and wastes.

151.     One or more of the Defendants' tortious actions resulting in hazardous and toxic materials, substances and waste pollution have invaded the legal protections afforded Plaintiffs and the Class by the laws of Ohio.

152.     Plaintiffs and the Class will benefit from medical monitoring for the aforementioned medical and emotional conditions because testing and continued monitoring will bring to light the onset of these medical and emotional conditions so that treatment and intervention may begin at the earliest point possible.

153.     Plaintiffs and the Class will benefit from a medical monitoring program featuring an epidemiological component that collects and analyzes medical monitoring results[5] so that other heretofore unrecognized latent, dread diseases that may be associated with exposure to hazardous and toxic materials, substances and wastes may be identified so that treating professionals may better care for the Class Members and so that medical professionals engaged in the research and development of new treatment will have access to a broader universe of data.

## VIII.   ALTERNATIVE PLEAS FOR RELIEF

154.     The Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

155.     The Plaintiffs are proceeding, under this, their *Second Amended Complaint*, solely on Count One (Violation of Price Anderson Act), Count Two (Violation of Other Federal Statutes), and Count Three(A) (Declaratory Judgment as to Class Rights and Status).   Unless or until discovery reveals that one or more Defendants or their activities are not covered by the Price Anderson Act, or the Plaintiffs' cause of action for violation of Price Anderson Act has been dismissed or otherwise negatively disposed, of, these *Pleas for Alternative Relief* remain preserved but unasserted and, therefore, not ripe for the Court's determination of their applicability to this action.

---

[5] Such epidemiological data will be collected, maintained and analyzed in such a manner as to protect the identity of individual class members.

156.     In the event, however, the Court, for any reason, finds that any of the Plaintiffs'

claims, or one or more Defendants, or their activities, fail to be cognizable or governed under

the Price Anderson Act,[6] the Plaintiffs herein allege the following state law causes of action in

the alternative to the claim set forth above in Count One (Violation of the Price Anderson Act),

as well as two additional requests for declaratory judgment relief under Count Three:

### ALTERNATIVE COUNT ONE(A) - NEGLIGENCE/GROSS NEGLIGENCE

157.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs

as if fully restated herein.

158.     One or more of the Defendants' conduct, acts, and omissions violated duties owed

to Plaintiffs and the Class. Defendants' negligence proximately caused damage to Plaintiffs and

the Class.

159.     One or more of the Defendants failed to act as a reasonably prudent nuclear operator

under like circumstances would.

160.     One or more of the Defendants' failure to warn also constitutes negligence.

### ALTERNATIVE COUNT ONE(B) – TRESPASS

161.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs

as if fully restated herein.

162.     One or more of the Defendants' conduct as set forth herein constitutes trespass,

which resulted in damages to Plaintiffs and the Class.

### ALTERNATIVE COUNT ONE(C) – NUISANCE

---

[6] The following are a non-exclusive list of reasons why such claim could be found to be not cognizable under Price Anderson: a) the releases of the defendants do not rise above the level specified under PAA and/or the applicable regulations; b) the activity complained of by a particular defendant is not covered by an indemnification agreement and/or under a license issued for the defendant or the Plant; c) the standards under PAA and/or the applicable regulations are found to be unconstitutional either generally or as applied to the Plaintiffs' claims.

163.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

164.     One or more of Defendants' conduct as set forth herein constitutes the tort of nuisance which is ongoing and has resulted in damages to Plaintiffs and the Class.

## ALTERNATIVE COUNT ONE(D) – ULTRA-HAZARDOUS ACTIVITY/ABSOLUTE LIABILITY/STRICT LIABILITY

165.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

166.     One or more Defendants' conduct as set forth herein constitutes the tort of abnormally dangerous/ultra-hazardous/abnormally hazardous activity, which resulted in damages to Plaintiffs and the Class for which Defendants, or one or more of them, are strictly/absolutely liable.

## ALTERNATIVE COUNT ONE(E) – INJUNCTIVE AND EQUITABLE RELIEF OF MEDICAL MONITORING

167.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

168.     Plaintiffs and the Class have been and continue to be exposed to radioactive contaminants, which are known to be carcinogenic substances, and other hazardous and toxic materials at a concentration higher than expected for the general populace.

169.     Plaintiffs and the Class face a lifetime of latent, dread medical and emotional conditions proven to be linked to exposure to radioactive particles.

170.     One or more of the Defendants' tortious actions resulting in radioactive pollution have invaded the legal protections afforded Plaintiffs and the Class by the laws of Ohio.

171.     Plaintiffs and the Class will benefit from medical monitoring for the aforementioned medical and emotional conditions because testing and continued monitoring will bring to light the onset of these medical and emotional conditions so that treatment and intervention may begin at the earliest point possible.

172.     Plaintiffs and the Class will benefit from a medical monitoring program featuring an epidemiological component that collects and analyzes medical monitoring results[7] so that other heretofore unrecognized latent, dread diseases that may be associated with exposure to radioactive particles may be identified so that treating professionals may better care for the Class Members and so that medical professionals engaged in the research and development of new treatment will have access to a broader universe of data.

173.     Further, Plaintiffs and the Class will require on-going care for the conditions which are known to result from exposure to radioactive particles.

174.     The harms visited upon Plaintiffs and the Class are irreparable.

175.     Money damages will not suffice because it is impossible to predict with any certainty the costs of such monitoring and treatment for each individual class member nor is it possible to predict new treatment and intervention protocol that may be developed as data from medical monitoring of the Class is provided to the medical research community.

176.     Furthermore, money damages will not suffice because an award of money damages for future monitoring and treatment would not result in comprehensive programs, whereby important information is shared among the medical community so that new treatments, protocols, intervention and test may be developed.

---

[7] Such epidemiological data will be collected, maintained and analyzed in such a manner as to protect the identity of individual class members.

177.     Plaintiffs, on behalf of all those similarly situated, seek a Court-administered fund replenished from time-to-time by one or more of the Defendants to achieve such injunctive and equitable relief as necessary for the continuing benefit of the class, including a court-administered medical monitoring program.

178.     Given the immense wealth of the Defendants, such injunctive and equitable relief presents no undue burden or irreparable damage to the one or more of the Defendants.

### ALTERNATIVE COUNT THREE(B) - DECLARATORY JUDGMENT OF DUE PROCESS PROTECTION OF STATE LAW CLAIMS

179.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

180.     In the event that one or more of the Defendants or their activities, as found by Plaintiffs after reasonable and thorough discovery, are found by the Court not to be governed by or under the Price Anderson Act, Plaintiffs seek declaratory relief pursuant to 28 U.S.C. §§ 2201.

181.     Additionally, in the event that the Court finds that the discharges and/or releases and/or activities do not violate the applicable standard, do not rise to the level of a nuclear incident, that no nuclear incident or incidents have occurred, in their entirety, redressable under Price Anderson, Plaintiffs seek declaratory relief pursuant to 28 U.S.C. §§ 2201.

182.     Under the circumstances as stated in the preceding paragraphs, it would violate the Plaintiffs' due process rights to construe the Price Anderson Act as barring any recovery by Plaintiffs. *Cook v. Rockwell Intern. Corp.,* 790 F.3d 1088, 1099 (10th Cir. 2015)(*Gorsuch, J.*).

183.     As a matter of due process, Congress cannot eliminate longstanding common law rights without providing any "reasonable alternative remedy" unless there is a "compelling" reason to do so. *Id., citing Prune Yard Shopping Ctr. v. Robins,* 447 U.S. 74, 93–94, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (Marshall, J., concurring).

184.    Under the circumstances as stated in the preceding paragraphs, the Plaintiffs request that this Court declare and determine the applicability of state law to the Plaintiffs' claims and damages.

## ALTERNATIVE COUNT THREE(C) - DECLARATORY JUDGMENT OF UNCONSTITIONALITY OF PAA 100 MREM STANDARD

185.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

186.    In the event that one or more of the Defendants or their activities, as found by Plaintiffs after reasonable and thorough discovery, are found by the Court not to be governed by or under the Price Anderson Act, Plaintiffs seek declaratory relief pursuant to 28 U.S.C. §§ 2201.

187.    Additionally, in the event that the Court finds that the discharges and/or releases and/or activities do not violate the applicable standard, do not rise to the level of a nuclear incident, that no nuclear incident or incidents have occurred, in their entirety, redressable under Price Anderson, Plaintiffs seek declaratory relief pursuant to 28 U.S.C. §§ 2201.

188.    Regulations promulgated under the Price Anderson Act erroneously and arbitrarily set a 100 millirem above background average yearly dose for individual members of the public, as specified in 10 C.F.R. part 20, *et seq.*

189.    Such erroneously and arbitrarily set dose limit is based upon little or no scientific data/information/evidence and, as such, its imposition upon the Plaintiffs violates their constitutionally protected rights.

190.    Under the circumstances as stated in the preceding paragraphs, the Plaintiffs request that this Court declare and determine the constitutionality of the application of a dose limit to Plaintiffs' claims and damages.

191.     As the Plaintiffs are not pursuing the unconstitutionality of the Price Anderson Act at the time of the filing of the First and Second Amended Complaints, but rather, as an alternative theory of liability in the event the Court determines the Plaintiffs have not met their burden of proving the applicable levels of contamination thereunder, the Plaintiffs are not placing the United States Attorney on notice, pursuant to Fed. R. Civ. Pro. 5.1(a) and ask that the Court not certify the issue to the United States Attorney, pursuant to Fed. R. Civ. Pro. 5.1(b) until such time as the contingencies set forth herein have occurred.

## DEMAND FOR JURY TRIAL

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this Complaint that are so triable as a matter of right.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for a Jury Trial and for the following relief:

(1) An Order certifying this action to proceed as a Class Action, authorizing Plaintiffs to represent the interests of the Class (or subclasses, as appropriate) and appointing undersigned counsel to represent the Class;

(2) An award of damages or mechanism for recovery for Class Members who incurred any out-of-pocket expenses as a result of Defendants' acts or omissions along with an award of damages to pay for any necessary mitigation or remediation of Class Members' property;

(3) An award of damages or mechanism for recovery to compensate for loss of use and enjoyment of property, annoyance, nuisance, aggravation, and inconvenience as a result of Defendants' acts or omissions;

(4)  An award of punitive damages for all Class Members who were exposed to radioactive materials and/or toxic and/or hazardous materials/wastes as a result of Defendants' acts or omissions;

(5)  A finding that Defendants are jointly and severally liable to the Plaintiffs for any and all damages, whether found or awarded by the Court or a jury;

(6)  An Order implementing a remediation and restoration including full site characterization and cleanup of the Plaintiffs' properties;

(7)  An Order implementing a medical surveillance and medical monitoring program;

(8)  Prejudgment and post-judgment interest;

(9)  An Order establishing such administrative procedures as are reasonable to effectuate the relief granted to Plaintiffs and the Class Members;

(10) Declaratory relief clarifying the rights and obligations of the parties to each other.

(11) That the Court order Defendants to pay for the costs of this proceeding, including reasonable attorneys' fees and costs, including, but not limited to, costs of class notice and administration;

(12) Recovery costs awardable under CERCLA;

(13) Injunctive relief awardable under CERCLA;

(14) Attorneys' fees and costs awardable under CERCLA; and

(15) Such other relief as the Court or jury may deem appropriate.

Respectfully submitted,

/s/ Mark F. Underwood
Mark F. Underwood (Tx.# 24059341)(WV# 7028)
**Underwood Law Offices**
923 Third Avenue
Huntington, WV  25701
Telephone: (304) 209-4387

munderwood@underwoodlawoffices.com

Stuart E. Scott (0064834)
Kevin C. Hulick (0093921)
**Spangenberg Shibley & Liber LLP**
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
Telephone: (216) 696-3232
Facsimile: (216) 696-3924
sscott@spanglaw.com
khulick@spanglaw.com

Jason A. Leasure
**Vital & Vital, L.C.**
536 Fifth Avenue
Huntington, WV  25701
Telephone: (304) 525-0320
jleasure@vitallc.com

Celeste Brustowicz
Stephen H. Wussow
Victor Cobb
**Cooper Law Firm, LLC**
1525 Religious Street
New Orleans, LA  70130
Telephone: (504) 399-0009
cbrustowicz@sch-llc.com
swussow@sch-llc.com
vcobb@sch-llc.com

Stuart H. Smith (of counsel to Cooper Law Firm, LLC)
**Stuart H. Smith, LLC**
508 St. Philip Street
New Orleans, LA  70118
Telephone: (504) 566-1558
ssmith@sch-llc.com

Kevin W. Thompson
David R. Barney, Jr.
**Thompson Barney**
2030 Kanawha Boulevard, East
Charleston, WV  25311
Telephone: (304) 343-4401
Facsimile: (304) 343-4405
kwthompsonwv@gmail.com

drbarneywv@gmail.com

**ATTORNEYS FOR PLAINTIFFS**