IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

URSULA MCGLONE, et al.,                      :
                                             :     Case No. 2:19-cv-02196
            Plaintiffs,                       :
                                             :     JUDGE ALGENON L. MARBLEY
      v.                                      :
                                             :     Magistrate Judge Deavers
CENTRUS ENERGY CORPORATION, et al.,          :
                                             :
                                             :
            Defendants.                       :

## OPINION & ORDER

### I. INTRODUCTION

This matter is before the Court on Defendants Centrus Energy Corporation; United States Enrichment Corporation; Uranium Disposition Services, LLC; BWXT Conversion Services, LLC; Mid-America Conversion Services; Bechtel Jacobs Company, LLC; LATA/Parallax Portsmouth, LLC; and Fluor-BWXT Portsmouth, LLC's Motion to Dismiss. Doc. 83. Due to the suspension of in-court proceedings as a result of the COVID-19 pandemic, the Court will resolve this Motion on the briefs and without oral argument. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion [#83].

### II. BACKGROUND

Plaintiffs Ursula McGlone, Jason McGlone, Julia Dunham, Brittani Rider, and Adam Rider, proceeding on behalf of themselves, their minor children, and all others similarly situated, initiated this civil action on May 26, 2019, alleging that they were injured when uranium radiation was released onto their property from the Portsmouth Gaseous Diffusion Plant (the "Plant") in Pike County, Ohio.

1

From 1954 to 2001, the Plant produced enriched uranium to support the United States' nuclear weapons program and to support commercial nuclear reactors.  Beginning in 1989, and continuing today, there have been ongoing efforts to clean up the environmental harm caused by uranium production at the Plant.  This remediation was undertaken, in part, pursuant to a Consent Decree overseen by the Ohio EPA.  Each of the Defendants in this case was, at some point between 1993 and present day, responsible for at least one of the following activities at the Plant: uranium enrichment operations; depleted uranium hexafluoride conversion; or environmental remediation.

The Plaintiffs in this case all own property located within five miles of the Plant.  Plaintiffs contend that their properties have been impacted by or are within the zone impacted by the release of radioactive and toxic materials from the Plant.  Plaintiffs have thus filed this lawsuit raising 15 claims:

1)  **Count One:** Violation of the Price-Anderson Act;

2)  **Count Two:** Violation of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA);

3)  **Count Three (A):** Declaratory Judgment as to Class Rights and Status;

4)  **Count Four (A):** Negligence/Gross Negligence;

5)  **Count Four (B):** Trespass;

6)  **Count Four (C):** Nuisance;

7)  **Count Four (D):** Ultra-Hazardous Activity/Absolute Liability/Strict Liability;

8)  **Count Four (E):** Injunctive and Equitable Relief of Medical Monitoring;

9)  **Alternative Count One (A):** Negligence/Gross Negligence;

10)  **Alternative Count One (B):** Trespass;

11)  **Alternative Count One (C):** Nuisance

12) **Alternative Count One (D):** Ultra-Hazardous Activity/Absolute Liability/Strict Liability;

13) **Alternative Count One (E):** Injunctive and Equitable Relief of Medical Monitoring;

14) **Alternative Count Three (B):** Declaratory Judgment of Due Process Protection of State Law Claims; and

15) **Alternative Count Three (C):** Declaratory Judgment of Unconstitutionality of PAA 100 MREM Standard.[1]

Doc. 78.  Defendants now move to dismiss Plaintiffs' Complaint for a failure to state a claim upon which relief can be granted.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint for a failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, "the plaintiff must allege facts that, if accepted as true, are sufficient to raise a right to relief above the speculative level and to state a claim to relief that is plausible on its face." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)) (internal quotations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).  And although the court "must accept all well-pleaded factual

---

[1] Plaintiffs have not yet filed notice of this constitutional challenge with the United States Attorney General as required under Federal Rule of Civil Procedure 5.1.  Plaintiffs thus ask the Court to refrain from certifying this issue for review.  The Court will instead **DISMISS** Alternative Count Three (C) **WITHOUT PREJUDICE**.

allegations in the complaint as true," the court "need not accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal quotations omitted).

## IV. ANALYSIS

Defendants move to dismiss Plaintiffs' Complaint for a failure to state a claim upon which relief can be granted. Defendants advance several arguments. The Court will address each of these arguments, in turn, below.

### A. Price-Anderson Act Claim (Count One)

First, Defendants contend that Plaintiffs have not stated a cognizable claim under the Price-Anderson Act because: (1) Plaintiffs fail to allege that they or their properties have been exposed to radiation above the federal numerical dose limits; (2) Plaintiffs fail to allege that the actions of any one Defendant caused their injuries; and (3) Plaintiffs fail to allege a compensable injury. Because Defendants' first argument is dispositive of the issue, the Court need not address arguments two or three.

Congress enacted the Price-Anderson Act in 1957 as an amendment to the Atomic Energy Act "to encourage private sector investment in development of nuclear power by limiting the liability of private owners and operators in the event of a nuclear incident." *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1549 (6th Cir. 1997) (*Day v. NLO, Inc.*, 3 F.3d 153, 154 n.1 (6th Cir. 1993)). "The Act requires private owners and operators 'to purchase a specified amount of insurance, and damage awards over and above that amount are then indemnified by the government.'" *Id.* (quoting *Day*, 3 F. 3d at 154 n.1). "In 1988, Congress enacted the Price-Anderson Amendments Act of 1988, which explicitly created a federal cause of action for 'public liability actions' that arise from nuclear incidents." *Id.*

A public liability action is defined as "any legal liability arising out of or resulting from a 'nuclear incident.'" *Id.* at 1550. A nuclear incident, in turn, is "any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." *Id.* (quoting 42 U.S.C. § 2014(q)). To prevail on a claim under the Price-Anderson Act, Plaintiffs must establish four elements: (1) Defendants released radiation into the environment in excess of federal regulatory limits; (2) Plaintiffs were exposed to this radiation; (3) Plaintiffs have injuries; and (4) radiation was the cause of those injuries. *See In re TMI*, 67 F.3d 1103, 1119 (3d Cir. 1995). The federal regulatory limits applicable to this case can be found in 10 C.F.R. § 1301.[2] *See Adkins v. Chevron Corp.*, 960 F. Supp. 2d 761, 769 (E.D. Tenn. 2012) ("The permissible dose limits are found at 10 C.F.R. § 20.1301."); *TNS, Inc. v. N.L.R.B.*, 296 F.3d 384, 398 (6th Cir. 2002) ("[T]he Sixth Circuit has joined with almost every other circuit in holding that NRC safety regulations conclusively establish

---

[2] 10 C.F.R. § 1301:

> (a) Each licensee shall conduct operations so that—
>
> (1) The total effective dose equivalent to individual members of the public from the licensed operation does not exceed 0.1 rem (1 mSv) in a year, exclusive of the dose contributions from background radiation, from any administration the individual has received, from exposure to individuals administered radioactive material and released under § 35.75, from voluntary participation in medical research programs, and from the licensee's disposal of radioactive material into sanitary sewerage in accordance with § 200.2003, and
>
> (2) The dose in any unrestricted area from external sources, exclusive of the dose contributions from patients administered radioactive material and released in accordance with § 35.75, does not exceed 0.002 rem (0.02 millisievert) in any one hour.

the duty of care owed by defendants in radiation safety personal injury cases governed by the 1998 amendments to the Price-Anderson Act.").

Here, Defendants argue, among other things, that Plaintiffs' Complaint must be dismissed because they were required, but failed, to allege that they or their properties have been exposed to radiation above the federal regulatory limits. In response, Plaintiffs argue that they were only required to allege that Defendants released radiation in excess of federal regulatory limits, not that they were exposed to radiation in excess of these limits.

While there is some support for Plaintiffs' position, the cases reaching this conclusion have done so based on the interpretation of federal regulations that have now been superseded by 10 C.F.R. § 20.1301. *See In re TMI* 67 F.3d at 1116 ("The language of §§ 20.105 and 20.106, which regulate off-site radiation exposures, does not suggest that a breach occurs only when persons are exposed to excessive radiation. Instead, the regulations provide that a breach occurs whenever excessive radiation is released, whether or not anyone is present in the area exposed."); *McClurg v. Mallinckrodt, Inc.*, 2017 WL 2929444, at *6 (E.D. Mo. July 7, 2017) ("The Court agrees with the Third Circuit that this language [in §§ 20.105 and 20.106] does not suggest that a breach occurs only when the persons are exposed to excessive radiation. Instead, the regulations provide that a breach occurs whenever excessive radiation is released, whether or not anyone is present in the area exposed.") (internal quotations omitted). In 1991, §§ 20.105 and 20.106 were replaced by § 20.1301 "to reflect changes in the basic philosophy of radiation protection." *Good v. Fluor Daniel Corp.*, 222 F. Supp. 2d 1236, 1248 (E.D. Wash. 2002). Now, "[r]ather than bar release of radiation above a certain amount, the regulations bar *exposure* above a specified amount." *Id.* (citing 10 C.F.R. § 20.1301 (requiring licensees to conduct operations so that "[t]he total effective dose equivalent to individual members of the public from the licensed operation does not exceed 0.1

rems (1 millisievert) in a year")); *see Adkins*, 960 F. Supp. 2d at 771 ("District court decisions are just as overwhelming on the issue of whether an essential element of a public liability action is that the plaintiff's exposure exceeded the federal dose limits.").

Here, Plaintiffs' Complaint fails to allege that they or their properties have been exposed to radiation in excess of the limits prescribed in § 20.1301. Instead, Plaintiffs allege:

- Jason and Ursula McGlone's property, where they and L.M., G.M., B.M., E.M., and M.M. live, and (sic) is approximately two miles from the Portsmouth Site. This proximity puts the McGlone's property in the direct path of radioactive air emissions, radioactive particles distributed by the wind blowing such contamination off the site in dirt and dust, most if not all of which emanate from the Portsmouth Site.

- Julia Dunham's Property, where she, K.D., and C.D. reside, is approximately four miles from the Portsmouth Site. This proximity puts Ms. Dunham's property in the direct path of radioactive air emissions, radioactive particles distributed by the wind blowing such contamination off the site in dirt and dust, all of which emanate from the Portsmouth Site.

- Adam and Brittani Rider's Property, where they and M.R., C.R., L.R. and L.R. live, and (sic) is approximately four and one-half miles from the Portsmouth Site. This proximity puts the [Rider's] property in the direct path of radioactive air emissions, radioactive particles distributed by the wind blowing such contamination off the site in dirt and dust, most if not all of which emanate from the Portsmouth Site.

- Plaintiffs' properties have either tested positive for contamination or are in the zone of contamination.

Doc. 78 at 13. Nowhere do Plaintiffs specifically claim that they or their properties were exposed to radiation in excess of federal limits.

Alternatively, Plaintiffs argue that the federal regulatory limits in § 20.1301 do not apply to six of the Defendants -- Uranium Disposition Services, LLC; BWXT Conversion Services, LLC; Mid-America Conversion Services; Bechtel Jacobs Company, LLC; LATA/Parallax Portsmouth, LLC; and Fluor-BWXT Portsmouth, LLC -- because these Defendants were not licensed by the Nuclear Regulatory Commission. *See* 10 C.F.R. § 20.1002 ("The regulations in this part apply to

persons licensed by the Commission to receive, possess, use, transfer, or dispose of byproduct, source, or special nuclear material or to operate a production or utilization facility under parts 30 through 36, 39, 40, 50, 52, 60, 61, 63, 70, or 72 of this chapter, and in accordance with 10 CFR 76.60 to persons required to obtain a certificate of compliance or an approved compliance plan under part 76 of this chapter.").  Consequently, Plaintiffs maintain that these Defendants can be held strictly liable under Ohio law for their radiation emissions.

Plaintiffs supply no case law suggesting that non-licensees in a Price-Anderson Act suit are held to a different standard than licensees.  In fact, one court within this District has held just the opposite.  *See* Doc. 83-2 at 34 n.30, *Boggs v. Divested Atomic Corp.*, Case No. 90-cv-840 (S.D. Ohio Aug. 23, 2007) (Rice, J.) ("Part 20 governs activity by entities which are licensed by the NRC to possess, use, transfer or dispose of radioactive material.  See 10 C.F.R. § 20.1002.  The Defendants are contractors for the DOE rather than licensees of the NRC.  However, the regulations contained in Part 20 were made applicable to such contractors by virtue of Executive Order 12088 (1978).  See 43 F.R. 47707 (1978).  See also, Executive Order 11752 (1973), 38 F.R. 34793 (1973).").  Further, DOE General Order 458.1 requires contractors to "establish and implement procedures and practices" to ensure that "exposure of members of the public to ionizing radiation will . . . [n]ot cause a total effective dose (TED) exceeding 100 mrem (1mSv) in a year[.]".  *See* U.S. Dept. of Energy Order 458.1 (February 11, 2011).  This is the exact standard established by § 20.1301 for licensees.  The Court, therefore, finds no basis to hold Defendants to a more onerous standard than what § 20.1301 requires.

Nor does the Court find persuasive Plaintiffs' argument that 10 C.F.R. § 20.1101 sets the applicable standard in this case, as opposed to § 20.1301.  *See* 10 C.F.R. § 20.1101(b) ("The licensee shall use, to the extent practical, procedures and engineering controls based upon sound

radiation protection principles to achieve occupational doses and doses to members of the public that are as low as is reasonably achievable (ALARA).").  Several courts within the Sixth Circuit have already rejected this argument.  *See Adkins*, 960 F. Supp. 2d at 772 ("[S]o far as this Court knows, every court to address the ALARA standard referred to by plaintiffs has rejected it as the standard of care in a public liability action."); Doc. 83-2 at 37, *Boggs v. Divested Atomic Corp.*, Case No. 90-cv-840 (S.D. Ohio Aug. 23, 2007) ("ALARA is in essence a negligence standard which would allow juries to become the final arbiters of how much radiation can be released without violating federal law.  Such a result would violate the Supreme Court's admonition that 'the Federal Government maintains complete control of the safety and nuclear aspects' of nuclear energy.  Accordingly, the Court conclude[s] that ALARA is not part of the standard of care with which the Defendants were obligated to comply.") (internal citations omitted).  This Court will follow suit.

In short, Plaintiffs fail to state a cognizable claim against Defendants under the Price-Anderson Act.  Because Plaintiffs do not allege that they or their properties were exposed to radiation levels in excess of the limits set forth in 10 C.F.R. § 20.1301, Plaintiffs' claim in Count One of the Complaint is **DISMISSED**.

### B.  State Law Claims (Alternative Count One)

Defendants also argue that Plaintiffs' state law claims, as set forth in Alternative Count One (A) through (E), are preempted by the Price-Anderson Act, and thus, subject to dismissal. The Court agrees.

Several courts within this Circuit, including the Sixth Circuit itself, have addressed the issue of preemption in connection with the Price-Anderson Act.  In *Nieman*, the Sixth Circuit held that "a claim growing out of any nuclear incident is compensable under the terms of the [Price-

Anderson Act] or it is not compensable at all." 108 F.3d at 1552 (quoting *In re TMI II*, 940 F.2d 832, 854 (3d Cir. 1991)); *see Rainer v. Un. Carbide Corp.*, 402 F.3d 608, 617 (6th Cir. 2005) ("As the district court noted, this court has interpreted the Price-Anderson Act as preempting otherwise applicable state-law causes of action."). Similarly, in *Adkins*, the Eastern District of Tennessee, relying on *Nieman*, held that "the Price-Anderson Act completely preempts state law causes of action for public liability arising out of or resulting from nuclear incidents." 960 F. Supp. 2d at 767; *see Smith v. Carbide & Chems. Corp.*, 2009 WL 3007127, at *2 (W.D. Ky. Sept. 16, 2009) ("In 1988, Congress enacted the Price-Anderson Amendments Act of 1988, which created a federal cause of action for 'public liability actions' that arise from nuclear incidents. As a result, the Act now provides the 'exclusive means' for pursuing claims arising out of any nuclear incident."). It follows that, within the Sixth Circuit, if Plaintiffs' allegations arise out of a "nuclear incident," then such claims are preempted by the Price-Anderson Act.

Other courts almost uniformly follow this Circuit's approach. *See In re TMI II*, 940 F.2d at 854-55 ("Under the terms of the Amendments Act, the 'public liability action' encompasses '*any* legal liability' of any 'person who *may* be liable' on account of a nuclear incident. Given the breadth of this definition, the consequence of a determination that a particular plaintiff has failed to state a public liability claim potentially compensable under the Price-Anderson Act is that he has no such claim at all.") (internal citation omitted) ("[T]here can be no action for injuries caused by the release of radiation from federally licensed nuclear power plants separate and apart from the federal public liability action created by the Amendments Act."); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105 (7th Cir. 1994) ("[S]tates are preempted from imposing a non-federal duty in tort, because any state duty would infringe upon pervasive federal safety regulations in the field of nuclear safety, and thus would conflict with federal law."); *Roberts v. Florida Power*

10

*& Light Co.*, 146 F.3d 1305, 1308 (11th Cir. 1998) ("[V]irtually every federal court to consider the issue, including three circuit court of appeals, have held that 'federal regulations must provide the sole measure of the defendants' duty in a public liability cause of action. This is because any state duty would infringe upon pervasive federal regulation in the field of nuclear safety, and thus would conflict with federal law.") (internal quotations and citations omitted); *but see Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1099 (10th Cir. 2015) (finding the Price-Anderson Act does not preempt "a state law nuisance claim when a nuclear incident is asserted but unproven"); *cf. Dailey v. Bridgeton Landfill, LLC*, 290 F. Supp.3d 1090, 1098 (E.D. Mo. 2017) (rejecting *Cook* and holding a plaintiff cannot proceed on the basis of Price-Anderson Act liability and state law liability simultaneously).

Here, Alternative Count One (A) through (E) are all Ohio state law claims based on the exact same conduct and injury alleged under Plaintiffs' Price-Anderson Act claim: Defendants' facility emitted radioactive material, which resulted in damage to or interference with their property. To be sure, Plaintiffs' Complaint specifies that Alternative Count One (A) through (E) was intended, at least in part, to serve as a backup should the Court find that "the releases of the [D]efendants do not rise above the level specified under PAA and/or the applicable regulations." *See* Doc. 78 at 39 n.6. In *Nieman*, however, the Sixth Circuit made clear that the Price-Anderson Act preempts state law claims arising out of a nuclear incident -- which is defined as any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material. *See* 108 F.3d at 1552; 42 U.S.C. § 2014(q). Plaintiffs' state law claims in Alternative Count One (A)

through (E) fit squarely within this definition. Accordingly, Alternative Count One (A) through (E) are **DISMISSED**.

Additionally, in Alternative Count Three (B), Plaintiffs assert that Price-Anderson Act preemption violates their due process rights by depriving them an adequate remedy under state law. The Sixth Circuit has already disposed of this argument in an analogous context. *See Rainer v. Un. Carbide Corp.*, 402 F.3d 608, 624 (6th Cir. 2005) ("Because Supreme Court precedent clearly calls for judicial restraint where Congress has provided what it considers adequate remedial mechanisms for constitutional violations, and because the Price-Anderson Act constitutes such an adequate remedial mechanism, we find no basis for the plaintiffs to bring their *Bivens* claims."). Similarly, here, the Price-Anderson Act provides an adequate remedial mechanism for state tort law violations. *See id.* (noting a public liability action under the Price-Anderson Act encompasses "any" legal liability arising out or resulting from a nuclear incident); *Day*, 3 F.3d at 154 n.1 ("The amendment [to the Price-Anderson Act] was not intended to alter the state law nature of the underlying tort claims. It provides that 'the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident occurs, unless such law is inconsistent with the provisions of such section.") (quoting 42 U.S.C. § 2014(hh)); *Nieman*, 108 F.3d at 1553 ("His federal claim will be derived from state law, as mandated by § 2014(hh), to the extent it is not inconsistent with federal law.").

Moreover, "the Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object." *Silver v. Silver*, 280 U.S. 117, 122 (1929). Congress created the Price-Anderson Act to remove the economic impediments of private sector investment in the development of nuclear power while simultaneously providing the public compensation in the event of a nuclear incident. *See Duke*

*Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 83 (1978). To this end, the Act now serves as the sole mechanism through which aggrieved parties may pursue legal liability arising out of or resulting from a nuclear incident. *See Rainer*, 402 F.3d at 624. Such economic balancing on the part of Congress has "a presumption of constitutionality" and "the burden is on [the] one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Duke Power Co.*, 438 U.S. at 83. Plaintiffs have not met that burden here. To the contrary, "[p]ermitting the states to apply their own nuclear regulatory standards, in the form of the duty owed by nuclear defendants in tort" -- as Plaintiffs suggest -- "would . . . 'frustrate the objectives of federal law.'" *In re TMI II*, 940 F.2d at 859. For these reasons, Plaintiffs' request in Alternative Count Three (B) for a declaratory judgment that Price-Anderson Act preemption violates their due process rights is **DISMISSED**.[3]

### C. CERCLA Claim (Count Two)

Next, Defendants argue that Plaintiffs' CERCLA claim must be dismissed for six independent reasons: (1) Plaintiffs fail to allege that any Defendant is a "responsible party" within the meaning of the statute; (2) Plaintiffs fail to allege that Defendants engaged in negligent, grossly negligent, or intentional misconduct; (3) Plaintiffs fail to allege that they have incurred necessary response costs; (4) Plaintiffs fail to allege that any response costs were consistent with the National

---

[3] Plaintiffs also suggest that Price-Anderson Act preemption violates the Fifth Amendment's Takings Clause, as it deprives them of an adequate remedy under state law for property damages, thereby amounting to a governmental taking of their homes without just compensation. As explained, however, the Price-Anderson Act provides an adequate remedial mechanism for state tort law violations. Moreover, the Government has not taken Plaintiffs' private property; rather, the Government has limited Plaintiffs' ability to pursue legal action under state common law. *See Mondou v. New York, N.H. & H.R. Co.*, 223 U.S. 1 50 (1912) ("A person has no property, no vested interest, in any rule of the common law.").

Contingency Plan; (5) Plaintiffs seek relief that cannot be recovered under the CERCLA; and (6) Plaintiffs' cost-recovery claim is time-barred.

The CERCLA is a statute which "facilitates cleanup and remediation of contaminated lands, and shifts the financial burden of such environmental response actions to the parties responsible for releasing hazardous substances." *Ohio ex rel. DeWine v. Breen*, 362 F. Supp. 3d 420, 434 (S.D. Ohio 2019) (quoting *ITT Indus., Inc. v. BorgWarner, Inc.*, 506 F.3d 452, 456 (6th Cir. 2007)). "CERCLA imposes liability on certain categories of potentially responsible parties ('PRPs') including: the current owner and operator of a contaminated facility, the owner or operator of a facility at the time hazardous substances were disposed of, and any person who arranged for disposal of such hazardous substances at a facility." *Id.* To state a claim under the CERCLA, Plaintiffs must establish four elements: "(1) the property is a facility; (2) there has been a 'release' or a 'threatened release' of a hazardous substance; (3) the release has caused the plaintiff to incur necessary costs of response that are consistent with the National Contingency Plan ('NCP'); and (4) the defendant is in one of four categories of potentially responsible parties ('PRPs')." *Id.* (citing *Reg'l Airport Auth. v. LGF, LLC*, 460 F.3d 697, 703 (6th Cir. 2006)). Under this backdrop, the Court will turn to Defendants' arguments.

### 1. Whether Plaintiffs Allege Defendants are Responsible Parties

First, Defendants argue that Plaintiffs' CERCLA claim must be dismissed because Plaintiffs fail to allege with plausibility that any of the Defendants are the current "owners and operators" of the Plant. Defendants, however, construe Plaintiffs' Complaint too narrowly.

There are four classes of individuals that can be held liable for the release of hazardous substances under the CERCLA: (1) current owners and operators of a facility where hazardous substances were disposed; (2) past owners or operators who owned or operated a facility at the

time of release; (3) transporters of hazardous substances; and (4) persons who arranged for disposal or treatment at any facility containing such substance. *Id.* at 437 (citing 42 U.S.C. § 9607(a)(1)-(4)). "To establish liability under CERCLA's section 9607(a)(1), [Plaintiffs] must prove that a defendant currently owns *and* operates a facility. In contrast, section 9607(a)(2) imposes liability on any person who at the time of disposal of any hazardous substance *owned or operated* any facility at which such hazardous substances were disposed of." *Id.* (internal quotations and citations omitted).

Here, Plaintiffs' Complaint alleges that "[e]ach responsible party is a current owner and operator of a vessel or facility under 42 U.S.C. § 9607(a)." *See* Doc. 78 at 32; *see also id.* at 33 ("The releases of hazardous substances occurred at a facility owned and operated by the Responsible Parties, who are therefore 'liable' for response costs under § 107(a) of CERCLA, 42 U.S.C. § 9607(a)(1)."). It is thus true that, as Defendants maintain, Plaintiffs plainly allege Defendants are responsible parties under § 9607(a)(1). The problem with this allegation, however, is that none of the Defendants owns the Plant. Rather, the United States Government does. Moreover, many of the Defendants have been off-site for several years and, therefore, cannot be considered current operators of the Plant. *See id.* at 8-10.

Notwithstanding the above, the Court is reminded that the pleading standards of Federal Rule of Civil Procedure 8 are to be construed liberally. *See Carter v. Ford Motor Co.*, 561 F.3d 562, 567 (6th Cir. 2009) ("Had the challenge to the sufficiency of her pleading arisen in the context of a Rule 12(b)(6) motion, the district court would have applied the 'extremely modest standard' of notice pleading, which direct[] courts to construe pleading[s] liberally."). Moreover, Rule 8(e) demands that pleadings "be construed so as to do justice." Fed. R. Civ. P. 8(e). Consistent with these principles, "the Rules require that [the Court] not rely solely on labels in a complaint, but

that [it] probe deeper and examine the substance of the complaint.  *Minger v. Green*, 239 F.3d 793, 799 (6th Cir. 2001).  To this end, the Sixth Circuit has made clear that "the label which a plaintiff applies to a pleading does not determine the nature of the cause of action which he states."  *Id.* (quoting *United States v. Louisville & Nashville R. Co.*, 221 F.2d 698, 701 (6th Cir. 1955)).

Throughout their 45-page Complaint, Plaintiffs have alleged that each of the Defendants, at different points between 1993 and present day, were responsible for either operations at the Plant or environmental remediation, including the disposal of waste.  *See* Doc. 78 at 8-10.  These allegations were sufficient to suggest that Plaintiffs intended to proceed under § 9607(a) generally, as opposed to just under § 9607(a)(1).  *See United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 503 (6th Cir. 2008) ("[A] complaint need not provide an exhaustive roadmap of a plaintiff's claims, but it must be sufficient to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.  So long as a complaint provides the defendant with such minimal notice, Rule 8's requirements are met.") (internal quotations and citations omitted).  Certainly, Defendants fall within the definition of a responsible party set forth in §§ 9607(a)(2)-(4), as they were either past operators at the Plant or responsible for the disposal of toxic waste.  Therefore, to dismiss Plaintiffs' Complaint on a technicality because they labeled their claim as one under § 9607(a)(1) as opposed to §§ 9607(a)(2)-(4) would result in a manifest injustice.  Hence, the Court will not do so here.

### 2.   Whether Plaintiffs Allege Negligence, Gross Negligence, or Intentionality

Next, Defendants argue that Plaintiffs' CERCLA claim must be dismissed because Plaintiffs fail to allege that Defendants' conduct was negligent, grossly negligent, or constituted intentional misconduct.

42 U.S.C. § 9619(a) provides that any "person who is a response action contractor with respect to any release of a hazardous substance or pollutant or contaminant from a vessel or facility shall not be held liable" under any federal law unless the release caused by the response action contractor was the result of conduct "which is negligent, grossly negligent, or which constitutes intentional misconduct." 42 U.S.C. § 9619(a)(1)-(2). A response action contractor ("RAC") is any person "who enters into a response action contract with respect to any release or threatened release of a hazardous substance or pollutant or contaminant from a facility and is carrying out such contract." 42 U.S.C. § 9619(e)(2)(A)(i). A response action contract, in turn, is a written agreement entered into by a response action contractor with a federal agency "to provide any remedial action under this chapter at a facility listed on the National Priorities List, or any removal under this chapter, with respect to any release or threatened release of a hazardous substance or pollutant or contaminant from the facility." 42 U.S.C. § 9619(e)(1).

As a threshold matter, Defendants claim that they are all RACs as defined in § 9619(e)(2) whereas Plaintiffs maintain that only two of the eight Defendants -- Bechtel Jacobs Company, LLC and Fluor-BWXT Portsmouth, LLC -- are RACs. Plaintiffs contend that Defendants Centrus Energy Corporation; United States Enrichment Corporation; Uranium Disposition Services, LLC; BWXT Conversion Services, LLC; Mid-America Conversion Services; and LATA/Parallax Portsmouth, LLC are instead "operators," in that they directed the workings of, management of, and affairs of the Plant, as opposed to facilitating remediation. Consequently, Plaintiffs argue that these six Defendants are subject to strict liability under the CERCLA.

Taking the allegations in Plaintiffs' Complaint at face value, three -- not two -- of the eight Defendants qualify as RACs responsible for environmental remediation at the Plant:

**Environmental Remediation and Waste Management**

37.     Environmental cleanup at the Portsmouth Site began in 1989, has been continuous, and continues today.

38.     Between 1997 and 2005 Bechtel Jacobs Company, LLC ("Bechtel Jacobs") was responsible for environmental remediation at the Portsmouth Site.

39.     Between 2005 and 2010 LATA/Parallax Portsmouth, LLC ("LATA/Parallax") was responsible for environmental remediation at the Portsmouth Site.  LATA/Parallax was responsible for groundwater and soil remedial actions, removing legacy waste, decontamination and decommissioning (D&D) facilities, highly enriched uranium disposition, operating the site waste storage facilities, and surveillance and maintenance activities, as well as other activities.

40.     From 2010 to present Fluor-BWXT Portsmouth, LLC ("Fluor-BWXT") has been responsible for environmental remediation at the Portsmouth Site.  Fluor-BWXT's work is expected to continue until 2024.

Doc. 78 at 10.  The other five Defendants are alleged to have been responsible for the production of uranium or operations at the Plant.  *See id.* at 8-10.  At this stage, the Court accepts the facts alleged in Plaintiffs' Complaint as true; however, discovery may ultimately prove otherwise.[4]

Because it appears that at least three of the Defendants qualify as RACs, Plaintiffs are required to plead facts establishing that their conduct in connection with cleanup activities at the Plant were negligent, grossly negligent, or constituted intentional misconduct.  Here, Plaintiffs have alleged the following facts demonstrating Defendants' misconduct:

"Defendants' acts and omissions and negligent releases of hazardous, toxic, and radioactive waste materials have exposed Plaintiffs to highly dangerous materials."  Doc. 78 at 28.

"According to recent scientific testing, radioactive materials which have been identified as originating from the plant, particularly enriched Uranium, exist at statistically significant excess levels in the sediments and floodwater sediments of the nearby creeks and rivers.

---

[4] Plaintiffs assert that the RAC Defendants can also be held liable as operators because they had dual duties.  *See Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1341 (9th Cir. 1992) (rejecting argument that "a contractor can *never* be liable as an operator under section 9607(a)(2)).  While this argument might apply to Defendant LATA Parallax Portsmouth, LLC, there are no facts in the Complaint suggesting Defendants Bechtel Jacobs Company, LLC or Fluor-BWXT Portsmouth, LLC had operational duties at the Plant.

These creeks and rivers are ones into which radioactive liquid discharges from the plant are and have been released and also into which airborne discharges which are washed out by precipitation find their way into by means of runoff." Doc. 78 at 19.

"Reports by DOE, NIOSH and EPA, demonstrate that there have been multiple instances of releases of contaminants from the Portsmouth Site, including both radioactive and/or hazardous contaminants, to the water, air, and soil in violation of federal statutes and/or regulations." Doc. 78 at 11.

"Recent scientific testing performed at locations adjacent to the plant on publicly accessible areas supports a conclusion that external radiation levels exceed the allowable level of exposure to members of the public under federal law, including The Price-Anderson Act, and including, but not limited to, more than 100 millirems above background levels in a calendar year." Doc. 78 at 11.

"The counties which contain and are adjacent to the plant, namely Pike, Scioto, Vinton, Adams, and Lawrence counties, are among those having the highest cancer rates in the State of Ohio." Doc. 78 at 12.

Plaintiffs have met their minimal burden at the pleading stage.[5]

3. Whether Plaintiffs Allege Necessary, Recoverable Response Costs that are Consistent with the National Contingency Plan

Next, Defendants argue that Plaintiffs' CERCLA claim must be dismissed because Plaintiffs fail to allege that they incurred necessary response costs. The Court agrees.

Whether costs were necessary "is a threshold issue for recovery under § 107(a)." *Reg'l Airport Auth. Of Louisville v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006). Costs are necessary "if incurred in response to a threat to human health or the environment." *Id.* Here, Plaintiffs are seeking to recover four types of costs: (1) attorney fees, expert witness fees, and other litigation

---

[5] To the extent Defendants argue that Plaintiffs fail to tie a specific release to a particular Defendant, the Court believes this argument is premature. Plaintiffs are claiming damages stemming from contaminants that have been released from the Plant between 1993 and present day, and each of the Defendants have assumed control over that Plant at some point during this period. It would be virtually impossible at this stage for Plaintiffs to tie these releases to a particular Defendant without the benefit of discovery. It is, therefore, enough that Plaintiffs have alleged a specific timeframe.

costs; (2) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; (3) the costs of any health assessment or health effects study carried out under 42 U.S.C. § 9604( i); and (4) substantial investigation and sampling costs necessary to determine the nature and extent of the releases and contamination of the area around Pike County, including collecting environmental samples and analytical laboratory fees for the analysis of said samples. *See* Doc. 78 at 32-34. Plaintiffs, however, have not alleged facts establishing that any of these costs were necessary, and thus, recoverable.

The first cost, Plaintiffs' litigation-related expenses, is barred under Sixth Circuit precedent. *See Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 482 (6th Cir. 2004) ("Generally speaking, legal fees and litigation-related costs are not recoverable; only work that is closely tied to the actual cleanup . . . may constitute a necessary cost of response.") (internal quotations and citations omitted); *Vill. of Milford v. K-H Holding Corp.*, 390 F.3d 926, 936 (6th Cir. 2004) ("A CERCLA plaintiff may recover attorney's fees if the activities for which the fees are incurred could have been performed by a non-attorney, are closely tied to an actual cleanup, are not related to litigation, and are otherwise necessary."); *see also Krygoski Const. Co., Inc. v. City of Menominee*, 431 F. Supp. 2d 755, 766 (S.D. Ohio 2006) ("Fees for expert witnesses are not compensable under CERCLA unless they are a necessary part of remediating a site and closely related to the cleanup.").

Similarly, there is no private right to recover damages for injury to, destruction of, or loss of natural resources. *See* 42 U.S.C. § 9607(f)(1) ("In the case of an injury to, destruction of, or loss of natural resources under subparagraph (C) of subsection (a) liability shall be to the United States Government and to any State for natural resources within the State[.]"). Absent a private

20

right to recover these damages, the costs associated with assessing such an injury cannot be deemed necessary.

With respect to the third category of costs, the clear intent of the CERCLA is to give the Agency for Toxic Substances and Disease Registry ("ATSDR") the authority under 42 U.S.C. § 9604(i) to conduct health assessments and/or health effects studies and recover those costs. *See* 42 U.S.C. § 9607(f)(1); 42 U.S.C. § 9604(i); *Struhar v. City of Cleveland*, 7 F. Supp. 2d 948, 952 (N.D. Ohio 1998) ("CERCLA does not provide a private right of action for recovery of medical monitoring costs . . . [r]ather, the authority to create such a fund rests solely with the Agency for Toxic Substances and Disease Registry ('ATSDR')."); *Ambrogi v. Gould, Inc.*, 750 F. Supp. 1233, 1246 (M.D. Pa. 1990) ("[W]e must come to the conclusion that 'medical surveillance, health effect studies, and health assessments' are not recoverable response costs under CERCLA."); *but see Brewer v. Ravan*, 680 F. Supp. 1176, 1179 (M.D. Tenn. 1988) ("To the extent that plaintiffs seek to recover the cost of medical testing and screening conducted to *assess the effect of the release or discharge on public health or to identify potential public health problems presented by the release* . . . they present a cognizable claim under section 9607(a)."); *cf. Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1535-37 (10th Cir. 1992) (rejecting the *Brewer* interpretation as too broad and finding medical monitoring costs are not recoverable by a private party under the CERCLA). Indeed, Congress provided an explicit mechanism under the statute to allow private individuals to petition the ATSDR to perform these assessments. *See* 42 U.S.C. § 9604(i)(6)(B). To permit Plaintiffs to recover these costs, as some courts have done, would deem the provisions surrounding the ATSDR superfluous.

Finally, "investigative costs incurred by a private party after the EPA has initiated a remedial investigation, unless authorized by the EPA are not considered necessary because they

are duplicative of the work performed by the EPA." *Rolan v. Atl.Richfield Co.*, 427 F. Supp. 3d 1013, 1023-24 (N.D. Ind. 2019) (internal quotations omitted); *see Louisiana-Pac. Corp. v. Beazer Materials & Servs., Inc.*, 811 F. Supp. 1421, 1425 (E.D. Cal. 1993) ("As a general matter, investigative costs incurred by a private party after the EPA has initiated a remedial investigation, unless authorized by the EPA, are 'duplicative' and therefore not recoverable."); *Wilson Rd. Dev. Corp. v. Fronabarger Concreters, Inc.*, 209 F. Supp. 3d 1093, 1112 (E.D. Mo. 2016) ("Monitoring and assessment costs are needless and thus not recoverable where such efforts are 'duplicative of work already performed' to monitor and assess contamination."). For decades, extensive monitoring and remediation efforts have taken place at the Plant under the authority of the Ohio EPA. And critically, Plaintiffs do not allege that they were authorized by the EPA to conduct an independent investigation pursuant to the CERCLA. Accordingly, because Plaintiffs have failed to allege any necessary, recoverable response costs that are consistent with the National Contingency Plan, their CERCLA claim in Count Two of the Complaint is **DISMISSED**.

### 4. Whether Plaintiffs' CERCLA Claim is Time Barred

Even if Plaintiffs had adequately pled necessary, recoverable response costs, Defendants argue that Plaintiffs' CERCLA claim is barred by the statute of limitations. While it is no longer necessary to reach this issue, the Court agrees.

42 U.S.C. § 9613(g)(2) provides that an initial action for recovery of costs must be commenced:

> (A) for a removal action, within 3 years after completion of the removal action; and

> (B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action.

42 U.S.C. § 9613(g)(2)(A)-(B). The term removal in this context means "the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken

in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release." 42 U.S.C. § 9601(23). The term remedial, on the other hand, means "those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." 42 U.S.C. § 9601(24). While the elements of a removal action and remedial action may overlap, removal actions typically "cost less, take less time, and are geared to address an immediate release or threat of release of a hazardous substance" whereas remedial actions are "usually permanent responses that address more extraordinary environmental dilemmas." *Cytec Indus., Inc. v. B.F. Goodrich Co.*, 232 F. Supp. 2d 821, 833 (S.D. Ohio 2002). In some cases, "a response action may constitute both a removal and a remedial action, and a court is not constrained to find either term applicable at the expense of the other." *Id.*

Here, Defendants argue that the environmental cleanup at the Plant, which began in 1989 and continues today, constitutes a remedial action, given the long-term, permanent nature of the cleanup and the extensive oversight by the EPA under the Consent Decree. *See* Complaint, Doc. 78 at 10 ("Environmental cleanup at the Portsmouth Site began in 1989, has been continuous, and continues today."). Because the six-year statute of limitations for a remedial action commences

when on-site construction is initiated, Defendants maintain that Plaintiffs' Complaint, which was filed on May 26, 2019, is untimely.

Plaintiffs disagree, arguing that their Complaint was timely filed whether the response action at the Plant is a remedial action or a removal action. According to Plaintiffs, this is because neither removal nor remedial activities have begun "offsite." Stated differently, though Plaintiffs acknowledge that the Plant is the source of the emissions at issue in this case, they suggest that the response costs they incurred were based on actions taken outside the physical boundary of the Plant, and thus, the statute of limitations do not begin to run until cleanup begins in those areas. The Court, however, finds no basis in the law for such a distinction and Plaintiffs fail to provide anything more than a single sentence in support of their argument.

Alternatively, Plaintiffs argue that if the statute of limitations period has commenced, the triggering event did not take place until July 3, 2015, the day on which the Department of Energy issued its final decision formally identifying a "selected remedy" for the environmental cleanup at the Plant. In doing so, Plaintiffs claim that an action cannot be considered remedial until after that action is formally adopted. But critically, "there is no support in the statute for the rule that remedial action cannot begin until the EPA or another lead agency issues a final, written approval of the remedial design for the site." *Am. Premier Underwriters, Inc. v. Gen. Elec. Co.*, 866 F. Supp. 2d 883, 892 (S.D. Ohio 2012). Such a rule would "lead to the absurd result that actions brought by private parties to recover response costs in which no governmental agency was involved in the cleanup could never be classified as remedial actions because no lead agency would ever issue a final plan for the permanent remedy." *Id.* Even the Sixth Circuit has declined to adopt such a bright-line rule. *GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 444-45 (6th Cir. 2004) (declining to adopt bright-line rule that a remedial action can occur only after the final remediation

plan is adopted). Hence, contrary to Plaintiffs' beliefs, long-term, permanent actions taken before the DOE finalized its remedial plan in 2015 may still constitute a remedial action under the CERCLA.

Finally, Plaintiffs claim that several removal actions took place at the Plant in April 2010, were adopted by the DOE's finalized remedial plan in July 2015, and have continued through at least December 2016. For example, Plaintiffs contend that the following removal actions occurred: "infrastructure modifications, draining liquids, hazard abatement, asbestos removal, removal of recyclable equipment, work area improvements, and utility reconfigurations (including installation)." *See* Doc. 98 at 52-53. As such, Plaintiffs argue that the three-year statute of limitations associated with those actions had not elapsed when they filed their Complaint in May 2019. *See* 42 U.S.C. § 9613(g)(2)(A) (providing that an initial action for recovery of costs must be commenced, for a removal action, within 3 years after completion of the removal action).

Although the line between a removal action and a remedial action is often blurred, "it is critical to view the timing of the activity in the larger context of all the activity taking place with regards to the site." *Am. Premier Underwriters, Inc.*, 866 F. Supp. 2d at 899. Here, Plaintiffs concede that the "removal" actions referenced above were adopted by, and thus, consistent with the DOE's July 2015 permanent remedial plan. *See GenCorp., Inc.*, 390 F.3d at 444 ("The salient point here is that CERCLA's definition of 'remedial action' imposes a separate requirement on the term: 'remedial action' encompasses only 'those actions *consistent with [the] permanent remedy taken* . . . to prevent or minimize the release of hazardous substances,' and unless 'remedial action' meeting this requirement has begun, the statute-of-limitations-triggering event cannot occur."). Further, long-term cleanup at the Plant -- as Plaintiffs allege in their Complaint -- was taking place as early as 1989. *See* Doc. 78 at 1989. The Court, therefore, concludes that the response actions

Plaintiffs claim took place at the Plant beginning in April 2010 do not change the nature of this environmental cleanup from a long-term, permanent remedial action, with a six-year statute of limitations beginning in 1989, to a removal action, with a three-year statute of limitations window triggered in December 2016. Because Plaintiffs did not bring this CERCLA action within six years of remedial actions commencing at the Plant, their claim is untimely. For this additional reason, Count Two of the Complaint is **DISMISSED**.

### D. Non-Radioactive State Law Claims (Count Four)

In Count Four (A) through (E) of the Complaint, Plaintiffs bring state law claims for negligence/gross negligence, trespass, nuisance, ultra-hazardous activity, and medical monitoring. Each of these claims is predicated on the possibility that Plaintiffs' properties were contaminated and damaged by non-radioactive waste, as opposed to the radioactive waste alleged in their Price-Anderson Act claim. Defendants contend that Plaintiffs' state law claims must be dismissed for several reasons: (1) Plaintiffs do not plausibly allege that their properties have been impacted by non-radioactive materials; (2) Plaintiffs fail to allege how any non-radioactive hazardous substances migrated from the Plant onto their properties; (3) Plaintiffs have not asserted any plausible damages; (4) Plaintiffs fail to identify an abnormally dangerous activity that Defendants engaged in regarding non-radioactive materials; and (5) medical monitoring is not an independent cause of action.

#### 1. Whether Plaintiffs Allege a Claim for Trespass (Count Four (B))

"Trespass is the unlawful entry upon the property of another," the essential elements being "(1) an unauthorized intentional act, and (2) entry upon land in the possession of another." *Green*, 2008 WL 4449065, at *3. Additionally, "[t]o state a plausible airborne particle trespass claim, a

plaintiff must allege that the defendant's emitting practices contaminated or substantially damaged her property." *Elmer v. S.H. Bell*, 127 F. Supp. 3d 812 (N.D. Ohio 2015).

Here, Plaintiffs have asserted that reports from the DOE, NIOSH, and EPA confirm that Defendants released a combination of radioactive and hazardous contaminants from the Plant into the water, air, and soil. Doc. 78 at 11. These contaminants included uranium, depleted uranium, neptunium, plutonium, cesium, thorium, radium, toxic materials, heavy metals, polychlorinated biphenyls, trichloroethylene, and other organic and inorganic materials. *Id.* at 19. Plaintiffs allege that the wind carried these contaminants from the Plant to properties in the surrounding area. *Id.* at 2.

Additionally, Plaintiffs maintain that recent scientific testing shows that two of their properties have been contaminated by these toxic materials and a third is within the zone of impact of this contamination. *Id.* at 4-5. Further, Plaintiffs claim substantial damages to their property by way of the fact that counties immediately surrounding the Plant have the highest cancer rates in the state of Ohio. *Id.* at 12.; *see Abrams v. Nucor Steel Marion, Inc.*, 694 F. App'x 974, 979-80 (6th Cir. 2017) ("[A] plaintiff may establish substantial physical damage to, or interference with, his property by demonstrating that the concentration of an invading contaminant on his property is likely to cause harm to human health."). These allegations are sufficient for the Court to draw the inference at this stage that each of the Plaintiffs sustained a cognizable injury.

Finally, that Plaintiffs allege all Defendants are liable for this contamination is of no moment. Plaintiffs are claiming damages stemming from contaminants that have been released from the Plant between 1993 and present day, and each of the Defendants have assumed control over that Plant at some point during this period. It would be virtually impossible at this stage for Plaintiffs to tie these releases to a particular Defendant without the benefit of discovery. It is

27

enough that Plaintiffs have alleged a specific timeframe. Accordingly, the Court finds that Plaintiffs have stated a plausible claim for trespass in Count Four (B) of the Complaint. *Cf. Bellafaire v. Town of Wheatfield*, 401 F. Supp. 3d 405, 418 (W.D.N.Y 2019) (Finding Plaintiffs did not state a plausible claim for trespass where "Plaintiffs allege that an unspecified Defendant deposited or caused to be deposited an unspecified substance on, in, or underneath Plaintiffs' properties at an unspecified time which caused unspecified damage.").

2.  <u>Whether Plaintiffs Allege a Claim for Private Nuisance (Count 4 (C))</u>

Under Ohio law, nuisance is "a distinct civil wrong, consisting of anything wrongfully done or permitted which interferes with or annoys another in the enjoyment of his legal rights." *Green*, 2008 WL 4449065, at *1. A private nuisance is "a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Id.* at 2. To be actionable, "the invasion must be either (a) intentional and unreasonable or (b) unintentional but caused by negligent, reckless, or abnormally dangerous conduct." *Id.* Further, under Ohio law, "a plausible claim for private nuisance requires a plaintiff to allege an injury that is real, material, and substantial." *Elmer*, 127 F. Supp. 3d at 825.

Here, the same allegations and injury that form the basis for Plaintiffs' trespass claim in Count Four (B) apply to their private nuisance claim in Count Four (C). *See Brown v. Whirlpool*, 996 F. Supp. 2d 623, 640 (N.D. Ohio 2014) ("Traditionally, an intrusion on property by airborne particulates was actionable under a nuisance claim but did not constitute a trespass. However, many courts, including courts in Ohio, now recognize that an invasion of airborne particulates may interfere with a complainant's interest in exclusive possession [of her property] and may therefore constitute a trespass.") (internal quotations and citations omitted). Certainly, the intentional production and/or emission of toxic materials at the Plant, coupled with the resulting

contamination of Plaintiffs' properties, can constitute an unreasonable invasion. Accordingly, the Court finds that Plaintiffs have pled an adequate claim for private nuisance in Count Four (C) of the Complaint.

3. Whether Plaintiffs Allege a Claim for Negligence/Gross Negligence (Count Four (A))

As an initial matter, it is unclear whether Plaintiffs are proceeding on their Negligence/Gross Negligence claim in Count Four (A) as an independent cause of action or as one intertwined with their Private Nuisance claim. But to the extent Plaintiffs do pursue an independent negligence claim under Ohio law, they "must show the existence of a duty, a breach of that duty, and that the breach of that duty proximately caused [Plaintiffs'] injury." *Green v. Begley, Co.*, 2008 WL 4449065, at *3 (S.D. Ohio Sept. 29, 2008).

Here, Plaintiffs allege that Defendants had a duty to process, handle, store, and dispose of hazardous substances in safe, legal manner. Doc. 78 at 30. Additionally, Plaintiffs allege that Defendants had a duty to prevent such substances from being discharged or released in a manner that could harm Plaintiffs, and that Defendants had a duty to warn or notify Plaintiffs when such releases occurred. *Id.* Plaintiffs contend that Defendants breached these duties by releasing toxic substances into the community without warning. *Id.* at 30-31. Moreover, Plaintiffs maintain that their property was damaged by this breach because the presence of these contaminants is likely to increase their risk of cancer, which is consistent with findings in the community. The Court finds these allegations sufficient to state a plausible claim for negligence/gross negligence. *See Green*, 2008 WL 4449065, at *3 ("Plaintiff alleges that Defendant had a duty to handle, store, and dispose of chemicals used in the dry cleaning process in a reasonable manner to insure safety to employees, customers, and the general public. Plaintiff alleges that Defendant breached that duty by failing to exercise reasonable care, and as a direct and proximate result, Plaintiff suffered economic loss.

Based on the foregoing, the Court finds that Plaintiff has adequately stated a claim for negligence under Ohio law.").

    4.   <u>Whether Plaintiffs Allege a Claim for Ultra-Hazardous Activity (Count Four (D))</u>

The elements of strict liability for harm caused by abnormally dangerous activity are: "(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm; and (2) this strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous." *Green*, 2008 WL 4449065, at *3.

Throughout the Complaint, Plaintiffs have alleged that the release of radioactive and toxic materials stemming from the production and/or remediation of uranium at the Plant has damaged their properties by exposing them to a contaminant likely to cause harm to their health. Plaintiffs, therefore, implicitly rely on this abnormally dangerous activity as the basis for their claim. *See Crawford v. Nat'l Lead Co.*, 784 F. Supp. 439, 443 (S.D. Ohio 1989) ("[W]e have no doubt that Ohio courts would consider the production of uranium at the FMPC an abnormally dangerous activity."). Although Plaintiffs pursue this claim based only on the release of non-radioactive materials, as opposed to radioactive waste, courts have still found that such releases can be the type of harm which renders the operation of a uranium plant an abnormally dangerous activity. *See id.* at 444 ("[T]he seepage of uranium and other dangerous materials onto surrounding property, as alleged in the instant case, is the kind of harm which renders operation of the FMPC abnormally dangerous. Imposition of strict liability under these circumstances is justified."). Hence, Plaintiffs have stated a plausible strict liability claim for ultra-hazardous activity under Count Four (D).

5.  Whether Medical Monitoring is an Independent Cause of Action (Count Four (E))

Finally, Defendants argue that Count Four (E) of the Complaint must be dismissed because medical monitoring is not an independent cause of action.  Plaintiffs concede this point.  Thus, to the extent Plaintiffs have asserted an independent claim for medical monitoring, Count Four (E) is **DISMISSED**.

To be clear, however, "[a]lthough medical monitoring is not a cause of action, under Ohio law, it is a form of damages for an underlying tort claim." *Elmer*, 127 F. Supp. 3d at 825.  Indeed, "if a defendant's conduct increased a plaintiff's risk of suffering from a disease or illness, medical monitoring may be 'a compensable item of damage when liability is established under traditional tort theories of recovery.'" *Id.* (quoting *Day v. NLO*, 851 F. Supp. 869, 880 (S.D. Ohio 1994)). Therefore, if Plaintiffs establish liability and an increased risk of disease on an underlying tort claim, they may be entitled to medical monitoring as a remedy.

**E.  Declaratory Judgment Claim (Count Three (A))**

In Count Three (A), Plaintiffs seek a declaratory judgment clarifying the rights and obligations of the parties to each other.  Defendants argue that the Court should dismiss this claim as duplicative.  The Court agrees.

The Declaratory Judgment Act provides that a district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether *or* not further relief is or could be sought." *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 938 (S.D. Ohio 2012) (quoting 28 U.S.C. § 2201(a)).  While courts have the discretion to decide whether to entertain a declaratory judgment action, they typically "deny declaratory relief if an alternative remedy is better or more effective." *Grand Trunk Western R. Co. v. Consolidated Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)).

Here, Plaintiffs' claims stemming from emissions at the Plant have already ripened into a cause of action and Plaintiffs have sought damages under several alternative theories.  In other words, the question of whether Defendants are liable for these emissions has already been placed at issue, making Plaintiffs' claims for damages a better and more effective remedy.  Accordingly, the declaratory judgment claim in Count Three (A) of the Complaint is **DISMISSED** as duplicative of Plaintiffs' other causes of action.  *See Miami Valley Mobile Health Servs., Inc.*, 852 F. Supp. 2d at 938-39 ("The validity and enforceability of the contracts have already been placed at issue, and Plaintiffs' claim for damages is a better and more effective remedy.  The Court therefore agrees with Defendant that the declaratory judgment claim is duplicative and should be dismissed.").

## V. CONCLUSION

For the reasons stated herein, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss [#83].  Counts One, Two, Three (A), Alternative Count One (A) through (E), and Alternative Count Three (B) are hereby **DISMISSED**.  Further, Alternative Count Three (C) is **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: July 31, 2020**