IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **URSULA MCGLONE, JASON MCGLONE, L.M., T.M, G.M., B.M., E.M.,** and **M.M.,** minor children by and through their parent and/or guardian, Ursula McGlone, **ADAM RIDER, BRITTANI RIDER, M.R., C.R., L.R.** and **L.R**., minor children by and through their parent and/or natural guardian, Brittani Rider, **JOSHUA ROSS, RACHEL ROSS, J.R.** and **N.R.**, minor children by and through their parent and/or natural guardian, Rachel Ross, and **ADAM ROSS**, adult child and through his legal guardian, Rachel Ross, **PATSY BROWNFIELD**, and **MICKEY TACKETT** and **HEATHER TACKETT** | § § § § § § § § § § § § § § § | **CASE NO.: 2:19-CV-02196-ALM-EPD**<br><br>**Chief Judge Algenon L. Marbley; and**<br><br>**Chief Magistrate Judge Elizabeth Preston Deavers**<br><br>**Jury Demanded** |
| Ohio residents,<br>on behalf of themselves individually and<br>all others similarly situated, | § § § § § | |
| Plaintiffs, | § § | |
| **v.** | § § | |
| **CENTRUS ENERGY CORP**.,<br>a Delaware Corporation, individually and as<br>successor-in interest to USEC Incorporated, | § § § § | |
| **UNITED STATES ENRICHMENT CORPORATION,** a Delaware Corporation, | § § § | |
| **URANIUM DISPOSITION SERVICES, LLC,** a Tennessee Limited Liability Company, | § § § | |
| **BWXT CONVERSION SERVICES, LLC,** a Delaware Limited Liability Company, | § § § | |
| **MID-AMERICA CONVERSION SERVICES,** a Delaware Limited Liability Company, | § § § § | |
| **BECHTEL JACOBS COMPANY, LLC,** a Delaware Limited Liability Company, | § § | |

1

|  |  |
|---|---|
| **LATA/PARALLAX PORTSMOUTH, LLC,**<br>a New Mexico Limited Liability Company, | §<br>§<br>§ |
|  | § |
| **FLUOR-BWXT PORTSMOUTH, LLC ,**<br>an Ohio Limited Liability Company, | §<br>§ |
|  | § |
| Defendants. | §<br>§ |
| _____ | § |

## PLAINTIFFS' FOURTH AMENDED CLASS ACTION COMPLAINT

### I.

### INTRODUCTION

1.      Plaintiffs, Ursula McGlone, Jason McGlone, and L.M., T.M., G.M., B.M., E.M.,

and M.M., minor children by and through their parent and/or guardian, Ursula McGlone, Adam

Rider, Brittani Rider, and M.R., C.R., L.R. and L.R., minor children by and through their parent

and natural guardian, Brittani Rider, Joshua Ross, Rachel Ross, and J.R. and N.R., minor

children by and through their parent and natural guardian, Rachel Ross, and Adam Ross, adult

child by and through his legal guardian, Rachel Ross, Patsy Brownfield, Mickey Tackett and

Heather Tackett, on behalf of themselves individually and all others similarly situated

(collectively "Plaintiffs"), through undersigned counsel, hereby file this Fourth Amended Class

Action Complaint, pursuant to Fed. R. Civ. P. 15(a)(1)(B). Based on their personal knowledge,

information, and belief, as and for their Class Action Complaint for damages, equitable and

injunctive relief against the Defendants, Plaintiffs allege:

### II.

### NATURE OF THE ACTION

2.      In Pike County, Ohio sits the 3,777-acre Portsmouth Site (sometimes referred to

as "PORTS"), which has accommodated uranium enrichment operations by Defendants.

3.      What the populace did not know was that the operations at the Portsmouth Site

2

expelled air laden with radioactive material and other metals.

4.      Winds and water have carried the radioactive materials and other contaminants throughout the area in such concentrations that radioactive materials and metals can be found deposited in soils, surface water, and buildings in and around Piketon, Ohio.

5.      On May 13, 2019, Zahn's Corner Middle School in Piketon was suddenly closed due to health concerns because enriched uranium was detected inside the building. Neptunium-237 was also detected by an air monitor next to the school. The school is approximately two miles from the Portsmouth Site and serves more than 300 students. This incident was the first notification to the community about radioactive materials migrating into populated areas from the Portsmouth Site.

6.      Plaintiffs seek remediation of the radioactive, metal, organic, and inorganic contamination found on their property and restoration of their property to its original, uncontaminated condition.

7.      In addition to damages, Plaintiffs petition this Court for injunctive relief to protect Plaintiffs and Class Members from further dangers.

8.      Plaintiffs and Class Members are individuals who have suffered economic losses, property losses, and non-economic damages as the result of Defendants' toxic and radioactive releases. Plaintiffs and Class Members have all suffered in common an array of damages from Defendants' emissions of radioactive material, specifically, and as explained in more detail herein.

9.      Releases of radioactive material from the Portsmouth Site exceed levels of radiation and concentrations of radioactive materials permissible in unrestricted (general public) areas.

10.     Releases of hazardous and toxic materials and storage of hazardous substances and/or wastes pose a threat to the health of citizens in the surrounding area and pollute and devalue property owned by citizens in the surrounding area.

**III.**

**PARTIES**

**A.     <u>Plaintiffs</u>**

11.     Putative Class Representatives and Plaintiffs Ursula McGlone and Jason McGlone are married, above the age of majority, and live approximately two miles from the Portsmouth Site on property they own with L.M., T.M., G.M., B.M., E.M., and M.M. Recent scientific testing shows their property to be impacted with radioactive and toxic materials. The McGlones were unaware until such testing that their property had been contaminated with radioactive and toxic materials. They seek damages for loss of use and enjoyment of property, diminution of property value, annoyance, inconvenience, emotional distress, punitive and property damage, including remediation, along with such injunctive and declaratory relief as necessary to protect human health and the environment.

12.     Putative Class Representatives L.M., T.M., G.M., B.M., E.M., and M.M. are below the age of majority. Thus, their claims are brought by and through their parent and/or guardian, Ursula McGlone. L.M., T.M. G.M., B.M., E.M., and M.M. live approximately two miles from the Portsmouth Site. They live within the zone of impact. They seek such injunctive and declaratory relief as necessary to protect human health and the environment, including, but not limited to, medical monitoring and surveillance.

13.     Putative Class Representatives and Plaintiffs Adam Rider and Brittani Rider are above the age of majority and live approximately two miles from the Portsmouth Site on property they own with M.R., C.R., L.R. and L.R. Recent scientific testing shows their property

4

to be impacted with radioactive and toxic materials. The Riders were unaware until such testing that their property had been contaminated with radioactive and toxic materials. They seek damages for loss of use and enjoyment of property, diminution of property value, annoyance, inconvenience, emotional distress, punitive and property damage, including remediation, along with such injunctive and declaratory relief as necessary to protect human health and the environment.

14.     Putative Class Representatives M.R., C.R., L.R. and L.R. are below the age of majority. Thus, their claims are brought by and through their parent and natural guardian, Brittani Rider. M.R., C.R., L.R. and L.R live approximately two miles from the Portsmouth Site. They live within the zone of impact. They seek such injunctive and declaratory relief as necessary to protect human health and the environment, including, but not limited to, medical monitoring and surveillance.

15.     Putative Class Representatives and Plaintiffs Joshua Ross and Rachel Ross are married, above the age of majority, and live approximately three miles from the Portsmouth Site on property they own with J.R., N.R., and Adam Ross. Recent scientific testing shows their property to be impacted with radioactive and toxic materials. The Ross family was unaware until such testing that their property had been contaminated with radioactive and toxic materials. They seek such injunctive and declaratory relief as necessary to protect human health and the environment, including, but not limited to, medical monitoring and surveillance.

16.     Putative Class Representatives J.R. and N.R. are below the age of majority. Putative Class Representative Adam Ross is an adult for whom Joshua Ross and Rachel Ross serve as legal guardians. Thus, their claims are brought by and through their parent and legal

guardian, Rachel Ross. J.R., N.R., and Adam Ross live approximately three miles from the Portsmouth Site. They live within the zone of impact.

17.    Putative Class Representative Patsy Brownfield is above the age of majority and lives approximately three miles from the Portsmouth Site on one of multiple properties that she owns on Delay Drive in Piketon. Those properties have been occupied by Ms. Brownfield and/or her adult family members for decades. Ms. Brownfield's daughter raised her own son (Ms. Brownfield's grandson), on one of the properties. That grandson is currently 21 years old and has lived on the property since he was one year old. Recent scientific testing shows her property to be impacted with radioactive and toxic materials. Ms. Brownfield was unaware until such testing that her property had been contaminated with radioactive and toxic materials. She seeks damages for loss of use and enjoyment of property, diminution of property value, annoyance, inconvenience, emotional distress, punitive and property damage, including remediation, along with such injunctive and declaratory relief as necessary to protect human health and the environment.

18.    Putative Class Representatives and Plaintiffs Mickey Tackett and Heather Tackett are married, above the age of majority, and live approximately three miles from the Portsmouth Site on property they own. Recent scientific testing shows their property to be impacted with radioactive and toxic materials. The Tacketts were unaware until such testing that their property had been contaminated with radioactive and toxic materials. They seek damages for loss of use and enjoyment of property, diminution of property value, annoyance, inconvenience, emotional distress, punitive and property damage, including remediation, along with such injunctive and declaratory relief as necessary to protect human health and the environment.

B.    **Defendants**

**Gaseous Diffusion Plant and Centrifuge Plant Defendants**
**(hereinafter "Centrifuge Defendants")**

19.    Defendant Centrus Energy Corp. ("Centrus"), formerly USEC Incorporated ("USEC Inc."), is a Delaware corporation with its principal place of business in Maryland. This action is brought against Centrus Energy Corp., individually, and as successor-in-interest to USEC Inc.

20.    Defendant United States Enrichment Corporation ("USEC") is a Delaware corporation with its principal place of business in Maryland and is a wholly owned subsidiary of Centrus Energy Corp.

21.    Defendants Centrus and USEC at all times relevant were required to meet the standards set forth in 40 C.F.R. § 190.10 (which is incorporated into 10 C.F.R. § 20.1301 under subpart (e)), and/or 10 C.F.R. Parts 20 and 76 and Department of Energy Order 458.1.

**Depleted Uranium Hexafluoride Plant Defendants**
**(hereinafter "Depleted Uranium Defendants")**

22.    Defendant Uranium Disposition Services, LLC ("UDS") is a Tennessee limited liability company with its principal place of business in Florida.

23.    Defendant BWXT Conversion Services, LLC ("BWXT") is a Delaware limited liability company with its principal place of business in Kentucky.

24.    Mid-America Conversion Services, LLC ("MCS") is a Delaware limited liability company with its principal place of business in Kentucky.

25.    Defendants UDS, BWXT, and MCS at all times relevant were required to meet the standards set forth in 40 C.F.R. § 190.10 (which is incorporated into 10 C.F.R. § 20.1301 under subpart (e)) and/or 10 C.F.R. Parts 20 and 76 and Department of Energy Order 458.1.

**Environmental Remediation and Waste Management Defendants
(hereinafter "Remediation Defendants")**

26.     Bechtel Jacobs Company, LLC ("Bechtel Jacobs") is a Delaware limited liability company with its principal place of business in Tennessee.

27.     Lata/Parallax Portsmouth, LLC ("Lata/Parallax") is a New Mexico limited liability company with its principal place of business in New Mexico.

28.     Fluor-BWXT Portsmouth, LLC ("Fluor-BWXT") is an Ohio limited liability company with its principal place of business in Ohio.

29.     Defendants Bechtel Jacobs, Lata/Parallax, and Fluor-BWXT at all times relevant were required to meet the standards set forth in 40 C.F.R. § 190.10 (which is incorporated into 10 C.F.R. § 20.1301 under subpart (e)), and/or 10 C.F.R. Parts 20 and 76 and Department of Energy Order 458.1.

## IV.

## JURISDICTION

30.     Original jurisdiction of this Court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1332(d)(2). This Court is vested with jurisdiction by virtue of 28 U.S.C. § 1332(d). Minimal diversity exists between named Plaintiffs of this putative class action, all of whom are citizens of the State of Ohio, and Defendant Centrus, a citizen of Delaware, its state of incorporation, and Maryland, its headquarters and principal place of business location. The proposed class exceeds 100 persons and the amount in controversy exceeds $5,000,000.00.  Further, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under a law of the United States, namely, the Price-Anderson Act (hereinafter "PAA"), 42, U.S.C. § 2210, *et seq.* This Court may also exercise subject matter jurisdiction over this action directly pursuant to Section 2210(n)(2) of the PAA, which provides that the United States

District Court in the district where the nuclear incident takes place shall have original jurisdiction with respect to any public liability action arising out of, or resulting from, a nuclear incident.

31.     Venue is proper in this judicial district pursuant to 42 U.S.C. § 2210(n)(2) because the nuclear incidents giving rise to Plaintiffs' claims took place in this district.  As to the state law claims, venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

**V.**

**FACTUAL ALLEGATIONS**

A.     <u>**Operations at Portsmouth Site**</u>

**Gaseous Diffusion Plant**

32.     Located at the Portsmouth Site is the Portsmouth Gaseous Diffusion Plant, or the "A-Plant" as the locals refer to it. In July 1993, the United States Enrichment Corporation ("USEC") assumed the uranium enrichment operations at the Portsmouth Gaseous Diffusion Plant and operated the plant until 2001.

33.     The primary mode of enrichment was the gaseous diffusion of uranium hexafluoride to separate the lighter fissile isotope, U-235, from the heavier non-fissile isotope, U-238.

34.     From 2001 to 2011, USEC was responsible for maintaining the gaseous diffusion plant in a safe configuration. Initially, the process equipment was kept in Cold Standby, capable of restart if the need arose. Eventually, the plant transitioned to Cold Shutdown where systems were permanently disengaged, and equipment prepared for eventual decommissioning.

**Depleted Uranium Hexafluoride Conversion Plant**

35.     In 2002, Uranium Disposition Services, LLC ("UDS") was contracted to design, build, and operate a Depleted Hexafluoride Conversion Plant ("DUF6 Conversion Plant"). Depleted uranium hexafluoride (DUF6) is a coproduct of the uranium enrichment process that occurred at the Portsmouth Site. The DUF6 Conversion Plant was designed and constructed to convert inventory of DUF6 produced by both the Paducah Gaseous Diffusion and the Portsmouth Gaseous Diffusion Plants, to a more stable uranium oxide form for reuse, storage, and/or transportation and disposition. A coproduct of the conversion process is hydrofluoric acid (HF), which is reused industrially. The Portsmouth DUF6 inventory is expected to be processed in approximately 18 years.

36.     In 2010, BWXT Conversion Services, LLC was contracted to operate the DUF6 Conversion Plant at the Portsmouth Site. BWXT was also responsible for continuing cylinder surveillance and maintenance (S&M) services for the inventory of DUF6, low-enrichment uranium hexafluoride (UF6), normal UF6, and other cylinders. The contract was initially scheduled to expire in September 2016 but was extended to accommodate procurement for a new DUF6 operations contract.

37.     In 2016, Mid-America Conversion Services, LLC was contracted to operate the DUF6 Conversion Plant. MCS is responsible for providing cylinder surveillance and maintenance for the DUF6 conversion facility and associated equipment, operating the conversion facility to convert the DUF6 from the inventory at the Paducah and Portsmouth plants to uranium oxide; reusing, storing, transporting and/or disposing of the DUF6 conversion process end-products; selling the aqueous hydrofluoric acid (AqHF) product; and providing S&M services for the cylinder storage yards.

10

**Centrifuge Operations**

38.     In 2002, USEC Inc. signed a lease for use of centrifuge-related equipment and facilities at the Portsmouth Site.

39.     In 2004, USEC Inc. began operating what is known as the American Centrifuge Lead Cascade Facility ("Lead Cascade"). The Lead Cascade was a test loop which demonstrated the effectiveness of centrifuge design and equipment by processing uranium in a closed loop. In 2016, USEC Inc.'s successor, Centrus, ceased uranium enrichment operations at the Lead Cascade. This was followed by removal of uranium gas from the centrifuges and process piping, dismantling of equipment, and other actions needed to ultimately decommission the facility. The Lead Cascade is currently in decommissioning phase.

40.     The Lead Cascade was a test loop for USEC Inc.'s, now Centrus' American Centrifuge Plant ("ACP"). Construction on the ACP began in 2007 at the Portsmouth Site and was demobilized in 2009. On January 7, 2019, it was announced that the facility would be reopened, and the ACP is currently under construction.

41.     Centrus's centrifuge operations are carried out pursuant to source materials licenses which allow for the possession of radioactive material but do not allow for the disposal of radioactive material via air dispersion on Plaintiffs' properties.

**Environmental Remediation and Waste Management**

42.     Environmental cleanup at the Portsmouth Site began in 1989, has been continuous, and continues today.

43.     Between 1997 and 2005, Bechtel Jacobs Company, LLC ("Bechtel Jacobs") was responsible for environmental remediation at the Portsmouth Site.

44.    Between 2005 and 2010, LATA/Parallax Portsmouth, LLC ("LATA/Parallax") was responsible for environmental remediation at the Portsmouth Site. LATA/Parallax was responsible for groundwater and soil remedial actions, removing legacy waste, decontamination and decommissioning (D&D) facilities, highly enriched uranium disposition, operating the site waste storage facilities, and surveillance and maintenance activities, as well as other activities.

45.    From 2010 to present, Fluor-BWXT Portsmouth, LLC ("Fluor-BWXT") has been responsible for environmental remediation at the Portsmouth Site. Fluor-BWXT's work is expected to continue until 2024.

46.    In 2015, a plan was agreed to for the disposal of more than 2 million cubic yards of waste that would be generated from the Portsmouth Site's decontamination and decommissioning process. This plan includes construction of an on-site waste disposal facility. Construction activities on the waste disposal facility, including site clearing and roadway construction, began around 2017.

**Releases and Statistically Significant Increase in Cancer**

47.    Reports by DOE, NIOSH, and EPA demonstrates that there have been multiple instances of release of contaminants from the Portsmouth Site, including both radioactive and/or hazardous contaminants, to the water, air, and soil in violation of federal statutes and/or regulations.

48.    Recent scientific testing performed at locations adjacent to the plant on publicly accessible areas supports a conclusion that external radiation levels exceed the allowable level of exposure to members of the public under federal law, including the PAA, and including, but not limited to, more than 100 millirems above background levels in a calendar year.

49. Based on national and local cancer data from 2011 to 2016, cancer rate levels for all types of cancers in the small zip code of Jasper, Ohio, which lies to the west of the PORTS plant and along the Scioto River, are more than seven times the national rate.

50. Analysis of cancer rates for all cancers combined in the Census Tracts adjacent to the plant show statistical significance. Specifically, a 60% excess rate for all cancer types between 2011 and 2016, based on national and local cancer data. Zip code cancer data identify lung cancer as a major issue in the area near the Portsmouth site.

51. The counties which contain and are adjacent to the plant, namely Pike, Scioto, Vinton, Adams and Lawrence Counties, are among those having the highest cancer rates in the State of Ohio.

52. A preliminary review of statewide cancer data recently obtained from the Ohio Department of Health revealed a large excess of childhood blood cancer in the area immediately surrounding the plant.

53. Specifically, in the 5 census block groups closest to the plant, Plaintiffs' experts found 13 diagnoses for leukemia and lymphoma under the age of 25 from 1996 to 2017 in a population of only 2,652.

54. Statistics provided by the Ohio Department of Health place the incidence of leukemia and lymphoma for those under the age of 25 living within these five census block groups at 4.9 cases per 100,000, compared to 1.62 cases per 100,000 in comparison populations.

55. While additional statistical analysis and on-site sampling is required to fully characterize the cancer threat, Plaintiffs' experts have undertaken an initial statistical analysis showing clear evidence of excess cancer rates by comparing 12 other randomly selected areas of similar size in Ohio. Attached hereto as Exhibit 1 is a letter in the attached letter from Dr. Carl

Werntz, an epidemiologist who has reviewed the cancer data collected by the Ohio Department of Health. He has concluded that, based on a preliminary review, the childhood blood cancer incident rate for the area around the plant was triple the average incident rate compared to the 12 randomly selected areas, even though three of the randomly selected areas contained significant point sources of contamination.

56.     Excess risk of childhood blood cancers is consistent with exposure to the types of radiological contamination found around the plant. As outlined later in this Complaint, Plaintiffs' experts have calculated annual radiation doses to various organs based on the radioisotopes found in testing of Plaintiffs' soil. Attached hereto as Exhibit 2 is a letter from Health Physicist Dr. Phil Plato, in which Dr. Plato states that doses to the bone surface and spleen from the samples of Plaintiffs' soil far exceed federal regulatory standards, particularly in children. While these are only partial doses because Dr. Plato considered only one of many exposure pathways and total doses are much higher than soil-only dose calculations, the analysis shows that the bone surface and spleen are the organs most affected by the types of radiological contamination found around the Plant.

57.     Plaintiffs' expert in epidemiology and oncology, confirms that radiation exposure to the bone surface and spleen is known to cause childhood leukemia and lymphoma.

58.     More work remains to be done for the protection of the community (statistical comparison to all Ohio Counties, analysis of all age groups, expansion to other cancer types, etc.).  However, the statistically significant excess cancer rates evidence that residents have been exposed to radiation in excess of federal limits.

59.     The high levels of cancer in the areas near the site are consistent with the exposures of individuals living in these areas to the radioactive materials emanating from the plant.

**B.      Defendants' Operations Spread Radioactive Particles Off-Site Into Unrestricted Areas and Contaminated Plaintiffs' Properties**

60.     Upon information and belief, Defendants' activities have caused and/or contributed to radioactive contamination offsite and onto Plaintiffs' properties in levels that exceed levels allowable under federal law, and specifically, the PAA.

61.     Plaintiffs' properties are within the zone impacted by radioactive materials, including alpha-emitting radionuclides. Samples taken on and around Plaintiffs' properties and at other locations near the Portsmouth Site confirm an elevated presence of radioactive particles in violation of 10 C.F.R. §20.1301.

62.     Environmental evidence gathered thus far indicates that property and persons near the Portsmouth Site have been and continue to be exposed to toxic and radioactive substances and are negatively impacted by toxic and radioactive releases from the Portsmouth Site.

63.     Plaintiffs' environmental sampling and scientific testing of properties near the Portsmouth Site reveal the presence of radioactive and toxic materials consistent with those expected to be found near a site, such as the Portsmouth Site, where uranium enrichment operations are conducted. Tests reveal the presence of these radioactive and toxic materials in residences near the Portsmouth Site.

64.     Scientific analysis of samples has revealed the presence of "fingerprints" linking the hazardous, toxic, carcinogenic, radioactive materials either stored, processed and/or manufactured at the Portsmouth Site to the contamination alleged herein.

65.     Jason and Ursula McGlone's property, where they and L.M., T.M. G.M., B.M., E.M., and M.M live, is approximately two miles from the Portsmouth Site. This proximity puts the McGlones' property in the direct path of radioactive air emissions, radioactive particles distributed by the wind blowing such contamination off the site in dirt and dust, which emanates from the Portsmouth Site. Further, the McGlone property and other properties in floodplains also were contaminated via surface waters flowing off of PORTS because of the Defendants' activities.

66.     Adam and Brittani Rider's property, where they and M.R., C.R., L.R. and L.R. live, is approximately two miles from the Portsmouth Site. This proximity puts the Riders' property in the direct path of radioactive air emissions, radioactive particles distributed by the wind blowing such contamination off the site in dirt and dust, which emanates from the Portsmouth Site.

67.     Joshua and Rachel Ross's property, where they and J.R., N.R., and Adam Ross live, is approximately three miles from the Portsmouth Site. This proximity puts the Ross's property in the direct path of radioactive air emissions, radioactive particles distributed by the wind blowing such contamination off the site in dirt and dust, which emanates from the Portsmouth Site.

68.     Patsy Brownfield's property is approximately three miles from the Portsmouth Site. This proximity puts the Brownfield property in the direct path of radioactive air emissions, radioactive particles distributed by the wind blowing such contamination off the site in dirt and dust, which emanates from the Portsmouth Site.

69.     Mickey and Heather Tackett's property is approximately three miles from the Portsmouth Site. This proximity puts the Tacketts' property in the direct path of radioactive air

emissions, radioactive particles distributed by the wind blowing such contamination off the site in dirt and dust, which emanates from the Portsmouth Site.

70.     Plaintiffs' properties have tested positive for levels of radiation that exceed the federal regulatory limit in 10 C.F.R. §20.1301.

71.     On May 13, 2019, Zahn's Corner Middle School in Piketon was suddenly closed due to health concerns because enriched uranium was detected inside the building. Neptunium-237 was also detected by an air monitor next to the school. The school is approximately two miles from the Portsmouth Site. The school serves more than 300 students.

72.     Following closure of the Zahn's Corner Middle School, fencing was placed around the school property warning of radioactive material. Anyone who goes beyond the fencing is required to wear protective gear. Zahn's Corner Middle School remains quarantined and closed.

73.     G.M. and B.M. were active students at Zahn's Corner Middle school at the time of its closure. They were evacuated from the school after the detection of enriched uranium and neptunium.

74.     A recent study conducted by Northern Arizona University determined that:

(1)     Enriched Uranium is found in surface waters, sediments, and interior dusts in the Piketon area which is consistent with the operations at the Portsmouth Site.

(2)     Non-fallout $^{237}$Np (Neptunium) and Pu (Plutonium) isotopes are found in bed sediments, suspended sediments, and interior dusts in the Piketon area.

(3)     Non-fallout [237]Np (Neptunium) is found in sediments of an unnamed creek that is draining a landfill construction area that is currently being worked.

(4)     Enriched Uranium is found in interior spaces of Zahn's Corner Middle School and in attic dust in the Piketon area.

(5)     Emissions from the Portsmouth Site account for the enriched contents of Uranium, Neptunium, and Plutonium encountered in environmental samples from the Piketon area.[1]

75.     Defendants could have prevented or mitigated the offsite impact with better precautionary measures, compliance with applicable regulations, and the use of reasonable care. The foreseeable risks of harm posed could have been reduced or avoided by reasonable instructions or warnings when it became clear that toxins had been released into the environment. Those omissions render Defendants' operations not reasonably safe. Exposure to this radioactive and toxic mixture in the environment through human pathways can cause grave bodily injury and has created a need for a mitigation/abatement program to protect the public from further risk of being harmed by Defendants' tortious contamination of their properties.

76.     On information and belief, Plaintiffs allege that discharges of highly toxic and carcinogenic alpha-emitting radionuclides from the Portsmouth Site into the surrounding area have created an imminent and substantial endangerment to public health and the environment. Radioactive material contamination in and around Plaintiffs' properties is a nuisance which constitutes trespass and renders the properties unfit for normal use and enjoyment and destroys the properties' fair market value.

---

[1]Michael E. Ketterer, *Investigation of Anthropogenic Uranium, Neptunium and Plutonium in Environmental Samples Near Piketon, Ohio*, April 27, 2019.

77.     As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class are currently being subjected to radioactive waste contamination and will suffer irreparable harm if an injunction is not granted requiring Defendants to conduct a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

C.      **Radioactive Wastes**

78.     Ounce for ounce, radioactive isotopes are considered the most toxic materials known to man.

79.     Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay. As these materials decay, they release radiation energy and transform into other materials which may then also decay by releasing radiation energy and transforming into other materials.

80.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other material. When radiation energy interacts with other material, it causes a process called ionization which can damage chemical structures. When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutations in genetic material, which can lead to cancer and other harms.

81.     People are exposed to radiation in two ways: (1) external exposure from radioactive material in the environment and (2) internal exposure by radioactive material that has entered the body. Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin. The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

19

82.     One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that, even if the energy absorbed is low, the biological effects can still be gravely serious. Another characteristic is that there are latent biological effects of radiation.

83.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries. Somatic injuries are damages to the individual exposed. These include damages to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system, as well as cancers. Illnesses such as cancers may take a number of years to appear. Research shows that uranium has a high chemical affinity for DNA and causes genetic damage to individuals resulting in birth defect outcomes and cancer at levels much greater than previously modeled.

84.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells. As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase. These genetic mutations can be passed down to a person's offspring even generations later, manifesting in injuries such as birth abnormalities and cancer.

85.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment. As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material. The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate. For example, after one half-life, there will be one

half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eighth the original sample, and so forth.

The decay chain for U-238:



86.    The photo below shows tracks made by alpha rays emitted from a particle of plutonium embedded in the lung tissue. Alpha emitters are among the most deadly of radioactive materials. The tracks in the photograph were made by bursts of alpha radiation over a 48-hour period:



87.     The toxic and carcinogenic effects of exposure to radioactive materials have been a matter of general scientific knowledge since the early 20th Century.

88.     According to recent scientific testing, radioactive materials which have been identified as originating from the plant, particularly enriched Uranium, exist at statistically significant excess levels in the sediments and floodwater sediments of the nearby creeks and rivers.  These creeks and rivers are ones into which radioactive liquid discharges from the plant are, and have been, released and also into which airborne discharges washed out by precipitation find their way into by means of runoff.

89.     Recent evidence published in the scientific literature since 2000 highlights a particular anomalous hazard from Uranium which has a combination of chemical and radioactive genotoxicity owing to its high chemical affinity for DNA, the acknowledged target for the genetic and genomic effects which lead to cancer and other illnesses and also birth defects. These effects are especially relevant to inhaled Uranium.

D.     **Hazardous Substances and/or Wastes**

90.     One or more of the Defendants is responsible for PORTS continuing to release hazardous substances and/or wastes from the facility to offsite areas.  The waste stream that has

22

been and continues to be released from PORTS is mixed, and includes, but is not limited to, radionuclides such as Uranium, depleted Uranium, enriched Uranium, Neptunium, Plutonium, Cesium, Thorium, and Radium; toxic metals, heavy metals, Polychlorinated biphenyls (PCBs) (including dioxin forms of PCBs); Trichloroethylene (TCE); and other organic and inorganic materials.

   **E.**   **Concealment of Facts Related to Risk**

  91.   Defendants, through their silence, as well as their aggressive public relation efforts, have reassured the public, Plaintiffs, and the Class that their operations have not contaminated nearby properties. In particular, Defendants made misrepresentations that were meant to assure Plaintiffs and the Class Members that the Portsmouth Site presents absolutely no danger to public health.

  92.   Upon information and belief, Defendants have failed to accurately keep and maintain environmental and regulatory data and records to ensure their reliability.

**VI.**

**CLASS ACTION ALLEGATIONS**

  93.   Plaintiffs seek to represent the following class of individuals:

   *(1)   All property owners within a 5-mile radius of the Portsmouth Site or other geographic designation as supported by future scientific evidence;*

   *(2)   All residents and former residents with more than one year of residence within a 5-mile radius of the Portsmouth Site or other geographic designation as supported by future scientific evidence;*

   *(3)   All former students at Zahn's Corner Middle School from 1993 to its closure as well as their parents; and*

23

> (4)     All property owners with property within 500 yards of the Scioto
> River downstream of a point 500 yards upstream of Piketon until its confluence
> with the Ohio River at Portsmouth.

94.     Excluded from the Class are Defendants and their officers, directors, and employees, as well as the Court and its personnel working directly on the case with the exception of court reporters.

95.     Plaintiffs and all others similarly situated are entitled to have this case maintained as a class action pursuant to Federal Rules of Civil Procedure.

96.     The prerequisites for a class action under Federal Rule of Civil Procedure 23(a) are met. The class is so numerous that joinder of all persons is impracticable. As many as two thousand or more people are adversely affected by Defendants' release of radioactive materials. The number of Class Members can be readily determined from the United States Census Bureau, property records, and school records.

97.     There are common issues of law and fact, including: (a) whether Defendants are liable for damages to the class for negligently allowing the release of radioactive materials into the surrounding inhabited area and/or their failure to warn of those materials' toxicity; (b) the scope of damages caused by Defendants' conduct; (c) whether Defendants are strictly liable for conducting an ultra-hazardous activity injurious to members of the class; (d) whether Defendants are liable for nuisance and trespass; (e) whether Defendants may be compelled under statute or court order to take steps to protect human health and the environment, including but not limited to medical monitoring, topsoil replacement, a compliance audit and improved environmental safety measures; and (f) whether Defendants are liable to the Class for punitive damages. These

and other common issues of law and fact relate to and affect the rights of Plaintiffs and Class Members.

98.     Plaintiffs' claims are typical of the class. Plaintiffs all own property and reside and/or were present within the affected area.

99.     Plaintiffs have suffered annoyance, aggravation, as well as economic loss and injury to their real and personal property and/or have been subjected to health risks that are typical of the experience of Class Members. Plaintiffs' interests are identical to and aligned with those of other Class Members. Plaintiffs and Class Members have suffered an array of damages all stemming from the common trunk of facts and issues related to Defendants' emissions. Those damages are as follows:

> (1)     Non-Physical Tort Claims are pursued by Class Members for emotional distress, annoyance, loss of enjoyment, nuisance, and inconvenience;

> (2)     Property Related Claims are pursued by Class Members for trespass, property damage, diminution of value and loss of use of property;

> (3)     Equitable and Injunctive Relief in the form of Medical Monitoring is pursued by Class Members.

100.     Plaintiffs have retained counsel experienced in the prosecution of class action litigation who will adequately represent the interests of the class;

> (1)     Plaintiffs and their counsel are aware of no conflicts of interest between Plaintiffs and absent Class Members or otherwise that cannot be managed through the implementation of available procedures;

> (2)     Plaintiffs, through their counsel have adequate financial resources to assure that the interests of the class will be protected; and

25

(3)　　Plaintiffs are knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this litigation.

101.　　A class action may be maintained under Federal Rule of Civil Procedure 23(b)(2) because the parties opposing the class have acted and/or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole. Plaintiffs and the Class seek an injunction requiring:

(1)　　Amendments to Defendants' community warning plans;

(2)　　A third-party compliance audit of Defendants' waste management operations and environmental health and safety program;

(3)　　A full-site characterization of the entire affected areas to identify all impacted properties which require cleanup and to limit the opportunity for re-suspension;

(4)　　Decontamination of homes and topsoil replacement to remediate continuing threats to human health and the environment; and

(5)　　Implementation of a medical surveillance and medical monitoring program to protect Plaintiffs' and Class Members from ongoing threats to their health.

If this injunctive relief is not granted, great harm and irreparable injury to Plaintiffs and members of the Class will continue, and Plaintiffs and members of the Class have no adequate remedy at law for the injuries which are threatened to occur. Absent action from this Court, operations at the Portsmouth Site will continue to damage Plaintiffs and members of the Class and threaten future injury. Defendants' actions and inactions are generally applicable to the Class as a whole, and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Class as a whole.

102.    A class action may also be maintained under Federal Rule of Civil Procedure 23(b)(3) because common issues of law and fact predominate over those issues that might pertain to individual cases, and a class action is superior to other available procedures for the fair and efficient adjudication of this controversy. The interests of all members of the Class in establishing the liability of Defendants, and relative fault, for the release of radioactive materials are cohesive. The certification of a Class seeking damages is an appropriate means by which injured Plaintiffs and Class Members may assert claims to recover economic losses and property damage, as well as assert claims for annoyance, aggravation, and inconvenience.

103.    Furthermore, any denial of liability and defenses raised by the Defendants would be applicable to all claims presented by all members of the Class or can otherwise be managed through available procedures.

104.    Defendants' conduct presents common factual questions that predominate over any individual issues. Fundamentally, all of the Plaintiffs' claims arise out of Defendants' course of conduct causing the release of radioactive materials from the Portsmouth Site. Although Defendants' releases affected a sizable geographic area and many individuals and businesses, they can be traced back to actions taken, or not taken, by Defendants. Whether Plaintiffs and the Class Members are presenting one or more of the relevant categories of Non-Physical Tort Claims, Property Claims, and Medical Monitoring, they will present common liability proof that is the same for each member of the Class. Across claim categories, Plaintiffs' common proof of Defendants' liability will involve the same cast of characters, events, discovery, documents, fact witnesses, and experts.

105.    The need for proof of Plaintiffs' and Class Members' damages will not cause individual issues to predominate over common questions. The amounts of economic and non-economic losses, consistent with each of the categories of claims, can be efficiently demonstrated either at trial or as part of routine claims administration through accepted and court-approved methodologies with the assistance of court-appointed personnel, including Special Masters. Certain types or elements of damage are subject to proof using aggregate damage methodologies or simply rote calculation and summation.

106.    A class action is superior to maintenance of these claims on a claim-by-claim basis when all actions arise out of the same circumstances and course of conduct. A class action allows the Court to process all rightful claims in one proceeding. Class litigation is manageable considering the opportunity to afford reasonable notice of significant phases of the litigation to Class Members and permit distribution of any recovery. The prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members in this action, is impracticable and would create a massive and unnecessary burden on the resources of the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of each member of the class or subclasses, should that be determined to be appropriate.

107.    The conduct of this action as a class action conserves the resources of the parties and the court system, protects the rights of each member of the class, and meets all due process requirements.

108.     Certification of the Class with respect to particular common factual and legal issues concerning liability and comparative fault, as well as the necessary and appropriate quantum of punitive damages, or ratio of punitive damages to actual harm, is appropriate under Federal Rule of Civil Procedure 23(c)(4).

109.     The particular common issues of liability, comparative fault, and the quantum of punitive damages or ratio of punitive damages to actual harm are common to all Class Members no matter what type of harm or injury was suffered by each Class Member.

## VII.
## CAUSES OF ACTION

110.     Each cause of action alleged herein is brought against each Defendant.

## COUNT ONE—VIOLATION OF THE PRICE-ANDERSON ACT

111.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

112.     In 1957, Congress amended the Atomic Energy Act to implement its policy to foster private sector participation in the nuclear energy industry. These 1957 amendments became known as the PAA. The uranium and other radioactive substances processed, handled, stored, and/or disposed of by Defendants at the Portsmouth Site include, but are not limited to, nuclear by-product materials, special nuclear materials, and/or source materials. 42 U.S.C. § 2014(e), (z), (aa). Any release of these byproducts, special nuclear, or source materials causing bodily injury, sickness, disease, death, loss or damage to property, or loss of use of property constitutes a "nuclear incident" under the terms of the PAA. 42 U.S.C. § 2014(q).

113.     In 1988, Congress enacted the Price-Anderson Amendments Act of 1988, which explicitly created a federal cause of action for "public liability actions" that arise from nuclear incidents. *Nieman v. NLO, Inc*., 108 F.3d 1546, 1549 (6th Cir. 1997). A public liability action is

defined as "any legal liability arising out of or resulting from a 'nuclear incident.'" *Id*. at 1550. A nuclear incident, in turn, is "any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." *Id*. (quoting 42 U.S.C. § 2014(q)).

114.    To prevail on a claim under the PAA, Plaintiffs must establish four elements: (1) Defendants released radiation into the environment in excess of federal regulatory limits; (2) Plaintiffs were exposed to this radiation; (3) Plaintiffs have injuries; and (4) radiation was the cause of those injuries. *See In re TMI*, 67 F.3d 1103, 1119 (3d Cir. 1995). The federal regulatory limits applicable to this case can be found in 10 C.F.R. § 20.1301. *See Adkins v. Chevron Corp*., 960 F. Supp. 2d 761, 769 (E.D. Tenn. 2012) ("The permissible dose limits are found at 10 C.F.R. § 20.1301."). In particular, 10 C.F.R. § 20.1301(e) states that "in addition to the requirements of this part, a licensee is subject to the provision of EPA's generally applicable environmental radiation standards in 40 CFR part 190 shall comply with those standards."

115.    In accordance with the PAA, the Plaintiffs allege that: (1) the Defendants released radiation into the environment in excess of federal regulatory limits; (2) The Plaintiffs were exposed to the radiation released by the Defendants; (3)  Plaintiffs have injuries, including loss or damage to property, and/or loss of use of property; and (4) The radiation released by the Defendants was the cause of the Plaintiffs' injuries. Within the terms of the PAA, Plaintiffs further allege a public liability action based upon a "nuclear incident," or series of such incidents.

116.     Each Defendant's conduct constituted a "nuclear incident" within the meaning of the PAA because it was an occurrence within the United States causing loss or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material.

117.     Pursuant to the PAA, the substantive rules for decision in this action arising under 28 U.S.C. § 2210 shall be derived from the law of the State in which the nuclear incident involved occurred, namely, Ohio, unless such law is inconsistent with the provisions of such section.

118.     Ohio substantive rules for decision provide that a person is strictly liable for harm, injury, or damage arising from an abnormally dangerous/ultra-hazardous/unreasonably hazardous activity. Processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials which pose a significant risk of harm to persons living and working in the vicinity of the operation constitute such abnormally dangerous/ultra-hazardous/unreasonably hazardous activity under Ohio law.

119.     Defendants' conduct in the processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials posed significant risk of harm to persons living and working in the vicinity of the operation. The consequences of nuclear accidents or incidents to health, property, and the environment are extremely dire, and can be measured in millions, if not billions of dollars. It is not possible to eliminate all of the risk by taking reasonable precautions. Finally, the processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials has never been a matter of common usage; indeed, private operators historically were not permitted to engage in such activities at all. The conduct of Defendants' activities at the Portsmouth Site constituted abnormally dangerous activities.

120.     Defendants owed to Plaintiffs a duty of due care which could only be satisfied by the legal, safe, and proper processing, handling, storage, and/or disposal of the radioactive, toxic, and hazardous substances in Defendants' possession. Defendants had a duty to prevent the discharge or release of such substances that might harm Plaintiffs. Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to radioactive, toxic, and hazardous substances, and to warn or notify Plaintiffs of the fact that discharges or releases of these substances had occurred and were likely to occur in the future.

121.     Further, Defendants had a duty to comply with applicable state, federal, and local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials.

122.     Some Defendants applied for, obtained, and operated pursuant to an NRC license, and other Defendants were contractors operating on a site whose operations were regulated by an NRC license. All Defendants are liable for their activities at the site.

123.     Defendants are subject to the provisions of EPA's generally applicable environmental radiation standards in 40 CFR part 190, pursuant to 10 C.F.R. § 20.1301(e).

124.     Defendants breached these duties by their negligent, grossly negligent, and reckless processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials at the Portsmouth Site. Such conduct was in utter non-compliance with applicable federal, state, and local laws, regulations, and guidelines. Defendants' negligent, grossly negligent, reckless, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances into the communities surrounding the Portsmouth Site. These actual and continued releases subjected Plaintiffs to an unreasonable risk of harm, and to loss or damage to property, or loss of use of property. Defendants also failed to warn Plaintiffs of the actual and

threatened releases of such hazardous, toxic, and radioactive substances and of the reasonably foreseeable effects of such releases, an omission that was negligent, grossly negligent, and reckless. Finally, Defendants failed to act to prevent their releases from harming Plaintiffs.

125.    To the extent Defendants were or are subject to applicable federal regulations, Defendants breached their duty by violating federal regulations with respect to levels of radiation and concentrations of radioactive materials in unrestricted (general public) areas.

126.    Any Defendants not subject to applicable federal regulations issued pursuant to the Administrative Procedure Act, 5 U.S.C. § 500, *et seq*., are strictly liable under Ohio law.

127.    Defendants knew about the hazards associated with nuclear operations. The legislative history of the PAA, which was passed with the active participation of private companies involved in the nuclear power industry, is rife with references to the extreme consequences that could be expected in the event of a nuclear incident. Indeed, the gravity of such consequences was a major contributing factor to the passage of the PAA. These Defendants knew or should have known that their generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic, and hazardous substances, and exposure to gamma radiation from the uranium storage yard, in connection with their operations at the Portsmouth Site would result in actual injuries and increased risks to the persons, property, and economic interests of the public without taking proper safety precautions.

128.    The Defendants released radiation, including, but not limited to the following ways:

   a.      Defendants Centrus and its predecessor in interest USEC released radiation and contributed to the overexposure to radiation through actions which contributed to airborne particulate matter containing radionuclides to contaminate the

Plaintiffs' properties in excess of 10 C.F.R. § 20.1301 by: (1) failing to shut down the gaseous diffusion plant properly thereby negligently concentrating dangerous radionuclides which later were released into the environment during the subsequent remediation of the gaseous diffusion facilities; and, (2) failing to properly design, manage, and implement the remediation efforts throughout the PORTS facility which has allowed airborne particulate matter containing radionuclides to contaminate the Plaintiffs' properties; and (3) failing to properly design, manage, and implement the operation and remediation of the Depleted Uranium operations.

      b.      Defendants Uranium Disposition Services, BWXT Conversion Services, and Mid-America Conversion Services released radiation and contributed to the overexposure to radiation by (1) failing to properly contain airborne particulate matter associated with Depleted Uranium operations; and (2) failing to contain numerous leaks, emissions, and releases during operations, where those releases contained Uranium-238, which later decayed into Lead-210, Thorium-230, Radium-226, and Polonium-210, which now contaminates the Plaintiffs' properties.

      c.      Defendants, Bechtel Jacobs Company, Lata/Parallax Portsmouth, and Fluor-BWXT Portsmouth released radiation and contributed to the overexposure to radiation by failing to properly contain enormous clouds of dust and excessive airborne particulate matter containing Uranium-238, Uranium-235, Uranium-234, Neptunium-237, Plutonium-238, Lead-210, Thorium-230, Radium-226, and Polonium-210 in the course of their remediation work.

      129.      The radiation released by the Defendants was in excess of the federal regulatory dose limits set forth in 10 C.F.R. § 20.1301.

130.     Subpart (e) of 10 C.F.R. § 20.1301 ("Dose limits for individual members of the public") provides that "[i]n addition to the requirements of this part, a licensee subject to the provisions of EPA's generally applicable environmental radiation standards in 40 CFR part 190 shall comply with those standards." Within 40 C.F.R. part 190, 40 C.F.R. § 190.01 ("Applicability") provides that "The provisions of this part apply to radiation doses received by members of the public in the general environment and to radioactive materials introduced into the general environment as the result of operations which are part of a nuclear fuel cycle." The "[n]uclear fuel cycle" is defined as "the operations to be associated with the production of electrical power for public use by any fuel cycle through utilization of nuclear energy." 40 C.F.R. § 190.02(a). In addition, Section 190.02 defines the "[u]ranium fuel cycle" as " the operations of milling uranium ore, chemical conversion of uranium, isotopic enrichment of uranium, fabrication of uranium fuel, generation of electricity by a light-water-cooled nuclear power plant using uranium fuel, and reprocessing of spent uranium fuel, to the extent that these directly support the production of electrical power for public use utilizing nuclear energy, but excludes mining operations, operations at waste disposal sites, transportation of any radioactive material in support of these operations, and the reuse of recovered non-uranium special nuclear and by-product materials from the cycle." 40 C.F.R. § 190.02(b).

131.     The Defendants named herein are all engaged in operations at PORTS which are part of the uranium fuel cycle and/or the nuclear fuel cycle.

132.     40 C.F.R. § 190.10 ("Standards for normal operations") provides that "Operations covered by this subpart shall be conducted in such a manner as to provide reasonable assurance that: (a) The annual dose equivalent does not exceed 25 millirems to the whole body, 75 millirems to the thyroid, and 25 millirems to any other organ of any member of the public as the

result of exposures to planned discharges of radioactive materials, radon and its daughters excepted, to the general environment from uranium fuel cycle operations and to radiation from these operations."

133.    Putative Class Representatives Ursula McGlone and Jason McGlone have resided on their property since approximately September 2012 and have raised their five minor children, L.M., G.M., B.M., E.M., and M.M, on their property.  They are also raising their grandson, T.M. (T.M. is the natural son of L.M., who is also a minor). More specific information about each child is as follows:

a)    L.M. is currently fifteen years old and has lived on the property since she was seven years old;

b)    T.M. is less than one year old and has lived on the property for his entire life;

c)    G.M. is currently twelve years old and has lived on the property since he was four years old;

d)    B.M. is currently twelve years old and has lived on the property since he was four years old;

e)    E.M. is currently eleven years old and has lived on the property since he was three years old; and

f)    M.M. is currently four years old and has lived on the property for his entire life.

134.    Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the McGlone property sufficient to deliver a dose of 234.3 millirem to the bone surface and 427.6 millirem to the spleen of a 3-month-old infant.  Using International Commission on Radiological Protection ("ICRP") modeling, the doses to the bone surface and spleen of a 3-month-old infant at the McGlone

property are respectively 9.372 and 17.104 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

135. Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the McGlone property sufficient to deliver a total effective dose of 45.4 millirem to a 3-month-old infant. Using ICRP modeling, the total effective dose to a 3-month-old infant at the McGlone property is 1.8 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

136. Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the McGlone property sufficient to deliver a dose of 234.3 millirem to the bone surface and 427.6 millirem to the spleen of an 1-year-old child. Using ICRP modeling, the doses to the bone surface and spleen of a 1-year-old child at the McGlone property are respectively 9.3 and 17.1 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

137. Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the McGlone property sufficient to deliver a dose of 26.4 millirem to the bone surface and 79.7 millirem to the spleen of an 5-year-old child. Using ICRP modeling, the doses to the bone surface and spleen of a 5-year-old infant at the McGlone property are respectively 1.056 and 3.1 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

138. Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the McGlone property sufficient to deliver a dose of 48.6 millirem to the spleen of a 10-year-old child. Using ICRP

modeling, the dose to the spleen of a 10-year-old child at the McGlone property is 1.94 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

139.    Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the McGlone property sufficient to deliver a dose of 41.5 millirem to the bone surface and 31.2 millirem to the spleen of an 15-year-old child. Using ICRP modeling, the doses to the bone surface and spleen of a 15-year-old child at the McGlone property are respectively 1.6 and 1.248 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

140.    Putative Class Representatives Ursula McGlone's and Jason McGlone's property has been contaminated in excess of the limits established in 10 C.F.R. § 20.1301 to the extent that the property is no longer safe enough to use for raising children.

141.    Putative Class Representative Patsy Brownfield owns multiple properties on Delay Drive in Piketon, Ohio. The properties are contiguous. These properties have been occupied by Ms. Brownfield and/or her adult family members for decades. Ms. Brownfield's daughter raised her own son (Ms. Brownfield's grandson) on one of the properties. That grandson is currently 21 years old and has lived on the property since he was one year old.

142.    Scientific analysis revealed the presence of Neptunium-237, Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Brownfield property sufficient to deliver a total effective dose of 109.9 millirem to a 3-month-old infant. Using ICRP modeling, the total effective dose to a 3-month-old infant at the Brownfield property is 4.396 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e), 40 C.F.R. § 190.10 and 10 C.F.R. § 20.1301(a).

143. Scientific analysis revealed the presence of Neptunium-237, Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Brownfield property sufficient to deliver a dose of 457.9 millirem to the bone surface and 969.8 millirem to the spleen of a 3-month-old infant.  Using ICRP modeling the doses to the bone surface and spleen of a 3-month-old infant at the Brownfield property are respectively 18.3 and 38.7 times  in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

144. Scientific analysis revealed the presence of Neptunium-237, Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Brownfield property sufficient to deliver a total effective dose of 36.8 millirem to a 1-year-old child. Using ICRP modeling, the total effective dose to a 1-year-old child at the Brownfield property is 1.4 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

145. Scientific analysis revealed the presence of Neptunium-237, Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Brownfield property sufficient to deliver a dose of 111.7 millirem to the bone surface and 39.1 millirem to the spleen of a 1-year-old child. Using ICRP modeling, the doses to the bone surface and spleen of a 1-year-old child at the Brownfield property are respectively 4.4 and 1.5 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

146. Scientific analysis revealed the presence of Neptunium-237, Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Brownfield property sufficient to deliver a dose of 47.8 millirem to the bone surface and 180.7 millirem to the spleen of a 5-year-old child. Using ICRP modeling, the doses to the bone surface and spleen of a 5-year-old child at the Brownfield property are respectively 1.9 and 7.2 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

147.    Scientific analysis revealed the presence of Neptunium-237, Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Brownfield property sufficient to deliver a dose of 33 millirem to the bone surface and 110 millirem to the spleen of a 10-year-old child. Using ICRP modeling, the doses to the bone surface and spleen of a 10-year-old child at the Brownfield property are respectively 1.32 and 4.4 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

148.    Scientific analysis revealed the presence of Neptunium-237, Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Brownfield property sufficient to deliver a dose of 36.1 millirem to the bone surface and 70.6 millirem to the spleen of an 15-year-old child. Using ICRP modeling, the doses to the bone surface and spleen of a 15-year-old child at the Brownfield property are respectively 1.4 and 2.8 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

149.    Scientific analysis revealed the presence of Neptunium-237, Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Brownfield property sufficient to deliver a dose of 48.5 millirem to the spleen of an adult. Using ICRP modeling, the doses to the spleen of an adult at the Brownfield property is 1.9 times  in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

150.    Putative Class Representative Patsy Brownfield's property has been contaminated in excess of the limits established in 10 C.F.R. § 20.1301 to the extent that the property is no longer safe enough to use for raising children.

151.    Putative Class Representatives Joshua Ross and Rachel Ross have resided on their property since approximately June 2004 and have raised their two minor children, J.R. and N.R.,

and their adult child, Adam Ross, for whom they are legal guardians, on their property. More specific information about each child is as follows:

a)   J.R. is currently nine years old and has lived on the property for his entire life;

b)   N.R. is currently eleven years old and has lived on the property for his entire life; and

c)   Adam Ross is currently twenty years old and has lived on the property since he was four years old.

152.   Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Ross property sufficient to deliver a dose of 352.4 millirem to the bone surface and 820.5 millirem to the spleen of a 3-month-old infant. Using ICRP modeling, the doses to the bone surface and spleen of a 3-month-old infant at the Ross property are respectively 14 and 32.8 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

153.   Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Ross property sufficient to deliver a total effective dose of 90.8 millirem to a 3-month-old infant.  Using ICRP modeling, the total effective dose to a 3-month-old infant at the Ross property is 3.6 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

154.   Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Ross property sufficient to deliver a dose of 89.6 millirem to the bone surface and 33 millirem to the spleen of a 1-year-old child. Using ICRP modeling, the doses to the bone surface and spleen of a 1-year-old child at the Ross property are respectively 3.5 and 1.32 times  in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

155.    Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Ross property sufficient to deliver a dose of 36.3 millirem to the bone surface and 152.9 millirem to the spleen of an 5-year-old child. Using ICRP modeling, the doses to the bone surface and spleen of a 5-year-old infant at the Ross property are respectively 1.4 and 6.1 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

156.    Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Ross property sufficient to deliver a dose of 93.3 millirem to the spleen of a 10-year-old child. Using ICRP modeling, the dose to the spleen of a 10-year-old child at the Ross property is 3.7 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

157.    Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Ross property sufficient to deliver a dose of 59.7 millirem to the spleen of a 15-year-old child. Using ICRP modeling, the doses to the spleen of a 15-year-old child at the Ross property is 2.38 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

158.    Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Ross property sufficient to deliver a dose of 41 millirem to the spleen of an adult. Using ICRP modeling, the doses to the spleen of an adult at the Ross property is 1.6 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

159. Putative Class Representatives Joshua and Rachel Ross's property has been contaminated in excess of the limits established in 10 C.F.R. § 20.1301 to the extent that the property is no longer safe enough to use for raising children.

160. Putative Class Representatives Brittani Rider and Adam Rider have resided on their property since approximately October 2009 and have raised their four minor children, M.R., C.R., L.R., and L.R., on their property. More specific information about each child is as follows:

  a) M.R. is currently thirteen years old and has lived on the property since she was two years old;

  b) C.R. is currently ten years old and has lived on the property for his entire life;

  c) L.R. is currently six years old and has lived on the property for his entire life; and

  d) L.R. is currently six years old and has lived on the property for his entire life.

161. Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Rider property sufficient to deliver a dose of 98.2 millirem to the bone surface of a 3-month-old infant. Using ICRP modeling, the dose to the bone surface of a 3-month-old infant at the Rider property is 3.9 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

162. Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Rider property sufficient to deliver a dose of 29.6 millirem to the bone surface of a 15-year-old child. Using ICRP modeling, the dose to the bone surface of a 15-year-old child at the Rider property is 1.1 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

163.     Putative Class Representatives Brittani Rider's and Adam Rider's property has been contaminated in excess of the limits established in 10 C.F.R. § 20.1301 to the extent that the property is no longer safe enough to use for raising children.

164.     Putative Class Representatives Mickey Tackett and Heather Tackett have resided on their property for approximately three years.

165.     Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Tackett property sufficient to deliver a dose of 119.7 millirem to the bone surface and 196.2 millirem to the spleen of a 3-month-old infant. Using ICRP modeling, the doses to the bone surface and spleen of a 3-month-old infant at the Tackett property are respectively 4.7 and 7.8 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

166.     Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Plutonium-238, Polonium-210, and Radium-226 on the Tackett property sufficient to deliver a dose of 26.7 millirem to the bone surface of a 1-year-old child. Using ICRP modeling, the doses to the bone surface of a 1-year-old child at the Tackett property is 1.06 times in excess of the federal regulatory limits in 10 C.F.R. § 20.1301(e) and 40 C.F.R. § 190.10.

167.     Putative Class Representatives Mickey Tackett and Heather Tackett's property has been contaminated in excess of the limits established in 10 C.F.R. § 20.1301 to the extent that the property is no longer safe enough to use for raising children.

168.     The Plaintiffs, and their properties, were exposed to the radiation released by the Defendants.

169.     The Plaintiffs, and their properties, have injuries and damage caused by the radiation released by Defendants.   Specifically, Plaintiffs have suffered loss of property, damage

to property, and loss of use of property. *See* 42 U.S.C. § 2014(q). The Class area has experienced elevated rates of cancer and other radiation-related health problems caused by the overexposure to radiation. Also, Plaintiffs' properties have been damaged by radiation overexposure which detrimentally affects Plaintiffs' use of their properties. This radiation contamination constitutes actual, physical damage to the Plaintiffs' properties, and this damage is substantial and has caused a substantial interference of Plaintiffs' use of its properties and substantial physical damage. For example, the overexposure has caused diminution of property value, loss of enjoyment of property, annoyance, inconvenience, and emotional distress, all of which fit within the types of compensable damages set forth in 42 U.S.C. § 2014(q). Radiation is a highly potent form of contamination that physically impacts the property. Defendants' negligence has contaminated Plaintiffs' properties with harmful radiation and in doing so has rendered Plaintiffs' properties into death traps unsuitable for the rearing of children. Defendants' contamination now undermines Plaintiffs' ability to allow their children to play in their yards and community, ability to live in their homes without elevated risk of health problems and with the closure of Zahn's Middle School, even attend school. The concentration of radioactive contaminants on Plaintiffs' properties is likely to (and, in fact, has) caused harm to human health in the form of elevated rates of cancer and other health impacts such that it is unsafe to raise children on the property.

170. Some of Plaintiffs' children play in the creek bed and track radioactive material into their schools and homes. These creek beds and stream beds are contaminated with radioactive material. The children are in direct contact with these sediments. The stream sediments spread downstream, in a concentrated less diluted form, unlike airborne plumes that spread and dilute.

171.    Plaintiffs and the Class continue to be exposed to radioactive contaminants, which are known to be carcinogenic substances, and other hazardous and toxic materials at a concentration higher than expected for the general populace.

172.    Plaintiffs and the Class face a lifetime of latent, dread medical, and emotional conditions proven to be linked to exposure to radioactive particles.

173.    One or more of Defendants' tortious actions resulting in radioactive pollution have invaded the legal protections afforded Plaintiffs and the Class by the laws of Ohio.

174.    Plaintiffs and the Class will benefit from medical monitoring for the aforementioned medical and emotional conditions because testing and continued monitoring will bring to light the onset of these medical and emotional conditions so that treatment and intervention may begin at the earliest point possible.

175.    Plaintiffs and the Class will benefit from a medical monitoring program featuring an epidemiological component that collects and analyzes medical monitoring results so that other unrecognized latent, dread diseases that may be associated with exposure to radioactive particles may be identified so that treating professionals may better care for the Class Members and so that medical professionals engaged in the research and development of new treatment will have access to a broader universe of data.

176.    In addition, Plaintiffs and the Class will require ongoing care for the conditions which are known to result from exposure to radioactive particles.

177.    The harms visited upon Plaintiffs and the Class are irreparable.

178.    Money damages will not suffice because it is impossible to predict with any certainty the costs of such monitoring and treatment for each individual class member nor is it

possible to predict new treatment and intervention protocol that may be developed as data from medical monitoring of the Class is provided to the medical research community.

179.    Furthermore, money damages will not suffice because an award of money damages for future monitoring and treatment would not result in comprehensive programs, whereby important information is shared among the medical community so that new treatments, protocols, intervention and tests may be developed.

180.    Plaintiffs, on behalf of all those similarly situated, seek a Court-administered fund replenished from time-to-time by one or more of Defendants to achieve such injunctive and equitable relief as necessary for the continuing benefit of the Class, including a court-administered medical monitoring program.

181.    Given the immense wealth of Defendants, such injunctive and equitable relief presents no undue burden or irreparable damage to the Defendants.

182.    Federal regulations control the standard of care for Plaintiffs' public liability action under the PAA. Under the umbrella of Plaintiffs' PAA claim, Plaintiffs assert the following state law causes of action:

<u>**COUNT ONE (A)—NEGLIGENCE/GROSS NEGLIGENCE**</u>

183.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

184.    One or more of the Defendants' conduct, acts, and omissions violated duties owed to Plaintiffs and the Class. Defendants' negligence proximately caused damage to Plaintiffs and the Class.

185.    One or more of the Defendants failed to act as a reasonably prudent nuclear operator under like circumstances would.

186.     One or more of the Defendants' failure to warn also constitutes negligence.

## COUNT ONE (B)—TRESPASS

187.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

188.     One or more of the Defendants' conduct as set forth herein constitutes trespass. Indeed, Defendants' actions caused the entry of unauthorized radioactive contaminants onto Plaintiffs' properties and the Class Members' properties, which resulted in damages to Plaintiffs and the Class.

## COUNT ONE (C)—NUISANCE

189.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

190.     One or more of Defendants' conduct as set forth herein constitutes the tort of nuisance which is ongoing. Indeed, Defendants' conduct has negligently created a potential and unreasonable risk of harm which has affected Plaintiffs' interest in their, and the Class Members' properties.  This has resulted in damages to Plaintiffs and the Class.

## COUNT ONE (D)—ULTRA-HAZARDOUS ACTIVITY/ABSOLUTE LIABILITY/STRICT LIABILITY

191.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

192.     One or more Defendants' conduct as set forth herein constitutes the tort of abnormally dangerous/ultra-hazardous/abnormally hazardous activity. Indeed, the production of uranium is an abnormally dangerous activity under Ohio law. Defendants' conduct has resulted in damages to Plaintiffs and the Class for which Defendants, or one or more of them, are strictly/absolutely liable.

## COUNT TWO—STATE-LAW CLAIMS AS TO NON-RADIOACTIVE
## HAZARDOUS SUBSTANCES/WASTES ONLY

193.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs

as if fully restated herein.

194.    To the extent that the contamination of the Plaintiffs' properties and/or other

damages of the Plaintiffs is caused by non-radioactive releases, substances, and/or wastes, the

Plaintiffs assert the following state-law claims.

195.    By asserting the following state-law claims, the Plaintiffs are not asserting these

claims at this time as to any contamination or releases of radioactive materials which would be,

or could be, governed by the Price-Anderson Act.[2]

196.    Plaintiffs and the Class have been and continue to be exposed to hazardous and

toxic materials, substances, and wastes at a concentration higher than expected for the general

populace.

197.    Plaintiffs and the Class face a lifetime of latent, dread medical, and emotional

conditions proven to be linked to exposure to hazardous and toxic materials, substances, and

wastes.

198.    One or more of the Defendants' tortious actions resulting in hazardous and toxic

materials, substances, and waste pollution have invaded the legal protections afforded Plaintiffs

and the Class by the laws of Ohio.

199.    Plaintiffs and the Class will benefit from medical monitoring for the

aforementioned medical and emotional conditions because testing and continued monitoring will

---

[2]  Plaintiffs reserve their right to assert, in the alternative, state law claims as to radioactive contamination or releases only upon the occurrence of contingent circumstances, such as dismissal of their PAA claim and/or determination that the PAA does not apply.

bring to light the onset of these medical and emotional conditions so that treatment and intervention may begin at the earliest point possible.

200.     Plaintiffs and the Class will benefit from a medical monitoring program featuring an epidemiological component that collects and analyzes medical monitoring results so that other heretofore unrecognized latent, dread diseases that may be associated with exposure to hazardous and toxic materials, substances, and wastes may be identified so that treating professionals may better care for the Class Members and so that medical professionals engaged in the research and development of new treatment will have access to a broader universe of data.

201.     The Court has already ruled that the McGlone and Rider Plaintiffs have successfully alleged claims for breaches of trespass, private nuisance, negligence/gross negligence, and ultra-hazardous activity under Ohio law.  *See* Doc. 113 at PAGE ID #: 1691-95.

## COUNT TWO (A)—NEGLIGENCE/GROSS NEGLIGENCE

202.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

203.     One or more of the Defendants' conduct, acts, and omissions, with respect to hazardous substances and/or wastes, violated duties owed to Plaintiffs and the Class. Defendants' negligence proximately caused damage to Plaintiffs and the Class.

204.     One or more of the Defendants failed to act as a reasonably prudent operator under like circumstances would.

205.     One or more of the Defendants' failure to warn also constitutes negligence.

## COUNT TWO (B)—TRESPASS

206.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

207.     One or more of the Defendants' conduct, as to hazardous substances and/or wastes, as set forth herein constitutes trespass, which resulted in damages to Plaintiffs and the Class.

## COUNT TWO (C)—NUISANCE

208.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

209.     One or more of Defendants' conduct as set forth herein, as to hazardous substances and/or wastes, constitutes the tort of nuisance which is ongoing and has resulted in damages to Plaintiffs and the Class.

## COUNT TWO (D)—ULTRA-HAZARDOUS ACTIVITY/ABSOLUTE LIABILITY/STRICT LIABILITY

210.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

211.     One or more Defendants' conduct as set forth herein constitutes the tort of abnormally dangerous/ultra-hazardous/abnormally hazardous activity, which resulted in damages to Plaintiffs and the Class for which Defendants, or one or more of them, are strictly/absolutely liable.

## RESERVATION OF RIGHTS

212.     Out of an abundance of caution, Plaintiffs reallege all counts that were dismissed in the Opinion and Order dated July 31, 2020 (Doc. 113) in order to preserve these claims for a potential appeal.

## DEMAND FOR JURY TRIAL

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this Complaint that are so triable as a matter of right.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for a Jury Trial and for the following relief:

(1)  An Order certifying this action to proceed as a Class Action, authorizing Plaintiffs to represent the interests of the Class (or subclasses, as appropriate) and appointing undersigned counsel to represent the Class;

(2)  An award of damages or mechanism for recovery for Class Members who incurred any out-of-pocket expenses as a result of Defendants' acts or omissions along with an award of damages to pay for any necessary mitigation or remediation of Class Members' properties;

(3)  An award of damages or mechanism for recovery to compensate for loss of use and enjoyment of property, annoyance, nuisance, aggravation, and inconvenience as a result of Defendants' acts or omissions;

(4)  An award of punitive damages for all Class Members who were exposed to radioactive materials and/or toxic and/or hazardous materials/wastes as a result of Defendants' acts or omissions;

(5)  A finding that Defendants are jointly and severally liable to the Plaintiffs for any and all damages, whether found or awarded by the Court or a jury;

(6)  An Order implementing a remediation and restoration, including full-site characterization and cleanup of the Plaintiffs' properties;

(7)  An Order implementing a medical surveillance and medical monitoring program;

(8)  Prejudgment and post-judgment interest;

(9)     An Order establishing such administrative procedures as are reasonable to effectuate the relief granted to Plaintiffs and the Class Members;

(10)     Declaratory relief clarifying the rights and obligations of the parties to each other;

(11)     An order directing Defendants to pay for the costs of this proceeding, including reasonable attorneys' fees and costs, including, but not limited to, costs of Class notice and administration; and

(12)     Such other relief as the Court or jury may deem appropriate.

Respectfully submitted,

s/Mark F. Underwood
Mark F. Underwood (Tx.# 24059341)(WV# 7028)
**Underwood Law Offices**
923 Third Avenue
Huntington, WV  25701
Telephone: (304) 209-4387
munderwood@underwoodlawoffices.com

Stuart E. Scott (0064834)
Kevin C. Hulick (0093921)
**Spangenberg Shibley & Liber LLP**
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
Telephone: (216) 696-3232
Facsimile: (216) 696-3924
sscott@spanglaw.com
khulick@spanglaw.com

Jason A. Leasure (0081684)
Matthew R. Oliver (0097318)
**Vital & Vital, L.C.**
536 Fifth Avenue
Huntington, WV  25701
Telephone: (304) 525-0320
jleasure@vitallc.com
moliver@vitallc.com

Stuart H.Smith
Celeste Brustowicz
Victor Cobb

**Cooper Law Firm, LLC**
1525 Religious Street
New Orleans, LA  70130
Telephone: (504) 399-0009
cbrustowicz@sch-llc.com
vcobb@sch-llc.com
ssmith@sch-llc.com

Kevin W. Thompson
David R. Barney, Jr.
**Thompson Barney**
2030 Kanawha Boulevard, East
Charleston, WV  25311
Telephone: (304) 343-4401
Facsimile: (304) 343-4405
kwthompsonwv@gmail.com
drbarneywv@gmail.com

**ATTORNEYS FOR PLAINTIFFS**